UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                     :

UNITED STATES OF AMERICA         :
                                     :

          - v. -           :                  S6 20 Cr. 160 (MKV)
                                     :

ERICA GARCIA,                :
MARCOS ZULUETA,        :
MICHAEL TANNUZZO,     :
SETH FISHMAN,          :
LISA GIANNELLI,         :
JORDAN FISHMAN,       :
RICK DANE, JR.,         :
CHRISTOPHER OAKES,    :
JASON SERVIS,          :
ALEXANDER CHAN, and    :
REBECCA LINKE,        :
                                     :

              Defendants.      :
                                     :
                                     :
------------------------------------------------------x

# THE GOVERNMENT'S OMNIBUS BRIEF IN OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS TO SUPPRESS CERTAIN INTERCEPTED COMMUNICATIONS AND EVIDENCE OBTAINED FROM PREMISES SEARCHES, CELLPHONE SEARCHES, AND SEARCHES OF ELECTRONICALL STORED INFORMATION

                                    AUDREY STRAUSS
                                      United States Attorney
                                      Southern District of New York

Andrew C. Adams
Sarah Mortazavi
Anden Chow
Assistant United States Attorneys
*- Of Counsel -*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT .......................................................................................................................... 9

I.     APPLICABLE LAW ................................................................................................... 9

   A.   Probable Cause .................................................................................................. 9

   B.   Reasonable Alternative Techniques Under 18 U.S.C. § 2518(1)(c) ................. 14

   C.   Misrepresentations and Omissions in an Affidavit .......................................... 16

   D.   Standing............................................................................................................ 20

   E.   Good Faith Exception ....................................................................................... 22

   F.   Fruit of the Poisonous Tree .............................................................................. 23

II.    DISCUSSION .......................................................................................................... 25

   A.   Seth Fishman's Motions to Suppress ............................................................... 25

   B.   Lisa Giannelli's Motions to Suppress .............................................................. 57

   C.   Jordan Fishman's Motion to Suppress ............................................................. 62

   D.   Erica Garcia's Motions to Suppress ................................................................. 62

   E.   Jason Servis and Alexander Chan's Motions to Suppress ................................ 86

   F.   Christopher Oakes' Motions to Suppress ....................................................... 124

   CONCLUSION ...................................................................................................... 143

## TABLE OF AUTHORITIES

CASES

*Franks v. Delaware*,
438 U.S. 154 (1978) ................................................................................. 17, 19, 20, 47, 143

*Illinois v. Gates*,
462 U.S. 213 (1983) ........................................................................................... 11, 12, 123

*Murray v. United States*,
487 U.S. 533 (1988) ................................................................................................... 23

*Rakas* v. *Illinois*,
439 U.S. 128 (1978) .............................................................................................. 20-21

*Rivera v. United States*,
928 F.2d 592 (2d Cir. 1991) ..................................................................................... 17

*Spinelli v. United States*,
393 U.S. 410 (1969) .................................................................................................. 10

*United States v. Ambrosio*,
898 F. Supp. 177 (S.D.N.Y. 1995) ...................................................................... 10, 23

*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) ......................................................... 17-19, 73, 78, 79

*United States v. Barlin*,
686 F.2d 81 (2d Cir. 1982) ............................................................................ 82, 144

*United States v. Bellomo*,
954 F. Supp. 630 (S.D.N.Y. 1997) .................................................................. 23, 46-47

*United States v. Bianco*,
998 F.2d 1112 (2d Cir. 1993) .................................................................................. 47

*United States v. Brown*,
744 F. Supp. 558 (S.D.N.Y. 1990) ........................................................................ 18

*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000) ...................................................................... 17, 20, 110

*United States v. Cardona*,
No. 14 Cr. 314 (RA), 2015 WL 769577 (S.D.N.Y. Feb. 24, 2015) ................................. 139

*United States v. Caruso*,
415 F. Supp. 847 (S.D.N.Y. 1976) ........................................................................ 25

*United States v. Clark*,
    638 F.3d 89 (2d Cir. 2011) ............................................................................ 17, 85

*United States v. Concepcion*,
    579 F.3d 214 (2d Cir. 2009) ................................................. 10-16, 32, 37, 466, 122

*United States v. Conyers*,
    No. 15 Cr. 537 (VEC), 2016 WL 7189850 (S.D.N.Y. Dec. 9, 2016) ........................... 27, 62

*United States v. de la Cruz-Paulino*,
    61 F.3d 986 (1st Cir. 1995) ................................................................................ 27

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999) ......................................... 11, 13, 14, 15, 37, 71, 83, 119

*United States v. Dore*,
    586 F. App'x 42 (2d Cir. 2014) ......................................................................... 22

*United States v. Falso*,
    544 F.3d 110 (2d Cir. 2008) ......................................................................... 17, 19

*United States v. Fama*,
    758 F.2d 834 (2d Cir. 1985) ..................................................... 32, 66, 82, 144

*United States v. Fazio*,
    No. 11 Cr. 873 (KBF), 2012 WL 1195157 (S.D.N.Y. Apr. 6, 2012) ...... 28, 29, 32, 38, 47, 66, 67, 138

*United States v. Feola*,
    651 F. Supp. 1068 (SD.N.Y. 1987) ................................................................. 13, 18

*United States v. Filippi*,
    2013 WL 208919 (S.D.N.Y. Jan. 16, 2013) ......................................................... 22

*United States v. Fury*,
    554 F.2d 522 (2d Cir. 1977) ........................................................................... 10

*United States v. Gallo*,
    863 F.2d 185 (2d Cir. 1988) ........................................................................... 12

*United States v. Gangi*,
    33 F. Supp. 2d 303 (S.D.N.Y. 1999) .................................................. 10, 12, 23, 28, 64

*United States v. Gigante*,
    979 F. Supp. 959 (S.D.N.Y. 1997) ................................................................. 11, 15, 121

*United States v. Giordano*,
    416 U.S. 505 (1974) ................................................................................. 24, 25, 51

*United States v. Gotti*,
    42 F. Supp. 2d 252 (S.D.N.Y. 1999) ................................................................. 23

*United States v. Gotti*,
    459 F.3d 296 (2d Cir. 2006) ................................................................. 32, 66

*United States v. Haqq*,
    278 F.3d 44 (2d Cir. 2002) ................................................................. 20

*United States v. Herrera*,
    No. 02 Cr. 477 (LAK), 2002 WL 31133029 (S.D.N.Y. Sept. 23, 2002) ............................ 14

*United States v. Hester*,
    No. 19 Cr. 324 (NSR), 2020 WL 3483702 (S.D.N.Y. June 26, 2020) ................................ 62

*United States v. Hyde*,
    574 F.2d 856 (5th Cir. 1978) ................................................................. 13

*United States v. Ianniello*,
    621 F. Supp. 1455 (S.D.N.Y.) ................................................................. 15

*United States v. Kahn*,
    415 U.S. 143 (1974) ................................................................. 14

*United States v. Kilgore*,
    524 F.2d 957 (5th Cir. 1975) ................................................................. 24

*United States v. Klump*,
    536 F.3d 113 (2d Cir. 2008) ................................................................. 2, 16, 17, 78

*United States* v. *Labate*,
    No. 00 Cr. 632 (WHP), 2001 U.S. Dist. LEXIS 6509 (S.D.N.Y. May 18, 2001) ................... 10

*United States v. Lace*,
    669 F.2d 46 (2d Cir. 1982) ................................................................. 23, 25, 51

*United States v. Lahey*,
    967 F. Supp. 2d 698 (S.D.N.Y. 2013) ................................................................. 20, 92

*United States v. Lambus*,
    897 F.3d 368 (2d Cir. 2018) ................................................................. 19

*United States v. Leon*,
    468 U.S. 897 (1984) ................................................................. 22

*United States v. Levy*,
    No. 11 Cr. 62 (PAC), 2012 WL 5830631 (S.D.N.Y. Nov. 16, 2012) ................... 16, 37, 38, 41, 46, 140

*United States v. Lilla,*
    699 F.2d 99 (2d Cir. 1983) ................................................................. 14, 38, 68, 69

*United States v. Magaddino,*
    496 F.2d 455 (2d Cir. 1974) ................................................................. 2, 10, 16

*United States v. Mandell,*
    710 F. Supp. 2d 368 (S.D.N.Y. 2010) ................................................................. 18

*United States v. Marino,*
    664 F.2d 860 (2d Cir. 1981) ................................................................. 12-13

*United States v. Martin,*
    426 F.3d 68 (2d Cir. 2005) ................................................................. 11-12

*United States v. Mathieu,*
    No. 16 Cr. 763 (LGS), 2018 WL 5869642, at *1 (S.D.N.Y. Nov. 9, 2018) ....................................... 62

*United States v. McGuire,*
    307 F.3d 1192 (9th Cir. 2002) ................................................................. 15

*United States v. McHale,*
    495 F.2d 15 (7th Cir. 1974) ................................................................. 25

*United States v. Miller,*
    116 F.3d 641 (2d Cir. 1997) ................................................................. 14

*United States v. Montoya-Eschevarria,*
    892 F. Supp. 104 (S.D.N.Y. 1995) ................................................................. 21

*United States v. Osorio,*
    949 F.2d 38 (2d Cir. 1991) ................................................................. 21

*United States v. Padilla,*
    508 U.S. 77 (1993) (per curiam) ................................................................. 20

*United States v. Pangburn,*
    983 F.2d 449 (2d Cir. 1993) ................................................................. 138

*United States v. Paulino,*
    850 F.2d 93 (2d Cir. 1988) ................................................................. 21, 51

*United States v. Percoco,*
    No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ....................................... 62

*United States v. Perez,*
    247 F. Supp. 2d 459 (S.D.N.Y. 2003) ................................................................. 18

*United States v. Pichardo*,
 No. 97 CR. 233 (LMM), 1999 WL 649020 (S.D.N.Y. Aug. 25, 1999) ............................................. 37

*United States v. Pitts*,
 6 F .3d 1366 (9th Cir. 1993) ......................................................................................................... 82

*United States v. Pizarro, et al.*,
 No. 17 Cr. 151 (AJN), 2018 WL 1737236 (S.D.N.Y. Apr. 10, 2018) ............................................. 21

*United States v. Plotkin*,
 550 F.2d 693 (1st Cir. 1977) ......................................................................................................... 25

*United States v. Rahme*,
 813 F.2d 31 (2d Cir. 1987) ..................................................................................................... 20, 52

*United States v. Rajaratnam*,
 719 F.3d 139 (2d Cir. 2013) ......................................................................................... 19, 24, 96, 102

*United States v. Rajaratnam*,
 No. 09 Cr. 1184 (RJH), 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) ........................................ 20, 33

*United States v. Ray*,
 --- F.Supp.3d ----, 2021 WL 2134861 at *16 (S.D.N.Y. May 26) .................................................. 72

*United States v. Raymonda*,
 780 F.3d 105 (2d Cir. 2015) .......................................................................................................... 81

*United States v. Reilly*,
 76 F.3d 1271 (2d Cir. 1996) ................................................................................................... 18, 106

*United States v. Rice*,
 478 F.3d 704 (6th Cir. 2007) ......................................................................................................... 47

*United States v. Rivera*,
 750 F. Supp. 614 (S.D.N.Y. 1990) ................................................................................................ 17

*United States v. Rowell*,
 903 F.2d 899 (2d Cir. 1990) .............................................................................................. 11, 13, 82

*United States v. Ruggiero*,
 726 F.2d 913 (2d Cir. 1984) .......................................................................................................... 15

*United States v. Ruggiero*,
 824 F. Supp. 379 (S.D.N.Y. 1993) ....................................................................................... 12, 21, 51

*United States v. Saint Clair*,
 No. 19 Cr. 790 (PKC), 2021 WL 3076677 (S.D.N.Y. July 20, 2021) .............................................. 33

*United States v. Salas*,

    No. 07 Cr. 557 (JGK), 2008 U.S. Dist. LEXIS 92560 (S.D.N.Y. Nov. 5, 2008) ........................ 12, 64

*United States v. Scala*,

    388 F. Supp. 2d 396 (S.D.N.Y. 2005) ...................................................................... 12, 122

*United States v. Scasino*,

    513 F.2d 47 (5th Cir. 1975) ............................................................................................ 24

*United States v. Scully*,

    108 F. Supp. 3d 59 (E.D.N.Y. 2015) ............................................................................ 138

*United States v. Singh*,

    390 F.3d 168 (2d Cir. 2004) ............................................................................................ 81

*United States v. Smith*,

    9 F.3d 1007 (2d Cir. 1993) ...................................................................................... 13, 81

*United States v. Smith*,

    155 F.3d 1051 (9th Cir. 1998) ........................................................................................ 24

*United States v. Solomonyan*,

    451 F. Supp. 2d 626 (S.D.N.Y. 2006) ...................................................................... 10, 123

*United States v. Swain*,

    No. 08 Cr. 1175 (JFK), 2011 WL 4348142 (S.D.N.Y. Aug. 16, 2011) ............................. 26

*United States v. Swanson*,

    210 F.3d 788 (7th Cir. 2000) ......................................................................................... 17

*United States v. Tomero*,

    462 F. Supp. 2d 565 (S.D.N.Y. 2006) ................................................................. 22, 23, 46

*United States v. Torres*,

    901 F.2d 205 (2d Cir.1990) ..................................................................................... 15, 37

*United States v. Trippe*,

    171 F. Supp. 2d 230 (S.D.N.Y. 2001) ........................................................................... 15

*United States v. Ventresca*,

    380 U.S. 102 (1965) ...................................................................................................... 13

*United States v. Vilar*,

    No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ........................... 18, 72

*United States v. Wac*,

    498 F.2d 1227 (6th Cir. 1974) ....................................................................................... 24

*United States v. Wagner*,

    989 F.2d 69 (2d Cir. 1993) ............................................................... 10, 11, 16, 121, 122, 143

*United States v. Watson*,

    404 F.3d 163 (2d Cir. 2005) ........................................................................................... 21

*United States v. Whitehorn*,

    829 F.2d 1225 (2d Cir. 1987) ................................................................................... 23, 25

*United States v. Yannotti*,

    541 F.3d 112 (2d Cir. 2008) ........................................................................................... 11

*United States v. Young*,

    822 F.2d 1234 (2d Cir. 1987) ........................................................................... 14, 37, 38

*United States v. Zemlyansky*,

    945 F. Supp. 2d 438 (S.D.N.Y. 2013) ................................................................ 32, 45, 67

*Walczyk v. Rio*,

    496 F.3d 139 (2d Cir. 2007) ................................................................................... 12, 81

*Wong Sun v. United States*,

    371 U.S. 471 (1963) ............................................................................................... 23, 24

## STATUTES AND REGULATIONS

18 U.S.C. § 2510 ............................................................................................... 9, 26, 28

18 U.S.C. § 2516. ........................................................................................................... 33

18 U.S.C. § 2518 ........................................................................... 2, 10, 11, 14, 39, 72

18 U.S.C. § 2705 ................................................................................................... 140-141

18 U.S.C. § 3103a ................................................................................................ 140-142

810 Ky. Admin. Regs. 1:018 ............................................................................................ 89

810 Ky. Admin. Regs. 8:010 § 20(5) ............................................................................. 67

N.J. Admin. Code § 13 ................................................................................................... 67

9 NYCRR § 4043.12 ................................................................... 92, 114, 118, 120-121

9 NYCRR § 4043.14 ....................................................................................................... 67

9 NYCRR § 4043.16 ..................................................................................................... 112

9 NYCRR § 4120.2 ....................................................................................................... 139

9 NYCRR § 4120.17 ..................................................................................................... 139

Fed. R. Crim. P. 12 ......................................................................................................... 26

Fed. R. Crim. P. 41 ....................................................................................................... 141

## TABLE OF SHORT CITATIONS

| DESCRIPTION | SHORT CITATION | ATTACHMENT |
|---|---|---|
| October 23, 2018 Agent Affidavit In Support of Order of Interception of Surick Phone | October 23 Affidavit | Colson Declaration Exhibit A |
| December 18, 2018 Search Warrant Application for Entry to New Egypt, NJ Premises and Blood Draw | Surick Barn Search Affidavit | Adams Declaration Exhibit C |
| December 20, 2018 Agent Affidavit In Support of Order of Interception of Surick Phone | December 20 Affidavit | Adams Declaration Exhibit A |
| January 7, 2019 Agent Affidavit In Support of Order of Interception of Navarro's Phone | January 7 Affidavit | Colson Declaration Exhibit B |
| February 5, 2019 Agent Affidavit in Support of Email Search Warrant for Account JNavarroStables@gmail.com | Navarro Email Search Warrant | Adams Declaration Exhibit D |
| February 6, 2019 Agent Affidavit In Support of Order of Interception of Navarro's Phone | February 6 Affidavit | Colson Declaration Exhibit C |
| February 14, 2019 Agent Affidavit In Support of Order of Interception of Fishman and Oakes's Phones | February 14 Affidavit | Fishman Motion Exhibit A; Oakes Motion Exhibit 1 |
| March 7, 2019 Agent Affidavit In Support of Order of Interception of Navarro Phone | March 7 Affidavit | Colson Declaration Exhibit E |
| March 13, 2019 Search Warrant Application for Search of Oakes' Barn | 2019 Oakes Barn SW | Oakes Motion Exhibit 1 |

| DESCRIPTION | SHORT CITATION | ATTACHMENT |
|---|---|---|
| March 19, 2019 Agent Affidavit In Support of Order of Interception of Fishman and Oakes's Phones | March 19 Affidavit | Oakes Motion Exhibit 3 |
| March 29, 2019 Search Warrant Application for Anticipatory Search of Fishman's Cellular Phones | March 29 Fishman Phone SW | Fishman Motion Exhibit C |
| April 5, 2019 Agent Affidavit In Support of Order of Interception of Navarro's Phone | April 5 Affidavit | Colson Declaration Exhibit G |
| April 17, 2019 Agent Affidavit In Support of Order of Interception of Fishman and Giannelli's Phones | April 17 Affidavit | Fishman Motion Exhibit B |
| April 30, 2019 Agent Affidavit In Support of Order of Interception of Servis' Phone | April 30 Affidavit | Glavin Declaration Exhibit 1 |
| May 3, 2019 Agent Affidavit In Support of Order of Interception of Navarro's Phone | May 3 Affidavit | Colson Declaration Exhibit H |
| May 16, 2019 Agent Affidavit In Support of Order of Interception of Fishman's Phone | May 16 Affidavit | Adams Declaration Exhibit B |
| May 29, 2019 Agent Affidavit In Support of Order of Interception of Navarro and Servis' Phones | May 29 Affidavit | Glavin Declaration Exhibit 2; Colson Declaration Exhibit J |
| June 17, 2019 Search Warrant Application for Search of Email Accounts | Fishman Email SW | Fishman Motion Exhibit E |
| June 21, 2019 Search Warrant Application for Search of Dropbox Account | Fishman Dropbox SW | Fishman Motion Exhibit D |

x

| DESCRIPTION | SHORT CITATION | ATTACHMENT |
|---|---|---|
| June 27, 2019 Agent Affidavit In Support of Order of Interception of Servis and Rhein's Phones | June 27 Affidavit | Glavin Declaration Exhibit 3 |
| July 30, 2019 Agent Affidavit In Support of Order of Interception of Servis and Rhein's Phones | July 30 Affidavit | Glavin Declaration Exhibit 4 |
| October 25, 2019 Search Warrant Application for Search of Fishman Premises | Fishman Premises SW | Fishman Motion Exhibit F |
| January 15, 2020 Search Warrant Application for Search of Fishman's Electronic Devices | January 15 Fishman Electronics SW | Adams Declaration Exhibit E |
| February 7, 2020 Search Warrant Application for Historical and Prospective Cell Site Location Information For a Cellphone Associated with Jordan Fishman | Cell Site Warrant | Joyce Declaration Exhibit A |
| February 28, 2020 Search Warrant Application for Search of Oakes' Barn | 2020 Oakes Barn SW | Oakes Motion Exhibit 2 |
| March 5, 2020 Search Warrant Application for Search of Garcia's Vehicle | Garcia Vehicle Affidavit | Garcia Motion Exhibit A |
| March 27, 2020 Search Warrant Application for Search of Garcia's Phone | Garcia Phone Affidavit | Garcia Motion Exhibit D |

## PRELIMINARY STATEMENT

The Government respectfully submits this omnibus memorandum of law in opposition to: (1) Seth Fishman's motions to suppress all wiretaps of cellular phones over which Seth Fishman was intercepted, all wiretaps of the cellular phone used by Seth Fishman, and the seized physical evidence from premises searches of Seth Fishman's home, office, and storage unit, and seized electronic evidence from searches of a Dropbox account associated with Seth Fishman's company, and searches of his cellular phones, ("Fishman Mot." or "Fishman Motion"), which motion is joined by Lisa Giannelli and Jordan Fishman; (2) Giannelli's motion to suppress the T-III wiretap obtained of Giannelli's phone, and any other wiretaps in which she was intercepted ("Giannelli Mot." or "Giannelli Motion"), which motion is joined by Jordan Fishman; (3) Jordan Fishman's motion to suppress historical location information for a cellular phone used by Jordan Fishman ("J Fishman Mot." or "J Fishman Motion")[1]; (4) Erica Garcia's motion to suppress evidence obtained from the wiretap of Jorge Navarro's phone (the "Navarro Phone") ("Garcia Wiretap Mot." or "Garcia Wiretap Motion"), joined by Michael Tannuzzo, Marcos Zulueta, and Jason Servis, and Garcia's separate motion to suppress evidence obtained from a search of her vehicle and her phone ("Garcia Search Mot." or "Garcia Search Motion"); (5) Jason Servis' motion to suppress wiretaps of the cellular phone used by Jason Servis and Kristian Rhein ("Servis Motion" or "Servis Mot."); (6) defendant Alexander Chan's motions to suppress wiretaps of the cellular phone used by Jason Servis and Kristian Rhein ("Chan Motion" or "Chan Mot."); and (7) Christopher Oakes' motion

---

[1] As noted above, Jordan Fishman has also joined in his co-defendants' motions to suppress intercepted calls and text messages from any wires in which Jordan Fishman was intercepted. (Dkt. No. 436). Although the J Fishman Motion and appended declarations do not enumerate the T-III wires over which he was intercepted, Jordan Fishman was only intercepted over wire calls and/or text messages from cellular phones used by Seth Fishman and Lisa Giannelli.

to suppress wiretap intercepts of his cellular telephone ("Oakes Wiretap Mot." or "Oakes Wiretap Motion"), and Oakes' separately filed motion to suppress two searches of his barn space in 2019 and 2020 ("Oakes Barn Mot." or "Oakes Barn Motion").[2] The defendants' motions are entirely without merit and should be denied in full.

## BACKGROUND

This case arose from an investigation into overlapping and widespread schemes by racehorse trainers, veterinarians, drug distributors, and others to obtain money through lies, deceit, and active concealment of sophisticated doping of racehorses through the use of purportedly "untestable" drugs. These defendants were driven by the desire to collect prize money from racetracks, all while avoiding detection and interdiction of their offenses by various federal and state authorities, racetrack officials, owners, competitors, and others. As the result of that investigation, on February 26, 2020, a grand jury returned an indictment charging 19 defendants with adulterating and misbranding drugs in interstate commerce in various overlapping racehorse doping schemes. On November 5, 2020, a grand jury returned a superseding indictment (the "S6 Indictment") again charging 14 of the originally-indicted

---

[2] Among the defendants who remain in the case today, neither Rick Dane Jr. nor Rebecca Linke filed or joined in any suppression motions. Likewise, Tannuzzo's separate submission ("Tannuzzo Mot.") appears to be no more than a statement that Tannuzzo joins in all other motions filed by other defendants as may be applicable to him. (*See* Tannuzzo Mot. at 4). To the extent Tannuzzo's motion is construed as an independent brief in support of suppression of some category of evidence, Tannuzzo has failed to carry his burden, notwithstanding the motion's entreaties that the Court "assess whether the Government followed the procedures set forth in 18 U.S.C. § 2518," and that the Court consider a set of rhetorical questions in evaluating suppression. (*Id.* at 4, 7-8). In all cases, when challenging a wiretap, the defendant bears the burden of making and substantiating his or her arguments. *See United States v. Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). Tannuzzo's motion (which does not even enumerate the wiretaps or searches he challenges) does not independently meet this threshold. For the reasons explained herein, because no other defendant has established a basis for suppression, this motion must be denied.

2

defendants in various misbranding and adulteration charges, and charging Jason Servis, Kristian Rhein, and Alexander Chan with participation in both a drug adulteration and misbranding conspiracy and in a wire fraud conspiracy count. Here, the Government sets forth certain facts relevant to the defendants' various motions.[3]

## Background Relevant to The Interceptions and Search Warrants Related to Navarro and Garcia

The immediate backdrop for the investigation of Jorge Navarro, and in particular the interception of his communications beginning in January 2019, was the Government's months-long investigation of Navarro's co-conspirator Nick Surick and others in the horse racing industry. As detailed in the unchallenged wiretap affidavits in support the interception of Surick's cellphone (the "Surick Phone"), originally entered October 23, 2018 (*see* Declaration of Deborah Colson ("Colson Decl.") Ex. A (October 23, 2018 Agent Affidavit In Support of Order of Interception of Surick Phone) (the "October 23 Affidavit")), and extended thereafter for several months, the Government's investigation had revealed ample evidence of Surick and Navarro's efforts to obtain, share, distribute, discuss, use, and conceal various performance enhancing drugs that they each intended to be, and believed to be, untestable by racing authorities. *See generally, id.*

By December 20, 2018, when a second extension of the Surick Wiretap was sought, these themes of "untestability," secrecy surrounding doping operations, collaboration with other known

---

[3] Many of the details regarding the factual background of the charged conspiracies was set forth in the Government's response to Seth Fishman's Motion for a Bill of Particulars and to Dismiss the Indictment, (ECF No. 210), the Government's Opposition to the Defendants' Motions to Dismiss, (ECF No. 335), the Court's Order Denying Without Prejudice Seth Fishman's Motion for a Bill of Particulars and to Dismiss, (ECF No. 244), and Opinion and Order Denying the Defendants' Motions to Dismiss, (ECF No. 450), and are not all repeated herein. Moreover, certain details of the investigation are of particular relevance to the motions filed by individual or groups of defendants, and are consequently discussed in more detail in connection with the discussion of those motions, below.

dopers regarding means and methods, and the subjects' clear intent to evade regulatory scrutiny in an effort to obtain money under false pretenses were each firmly established. (*See* Declaration of Andrew C. Adams ("Adams Decl.") Ex. A[4] (December 20, 2018 Agent Affidavit In Support of Order of Interception of Surick Phone (the "December 20 Affidavit"))). The December 20 Affidavit described Surick's conversations, among others: (1) with co-defendant Christopher Marino, regarding the administration of baking soda to a horse, which not only can enhance the performance of the horse by reducing muscle fatigue but also has the effect of masking the presence of other prohibited substances in a test of the horse's urine, (*id.* at 34-35, 47-49); (2) with a third party, regarding the administration of substances to a horse in order to evade drug tests, (*id.* at 35-36); and (3) with several individuals—including Jorge Navarro—regarding unannounced, out-of-competition testing that the New Jersey Racing Commission ("NJRC") was attempting to conduct of Surick's horses, including a horse (Northern Virgin) that had recently received a prohibited blood builder that was likely to test positive on a drug test, (*id.* at 57-66).

Surick's operation—which directly involved Navarro, both as a facilitator of Surick's doping activities and as a kind of doping "mentor"—was sophisticated in its efforts to limit the number of people with access to the inner workings of the scheme and to conceal the scheme, more generally. For example, Surick entered his horses into races where he believed that officials would not test for the substance he administered, (*see* December 20 Affidavit at 72 (Surick and Marino discussing Surick's racing of a horse notwithstanding that the horse had been doped with Clenbuterol because Surick expected that testing would not occur at that race)). Surick

---

[4] Pursuant to the Court's Protective Order, (ECF No. 157), the Government respectfully requests that certain exhibits submitted in support of the Government's brief be filed and maintained under seal given the nature of the information contained therein.

administered masking agents to his horses, as noted above. And, as enumerated in multiple affidavits, Surick physically hid Northern Virgin to avoid drug testing, and then discussed with others falsifying records and lying to cover up Surick's physical concealment of that horse. (*Id.* at 66). Additionally, Surick was deeply concerned with the possibility of those around him providing information to law enforcement. (*See e.g.*, *id. at* 40 (discussion of retaliation against an individual believed to have told regulators that Surick was in possession of the doped horse); *id.* at 36-37 (describing how all communications between CS-3 and Surick ceased in October 2018 when rumors surfaced that CS-3 was cooperating with law enforcement); *id.* at 68 (Surick was advised not to share information with anyone, even co-conspirators)).

These facts and others informed the application for the initial wiretap of Navarro's cellphone (the "Navarro Phone") and those of Navarro's co-conspirators such as Oakes, Seth Fishman, Servis, and Garcia, though these facts are uniformly ignored throughout the defendants' various motions.

On January 7, 2019, the Government sought and obtained from the Honorable Richard M. Berman an order permitting it to intercept wire and electronic communications over the Navarro Phone. (Colson Decl. Ex. B (January 7, 2019 Agent Affidavit In Support of Order of Interception of the Navarro Phone (the "January 7 Affidavit"))). Those interceptions were extended by several judges upon independent review. (*Id*. Ex. C (February 6, 2019 Agent Affidavit In Support of Order of Interception of Navarro Phone (the "February 6 Affidavit")); *id.* Ex. E (March 7, 2019 Agent Affidavit In Support of Order of Interception of Navarro Phone (the "March 7 Affidavit")); *id.* Ex. G (April 5, 2019 Agent Affidavit In Support of Order of Interception of Navarro Phone (the "April 5 Affidavit")); *id.* Ex. H (May 3, 2019 Agent Affidavit In Support of Order of Interception of Navarro's Phone (the "May 3 Affidavit")); *id.* Ex. J (May 29, 2019 Agent Affidavit In Support of

Order of Interception of Navarro and Servis' Phones (the "May 29 Affidavit"))).[5] Each of these orders was founded on detailed affidavits setting forth facts that far exceeded the probable cause threshold for interception of Navarro's communications, as discussed in more detail below.

### Background Relevant to The Interceptions and Warrants Related to Seth Fishman, Giannelli, Jordan Fishman, and Oakes

Having investigated the Surick and Navarro doping operations, including through the use of grand jury process, covert search warrants, the use of confidential informants, and the review of state disciplinary records, interceptions over the Navarro Phone revealed the participation of Oakes and Seth Fishman in the then-ongoing Navarro conspiracy.

On February 14, 2019, the Honorable Edgardo Ramos approved the Government's application for an order to intercept wire and electronic communications occurring over a cellular telephone used by Seth Fishman (the "Fishman Phone") and Christopher Oakes (the "Oakes Phone").  As with every wiretap in this case, the Government's application included, among other things, a detailed (here, 65 pages), sworn affidavit from an FBI agent involved in the investigation setting forth certain background information on the investigation—including prior wiretap applications that had been submitted and approved for Target Subjects apart from Seth Fishman and Oakes—as well as facts supporting a finding of probable cause to support the Government's application based, in part, on conversations intercepted as a result of the prior authorized wiretaps over the Navarro Phone—in relevant part, the interception of the Navarro Phone beginning on or about January 7, 2019, as extended on February 6, 2019.  (*See* Fishman Mot. Ex. A (February 14,

---

[5] In the course of these intercepts, and among other various investigative steps to further the goals of the investigation, on February 5, 2019, the Government obtained a search warrant for a Google email account used by Navarro's business entity, the Navarro Racing Stable. (See Adams Decl. Ex. D (the "Navarro Email Search Warrant")).

2019 Agent Affidavit In Support of Order of Interception of Fishman and Oakes' Phones ("February 14 Affidavit"))).[6] These extension orders, and the interception of communications over a cellular telephone used by Giannelli (the "Giannelli Phone"), were approved by independent reviewing judges on multiple occasions over the following months. (*See* Oakes Mot. Ex. 3 (March 19, 2019 Agent Affidavit In Support of Order of Interception of Fishman and Oakes' Phones (the "March 19 Affidavit")); Fishman Mot. Ex. B (April 17, 2019 Agent Affidavit In Support of Order of Interception of Fishman and Giannelli's Phones (the "April 17 Affidavit")); *See* Adams Decl. Ex. B (May 16, 2019 Agent Affidavit In Support of Order of Interception of Fishman's Phone (the "May 16 Affidavit"))).

In the course of these interceptions and thereafter, the Government also obtained judicial approval for various other searches relevant to this motion. Those included physical searches of premises controlled by Oakes, made possible only through the unique insights provided by the wiretap of the Oakes Phone; searches of Seth Fishman's cellular phones, premises, and business data storage accounts; and a historical cellsite warrant pertaining to Jordan Fishman.[7]

---

[6] This same affidavit is also attached as Exhibit 1 to the Oakes Motion.

[7] On March 13, 2019, the Government obtained a search warrant to surreptitiously search Oakes' barn in order to collect samples of certain drugs found therein, and to conduct blood draws of two horses under Oakes' care that were scheduled to race two days later at a New York racetrack. (*See* Oakes Mot. Ex. 1 (March 13, 2019 Search Warrant Application for Search of Oakes' Barn (the "2019 Oakes Barn SW"))).

On March 29, 2019, the Government obtained an anticipatory warrant to search cellular phones found on Seth Fishman's person upon his arrival into a United States airport from overseas. (*See* Fishman Mot. Ex. C (March 29, 2019 Search Warrant Application for Anticipatory Search of Fishman's Cellular Phones (the "March 29 Fishman Phone SW"))). On June 17, 2019, the Government obtained a search warrant to search, in relevant part, two email accounts associated with Seth Fishman. (*See* Fishman Mot. Ex. E (June 17, 2019 Search Warrant Application for Search of Email Accounts (the "Fishman Email SW"))). On June 21, 2019, the Government obtained a search warrant to search an online storage account hosted by the platform Dropbox, which had been used to store records related to Seth Fishman's business, Equestology. (*See*

7

**Background Relevant to The Interceptions and Warrants Related to Servis and Rhein**

Initial and renewal interceptions over the Navarro Phone indicated that: (1) Servis was actively assisting Navarro to conceal Navarro's doping practices by "tipping off" Navarro to the presence of racetrack officials; (2) Navarro was willing to confide in Servis regarding his own doping practices and about his own corrupt relationship with an unnamed racetrack security official; (3) Navarro believed that Servis had his own corrupt relationship with a racetrack security official; and (4) Servis further participated in Navarro's doping scheme as a recipient of an unspecified, "[ir]regular" version of Clenbuterol, which Servis wished to obtain after assuring himself that regulators were not scrutinizing the Servis operation too closely.

---

Fishman Mot. Ex. D (June 21, 2019 Search Warrant Application for Search of Dropbox Account (the "Fishman Dropbox SW"))). On October 25, 2019, the Government obtained a premises search warrant to search three physical premises associated with Seth Fishman and/or Equestology: Seth Fishman's residence, Equestology's office space, and a storage unit. (*See* Fishman Mot. Ex. F (October 25, 2019 Search Warrant Application for Search of Fishman Premises (the "Fishman Premises SW"))).

Seth Fishman arrived in the United States on October 28, 2019, and was arrested shortly thereafter. Law enforcement agents seized cellular devices on Seth Fishman's person at the time of his arrest and subsequently, on January 15, 2020, sought and obtained a search warrant to search the devices seized from Seth Fishman at the time of his arrest. (*See* Adams Decl. Ex. E (January 15, 2020 Search Warrant Application for Search of Fishman's Electronic Devices (the "January 15 Fishman Electronics SW"))).

On February 7, 2020, the Government obtained a warrant seeking, among other things, historical and prospective cell site information for Jordan Fishman, among other individuals. (*See* Declaration of Patrick Joyce In Support Of J Fishman Mot. ("Joyce Decl.") Ex. A (February 7, 2020 Search Warrant Application for Historical and Prospective Cell Site Location Information For a Cellphone Associated with Jordan Fishman ("Cell Site Warrant")). On February 28, 2020, the Government obtained a warrant seeking to conduct a second premises search of Oakes' barn. (*See* Oakes Barn Mot. Ex. 2 (February 28, 2020 Search Warrant Application for Search of Oakes' Barn (the "2020 Oakes Barn SW"))).

Based on these and other communications, in the context of the broader investigation of the overlapping Servis and Navarro doping operations, and with the foreknowledge of the means and methods used by this criminal enterprise to conceal its illegal practices, the Government obtained an initial Title III order of interception for Jason Servis' cellphone (the "Servis Phone") on or about April 30, 2019. (*See* Declaration of Rita M. Glavin In Support Of Jason Servis' Motion to Suppress Ex. 1 (April 30, 2019 Agent Affidavit In Support of Order of Interception of Servis' Phone (the "April 30 Affidavit")). As with each of the other wiretap applications, this application included a detailed and lengthy affidavit in support providing background information, and ample probable cause to intercept communications over the Servis Phone. Such interceptions were extended on three occasions, with the final extension order being signed on July 30, 2019.

During the period of interception over the Servis Phone, the Government obtained probable cause to believe that a cellular telephone used by co-defendant Kristian Rhein—a licensed veterinarian, but also a promoter of drugs by a company known as Medivet Equine—would be used to communicate regarding Servis and others' efforts to administer purportedly untestable drugs to racehorses, while concealing that practice through false record keeping and other means. An initial order of interception of the Rhein Phone was authorized on May 29, 2019, and such interceptions were extended on two occasions, with the final period of interception authorized on July 30, 2019.

## ARGUMENT

## I.  APPLICABLE LAW

### A.  Probable Cause

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 (hereinafter "Title III") provides for the manner and method in which all applications for the

interception of wire, oral, or electronic communications must be made. *See* 18 U.S.C. §§ 2510-18. Title III also includes its own suppression remedy, providing that an "aggrieved person . . . may move to suppress" intercepted communications on three grounds: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(i-iii).

Before authorizing a wiretap under Title III, a judicial officer must find that there is probable cause to believe that crimes are being committed and that evidence of those crimes "could be obtained through the use of electronic surveillance." *United States v. Solomonyan*, 451 F. Supp. 2d 626, 635 (S.D.N.Y. 2006). In ruling on a motion to suppress wiretap evidence, the reviewing court must grant "considerable deference" to the issuing court's findings. *United States* v. *Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009); *see also United States* v. *Gangi*, 33 F. Supp. 2d 303, 306 (S.D.N.Y. 1999) ("[T]he issuing judicial officer's decision to authorize wiretaps 'should be paid great deference by reviewing courts.'" (quoting *Spinelli* v. *United States*, 393 U.S. 410, 419 (1969))). "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists. . . . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted) (reversing suppression order).

"[W]iretap orders are entitled to a presumption of validity." *United States* v. *Ambrosio*, 898 F. Supp. 177, 181 (S.D.N.Y. 1995) (citing *United States* v. *Fury*, 554 F.2d 522 (2d Cir.), *cert. denied,* 433 U.S. 910 (1977))). Accordingly, the defendants bear the burden of proving that probable cause was lacking. *See United States v. Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974).

10

Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization. *See United States* v. *Labate*, No. 00 Cr. 632 (WHP), 2001 U.S. Dist. LEXIS 6509, at *50 (S.D.N.Y. May 18, 2001). Although without "the insights of adversarial scrutiny, the issuing judge may not readily perceive every question that might legitimately be raised" regarding the requested wiretap, "so long as fundamental constitutional rights are preserved, the issuing court's determination should not be subjected to gratuitous 'Monday morning quarterbacking.'" *United States* v. *Gigante*, 979 F. Supp. 959, 963 (S.D.N.Y. 1997).

Title 18, United States Code, Section 2518(3) requires a probable cause determination on three issues: that an individual is committing, has committed, or is about to commit an enumerated offense; that particular communications concerning that offense will be obtained through the requested interception; and that the facilities subject to interception are being used in connection with the offense. 18 U.S.C. § 2518(3); *see United States* v. *Yannotti*, 541 F.3d 112, 124 (2d Cir. 2008); *United States* v. *Diaz*, 176 F.3d 52, 110 (2d Cir. 1999).

Probable cause requires that the totality of the circumstances reflect a fair probability of finding evidence of a crime. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see Diaz*, 176 F.3d at 110 (probable cause standard for wiretap is same as probable cause standard for search warrant). "The test for determining probable cause under 18 U.S.C. § 2518 is the same as that for a search warrant." *Wagner*, 989 F.2d at 71 (quoting *United States v. Rowell,* 903 F.2d 899, 901–02 (2d Cir. 1990)); *Fury,* 554 F.2d at 530.

The determination that probable cause exists is a relatively low threshold. "A judge's probable-cause determination is not overly strict. Presented with a warrant application, the judge must 'simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of

persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (emphasis omitted) (quoting *Gates*, 462 U.S. at 238). "The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235). Moreover, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Martin*, 426 F.3d at 74 (quoting *Gates*, 462 U.S. at 232). Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 231). Probable cause "to issue a wiretap order exists when the facts made known to the issuing court are sufficient to warrant a prudent [person] in believing that evidence of a crime could be obtained through the use of electronic surveillance." *United States v. Ruggiero*, 824 F. Supp. 379, 398 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995) (quotation and footnote omitted). In assessing probable cause, a reviewing court must read a wiretap affidavit as a whole and in a common-sense manner. Defendants may not "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause." *Gangi*, 33 F. Supp. 2d at 306; *accord United States* v. *Salas*, No. 07 Cr. 557 (JGK), 2008 U.S. Dist. LEXIS 92560, at *12 (S.D.N.Y. Nov. 5, 2008) (same). Put another way, "a court must look at the snowball, not the individual snowflakes." *United States* v. *Scala*, 388 F. Supp. 2d 396, 402 (S.D.N.Y. 2005).

Probable cause must exist at the time of issuance. *United States* v. *Marino*, 664 F.2d 860, 866 (2d Cir. 1981). The "principal factors in assessing whether or not the supporting facts have

become stale are [not only] the age of those facts [but also] the nature of the conduct alleged to have violated the law." *United States* v. *Gallo*, 863 F.2d 185, 191 (2d Cir. 1988). Where the affidavit presents "a picture of continuing conduct, as opposed to an isolated instance of wrongdoing . . . the passage of time between the last described act and the presentation of the application becomes less significant." *Id.* Courts in the Second Circuit have repeatedly upheld wiretap orders where the criminal conduct being investigated was carried out over a substantial time period, even where the passage of time between the last described act and the presentation of the application was weeks or months. *See Diaz*, 176 F.3d at 109 ("in a case involving an ongoing narcotics operation . . . 'intervals of weeks or months between the last described act and the application' for a wiretap do not necessarily make the information stale") (citations omitted); *Rowell*, 903 F.2d at 903 (gap of 18 months did not render information stale); *Martino*, 664 F.2d at 867-69 (three-week hiatus between last described event and application for wiretap was acceptable where there was evidence of "ongoing" drug conspiracy); *United States* v. *Feola*, 651 F. Supp. 1068, 1091 (SD.N.Y. 1987) (finding that two and a half months between informant information and the interception order was "a longer time than is typical of a wiretap operation," but "well within the limits of tolerance for an alleged ongoing conspiracy," and noting that information in support of a wiretap application "has an even longer shelf life in a continuing course of criminal conduct" (citing *United States* v. *Hyde*, 574 F.2d 856, 865 (5th Cir. 1978)).

"[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

### B.    Reasonable Alternative Techniques Under 18 U.S.C. § 2518(1)(c)

Title 18, United States Code, Section 2518(1)(c) requires that an application for the interception of telephonic communications make "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Similarly, Section 2518(3)(c) requires the judge reviewing a wiretap application to determine, as a condition of authorizing the wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

This requirement "is far from an insurmountable hurdle. The government must demonstrate only that normal investigative techniques would prove difficult. It need not show that any other option would be doomed to failure." *United States v. Herrera*, No. 02 Cr. 477 (LAK), 2002 WL 31133029, *1 (S.D.N.Y. Sept. 23, 2002). These requirements ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). As the Second Circuit has explained:

> [T]he purpose of the statutory requirements of § 2518 is not to preclude the Government's resort to wiretapping until after all other possible means of investigation have been exhausted by investigative agents; rather, the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

*Diaz*, 176 F.3d at 111 (internal citation and quotations omitted); *accord Concepcion*, 579 F.3d at 218 (Government not "required to exhaust all conceivable investigative techniques before resorting to electronic surveillance"). Thus, Title III's "alternative investigative techniques" sections do not establish a "requirement 'that any particular investigative procedures be exhausted before a wiretap be authorized.'" *United States v. Young*, 822 F.2d 1234, 1237 (2d

14

Cir. 1987) (quoting *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983)); *accord United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997).  Instead, Title III "only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Diaz*, 176 F.3d at 111 (internal quotation marks and brackets omitted).  "The issue of whether a normal investigative method has been exhausted must be tested in a practical and common sense manner." *Diaz*, 176 F.3d at 111; *accord United States v. Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984); *United States v. Trippe*, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) ("[T]he application must be viewed in a practical and common sense manner and need be only minimally adequate to support the issuing judge's determination of necessity.").  "A reasoned explanation, grounded in the facts of the case, and which squares with common sense, is all that is required."  *United States v. Ianniello*, 621 F. Supp. 1455, 1465 (S.D.N.Y.), *aff'd*,808 F.2d 184 (2d Cir. 1985).

Applying this commonsense approach, the Second Circuit has had little difficulty finding this requirement established in "complex and sprawling criminal cases involving large conspiracies." *Concepcion*, 579 F.3d at 218; *see also United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002) (concluding that because of the "special dangers" they pose, "the government is entitled to more leeway in its investigative methods when it pursues a conspiracy"); *United States v. Torres,* 901 F.2d 205, 231 (2d Cir.1990), cited with approval by *Concepcion*, 579 F.3d at 218 (holding that evidence of large-scale narcotics trafficking operation involving participants in multiple locations supported finding of necessity even though alternative investigative techniques had experienced some success in developing evidence concerning the conspiracy).

Just as with respect to a probable cause determination, substantial deference is owed by the reviewing court to the issuing court's prior finding as to the reasonable availability of alternative techniques to achieve the goals of an investigation. *See Gigante*, 979 F. Supp. at 963 ("In subsequently reviewing these determinations [probable cause and alternative techniques], the trial court must accord substantial deference to the findings of the issuing judicial officer, limiting its review to whether the issuing judicial officer had a 'substantial basis' for making the requisite findings.") (citing *Wagner*, 989 F.2d at 71); *see also Concepcion*, 579 F.3d at 217 (agreeing that Second Circuit precedent looks to whether the court that issued the wiretap order abused its discretion, and whether the affidavit was "minimally adequate" to support that judge's decision to issue the order). In a number of instances, the Second Circuit has reversed orders by district courts suppressing wiretap evidence because the suppression orders failed to show the appropriate level of deference to the authorizing judge's finding of necessity. *See Concepcion*, 579 F.3d at 219 (reversing reviewing judge's suppression order because, with appropriate deference paid to issuing judge's initial assessment that alternative investigative techniques failed or were unlikely to be fruitful, the affidavit was "minimally adequate" to support a finding of necessity); *id.* at 217 (citing *Wagner*, 989 F.2d at 74 ("revers[ing] the district court's suppression of evidence because it had not accorded sufficient deference to the initial decision to authorize a wiretap, on which the Government had relied")).

Because wiretap orders are presumptively valid, the defendants bear the burden of proving that "necessity" was lacking. *See Magaddino*, 496 F.2d at 459-60.

## C.    Misrepresentations and Omissions in an Affidavit

"Wiretap orders are presumed valid."  *United States v. Levy*, No. 11 Cr. 62 (PAC), 2012 WL 5830631, at *5 (S.D.N.Y. Nov. 16, 2012), *aff'd* 626 F. App'x 319 (2d Cir. 2015) (quoting

16

*United States v. Zapata,* 164 F.3d 620 (2d Cir. 1998) (summary order)).  *See also Franks v. Delaware*, 438 U.S. 154, 171 (1978) (search warrants are presumed valid); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008) (same).  With respect to an issuing judge's probable cause finding, "[t]he task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] a 'substantial basis' for making the requisite probable cause determination."  *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238).  "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in an affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure."  *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003).  Not every statement in an affidavit must be true.  *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).  To invoke the *Franks* doctrine, the defendant must demonstrate that there were intentional misstatements or omissions in the search warrant affidavit and that those misstatements or omissions were material.  *See Awadallah*, 349 F.3d at 64.  The defendant bears the burden of establishing both components—*i.e.*, intent and materiality—by a preponderance of the evidence.  *See Klump*, 536 F.3d at 119.

"The *Franks* standard is a high one."  *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).  To secure a *Franks* hearing, a defendant must make a "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause."  *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (emphasis added) (quoting *Franks*, 438 U.S. at 155-56, 170-71).  The burden to even obtain a *Franks* hearing is a heavy one, and such hearings are, thus, rare.  *See United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden.");  *United*

*States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus *Franks* hearings are rarely held.").

In reviewing a challenge to a warrant, "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "[a]ll storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (citations and internal quotation marks omitted); *see also Awadallah*, 349 F.3d at 67; *Feola*, 651 F. Supp. at 1109. "[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010) (quoting *Awadallah*, 349 F.3d at 67). "[T]he mere intent to exclude information is insufficient" to demonstrate recklessness, since "every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly." *Mandell*, 710 F. Supp. 2d at 373.

Accordingly, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Id.* at 374 (internal quotation marks omitted). This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* (internal quotation marks omitted).

To allow for the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted). The movant must make a substantial preliminary showing that a reasonable person would have known that the

issuing judge would have wanted to know the kind of information that was omitted. *See United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003).

An affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (emphasis omitted). "Rather, the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* (quoting *Awadallah*, 349 F.3d at 68). "[T]he mere intent to exclude information is insufficient . . . [since] every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly." *Awadallah*, 349 F.3d at 67-68 (internal quotation marks omitted).

"To prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted); *see also Falso*, 544 F.3d at 126 ("Allegations of negligence or innocent mistake are insufficient." (quoting *Franks*, 438 U.S. at 171)). "[W]hile there are times when a district court may properly find it 'absolutely necessary[, in order] to preserve the integrity of the criminal justice system,' to suppress evidence under its inherent or supervisory authority, 'the Supreme Court has explained that a court's inherent power to refuse to receive material evidence is a power that must be *sparingly exercised* [only in cases of] *manifestly improper conduct* by federal officials.'" *United States v. Lambus*, 897 F.3d 368, 401 (2d Cir. 2018) (emphases in original) (quoting *United States v. Getto*, 729 F.3d 221, 230 (2d Cir. 2013) (internal quotation marks omitted)).

Even if a defendant can demonstrate that an affiant intentionally or recklessly misled the

judge who initially granted the wiretap, a *Franks* motion will not be granted unless the defendant

can also demonstrate that the alleged misrepresentations or omissions were material to the issuing

judge's finding. *See Franks*, 438 U.S. at 165. To determine whether the alleged false statements

or omissions are material, a court should revise the affidavit by "delet[ing] false or misleading

statements and insert[ing] the omitted truths" and then determine whether the revised affidavit

would still support a finding of necessity. *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH),

2010 WL 4867402, at *19-24 (S.D.N.Y. Nov. 24, 2010) (upholding wiretap despite finding for

defendant on first prong of Franks based on conclusion that omissions were not material); *United

States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013) ("To determine if misrepresentations

or omissions are material, a court corrects the errors and then resolves de novo whether the

hypothetical corrected affidavit still establishes probable cause.").

"If the corrected affidavit supports probable cause, the inaccuracies were not material to

the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In

other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and

material omissions, there remains a residue of independent and lawful information sufficient to

support probable cause." *Id.* (internal quotation marks omitted).

### D.    Standing

"Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted."

*United States* v. *Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (quoting *Rakas* v. *Illinois*, 439 U.S. 128,

133-34 (1978)). "In order to prevail on a contention that a search violated the Fourth Amendment,

an accused must show that he had a legitimate expectation of privacy in a searched place or item."

*United States* v. *Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) (citing *Rawlings* v. *Kentucky*, 448 U.S. 98,

104 (1980)). In other words, "a defendant can urge the suppression of evidence obtained in

violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States* v. *Padilla*, 508 U.S. 77, 81 (1993) (per curiam) (emphasis in original).

"When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated." *United States* v. *Paulino*, 850 F.2d 93, 96 (2d Cir. 1988); *see also United States* v. *Osorio*, 949 F.2d 38, 40 (2d Cir. 1991). To satisfy this burden, a defendant must submit an "affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search." *Ruggiero*, 824 F. Supp. at 391 (citing *Rawlings*, 448 U.S. at 98; *Rakas*, 439 U.S. at 130 n.1). The fact that the Government connects a defendant to the subject of a search does not suffice to establish standing, absent an affidavit from someone with personal knowledge of the facts therein, which affidavit would establish standing on its own. *See United States* v. *Watson*, 404 F.3d 163, 166 (2d Cir. 2005) ("[The] defendant could not challenge the search of a residence merely because he anticipated that the Government will link the objects recovered in that search to defendant at trial.").

A defendant does not have standing to challenge a search "merely because he anticipate[s] that the Government will link the objects recovered in that search" to him "at trial." *Watson*, 404 F.3d at 166-67 (citing *United States* v. *Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993)). Courts routinely reject efforts by defendants to establish standing in this fashion. *See*, *e.g.*, *United States* v. *Filippi*, 2013 WL 208919, at *6 (S.D.N.Y. Jan. 16, 2013) (holding that "efforts made by the Government to link [the defendant] to [a] phone" are insufficient to establish the defendant's standing to challenge a warrant permitting the tracking of that phone); *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (holding that "defendant's unsworn assertion

of the Government's representations does not meet this burden" of establishing standing).

Standing must be established by the defendants themselves. *E.g.*, *United States* v. *Dore*, 586 F. App'x 42, 46 (2d Cir. 2014); *United States v. Pizarro, et al.*, No. 17 Cr. 151 (AJN), 2018 WL 1737236, at *7-8 (S.D.N.Y. Apr. 10, 2018) (denying motion to suppress historical cell site information where defendants failed to submit affidavit asserting ownership of the phones in question); *United States* v. *Walker*, 16 Cr. 567 (JSR), Mem. Op. at 3-4 (S.D.N.Y. Mar. 8, 2017) (holding that a defendant seeking to assert that he has a protectable privacy interest in cell site location information "must demonstrate that he owned or had exclusive use of the cell phone during the period in question," and finding that a defendant lacked standing because "[a]t most, the defendant has demonstrated non-exclusive and sporadic use").

### E.    Good Faith Exception

Although the Court need not reach the issue in this case, even if this Court finds that there was an abuse of discretion by the District Judges in issuing the various interception orders challenged by the defendants—which there was not—the Government relied on the interception orders in good faith and suppression would not be an appropriate remedy. *See United States* v. *Leon*, 468 U.S. 897, 922 (1984). Courts in this District Court have recognized that the "good-faith exception to the exclusionary rule" first identified by the Supreme Court in *United States v. Leon*, "applies in Title III cases." *United States v. Tomero*, 462 F. Supp. 2d 565, 572 (S.D.N.Y. 2006) (Kaplan J.). Accordingly, "even if the order failed to comply with Title III's requirements," the motion to suppress should nonetheless be denied where "nothing in the record suggests the government implemented it in bad faith." *Id.* at 572; *see also United States v. Bellomo*, 954 F. Supp. 630, 638 (S.D.N.Y. 1997) (Kaplan, J.) (same).

Under *United States* v. *Leon*, evidence collected pursuant to a judicial order authorizing a

search that is later found to have been issued without probable cause will be suppressed only if (1) the issuing judge abandoned her detached, neutral role; (2) the agent was dishonest or reckless in preparing the supporting affidavit for the order; or (3) the agents' reliance on the order was not reasonable. *Bellomo*, 954 F. Supp. at 638. While the Second Circuit has not directly addressed the question of whether *Leon* applies in the context of wiretaps, other Circuits and courts within the Second Circuit have found that it does. *See, e.g.*, *id.*; *United States* v. *Gotti*, 42 F. Supp. 2d 252, 267 (S.D.N.Y. 1999) (Parker, J.) (collecting cases); *Tomero*, 462 F. Supp. 2d at 572 (holding that the "good-faith exception to the exclusionary rule applies in Title III cases"); *United States v. Gangi*, 33 F. Supp. 2d 303, 307 (S.D.N.Y. 1999) (Chin, J.) (applying good faith exception to wiretap (citing *Ambrosio*, 898 F.Supp. at 186–89).

## F.    Fruit of the Poisonous Tree

Even if the Court were to conclude that suppression of communications intercepted pursuant to an initial interception order was required, it would not follow that suppression of any subsequent initial order of interception on a new cellular phone would be similarly "mandatory." Because the exclusionary rule does not extend to evidence derived from an "independent source," where the Government can demonstrate that subsequent applications are based on evidence derived independent of the "tainted" material, further suppression is not required. *See generally Murray v. United States*, 487 U.S. 533, 537 (1988) ("When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.") (citation omitted); *see also United States v. Lace*, 669 F.2d 46, 49 (2d Cir. 1982) ("The ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted

23

allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.") (quoting *United States v. Giordano*, 416 U.S. 505, 555 (1974) (Powell, J. concurring in part and dissenting in part)); *United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir. 1987) (where court can conclude from affidavit that probable cause for search existed without reference to tainted information, search remains valid)*; see also Wong Sun v. United States*, 371 U.S. 471, 487 (1963) ("[T]he exclusionary rule has no application" where "the Government learned of the evidence 'from an independent source.'"); *United States v. Rajaratnam*, 719 F.3d 139, 152 (2d Cir. 2013) (quoting S. Rep. No. 90-1097, at 96 (1968), *reprinted in* 1968 U.S.CC.A.N. 2112, 2185 ("When Title III was enacted, it was not intended 'generally to press the scope of the suppression role beyond [then current] search and seizure law.")); *Giordano*, 416 U.S. at 558-59 (Powell, J., dissenting in part) (noting that Title III "largely reflects existing law" and that "[t]here [was] . . . no intention to change the attenuation rule") (citing *Nardone v. United States*, 303 U.S. 338 (1939), *Wong Sun*, 371 U.S. 471 (1963); S. Rep. No. 90-1097, at 96).[8] In the context of a challenge to a wiretap application, the

---

[8] In *Giordano* the Supreme Court drew a clear distinction between an "original" application and order, and "extension orders" which "do not stand on the same footing as original authorizations but are provided for separately." *Giordano*, 416 U.S. at 530. With respect to extension orders alone, which was all that was at issue in *Giordano*, the *Giordano* court found that the "independent source" doctrine did not apply because "whether or not the application, without the facts obtained from monitoring [the original phone], would independently support original wiretap authority" was not relevant because "the Act itself forbids extensions of prior authorizations without consideration of the results meanwhile obtained." *Id.* at 533 (citing 18 U.S.C. § 2518(f)). Indeed, as the dissent in *Giordano* noted, as a result of the majority's holding, the independent source doctrine "while fully applicable to original wiretap orders, is wholly inapplicable to extension orders." *Id.* at 560 n. 7 (Powell, J., dissenting in part); *see United States v. Scasino*, 513 F.2d 47, 49 n.2 (5th Cir. 1975) ("*Giordano* involved the extension of the original wiretap . . . . We are not confronted with an extension order . . . but rather with two separate wiretaps, months apart, at two separate, independent gambling operations and different telephone numbers."); *United States v. Wac*, 498 F.2d 1227, 1231-32 (6th Cir. 1974) ("Not being an application for an extension, . . . the present case differs from *Giordano* and it cannot be said that the results of the conversations overheard pursuant to the first order were 'essential in law' to issuance of the second order."). *See*

"independent source" analysis requires the reviewing judge to "put[] aside all [the] tainted allegations" in the wiretap application and ask whether the remaining "independent and lawful information stated in the affidavit suffices to show probable cause." *Lace*, 669 F.2d at 49 (quoting *Giordano*, 416 U.S. at 555) (Powell, J. dissenting in part); *see also Whitehorn*, 829 F.2d at 1231 (where court can conclude from affidavit that probable cause for search existed without reference to tainted information, search remains valid).

## II.    DISCUSSION

### A.    Seth Fishman's Motions to Suppress

Seth Fishman moves to suppress: (1) any T-III wiretaps on others' phones in which Seth Fishman is intercepted,[9] (2) T-III wiretaps on Seth Fishman's phone; (3) the fruits of premises

---

*also United States v. Kilgore*, 524 F.2d 957, 959 (5th Cir. 1975) ("We agree with Justice Powell's characterization of the majority opinion [in *Giordano*] where he states that it casts no doubt on the proposition that the independent source rule is fully applicable to original orders.") (citing *Giordano*, 416 U.S. at n.7) (Powell, J., dissenting in part, concurring in part); *United States v. Caruso*, 415 F. Supp. 847, 851 (S.D.N.Y. 1976) (Pollack, J.), *aff'd* 553 F.2d 94 (2d Cir. 1977); *United States v. Plotkin*, 550 F.2d 693, 695-98 (1st Cir. 1977), *cert. denied*, 434 U.S. 820 (1977); *United States v. Smith*, 155 F.3d 1051, 1059-1063 (9th Cir. 1998), *cert. denied*, 525 U.S. 1071 (1999); *United States v. McHale*, 495 F.2d 15, 17 (7th Cir. 1974).

[9] Seth Fishman claims to have standing to suppress the intercepted calls obtained from wiretaps of cellular phones used by Surick and Navarro, merely because their calls were referenced in the affidavit. (Fishman Mot. at 16-17). Yet the Fishman Motion identifies solely the January 7 Affidavit, without mention of any other T-III applications Seth Fishman challenges. (Fishman Mot. at 1). Seth Fishman does not have standing to challenge every T-III interception that occurred in this case; he only has standing to challenge wiretaps in which he is named as a Target Subject (*i.e.*, he was "a person against whom the interception was directed," 18 U.S.C. § 2510(11)) or was intercepted in any wire, oral, or electronic communication, *id.* The defendant cannot vicariously assert standing to suppress intercepted communications between other co-defendants merely because he was described in an affidavit. Communication involving Seth Fishman were in fact intercepted as a result of wiretaps authorized on the basis of the February 6, 2019 Agent Affidavit In Support of Order of Interception of Navarro's Phone (the "February 6 Affidavit") and the April 5, 2019 Agent Affidavit In Support of Order of Interception of Navarro's Phone (the "April 5 Affidavit"). The Fishman Motion, however, contains no arguments pointing to any deficiencies in the January 7 Affidavit, the February 6 Affidavit, or the April 5 Affidavit. Fishman's arguments are squarely focused on challenges to the wiretap affidavits submitted in support of wiretaps of Seth Fishman's *own* cellular phone. Accordingly, the Government construes Seth Fishman's

25

searches of Seth Fishman's home, office, and storage unit; (4) the fruits of a search of Seth

Fishman's cloud storage Dropbox account; and (5) the fruits of searches of Seth Fishman's

electronic devices. (Fishman Mot. at 1).[10]  Seth Fishman's principal arguments are that the

---

challenge to "evidence [] derived from electronic eavesdropping on the phones of alleged co-conspirators in instances where the defendant is overheard in conversation with others" as a motion to join in the suppression motions of other defendants who seek suppression of the aforementioned wiretaps of Navarro's cellular phone.  Seth Fishman was also intercepted in calls over the Oakes Phone, which wiretaps were authorized as a result of the February 14 Affidavit and the March 19 Affidavit.  The Government likewise construes the Fishman Motion as joining in the Oakes Wiretap Motion to suppress the fruits of the wiretaps of the Oakes Phone, given that there is little discussion of the relevant affidavits supporting the wiretap of Oakes' cellular phone in the Fishman Motion.

[10] Although the Fishman Motion in fact moves to suppress evidence seized from searches of Seth Fishman's premises, his cloud storage account, and his electronic devices, the motion also—in a footnote—seeks "the right to move to suppress items of evidence the Government may seek to offer" from searches of the defendant's "home, office, and a storage facility" at some unspecified later time, citing that the "Government has yet to provide notice of the items of evidence it intends to offer into evidence that are products of these searches." (Fishman Mot. at 5).  Seth Fishman appears to be reserving his right to re-file these same suppression motions closer to trial, once the Government has indicated which exhibits from each search it intends to offer into evidence at trial. As an initial matter, this request for yet another round of pre-trial briefing (which would amount to a fourth round of pre-trial briefing by Seth Fishman) appears to be moot.  Seth Fishman is and has been capable of filing a suppression motion (as he and others have already done) without a preview of the Government's case in chief at trial.  The Government produced in discovery, over one year ago, inventories of the items it had seized as a result of these premises searches as well as photographs of the evidence seized, so the defendant has known for ample time the extent of evidence the Government seized as a result of these searches, and has *already moved to suppress the evidence the Government seized from those searches* in the Fishman Motion, currently under consideration by the Court. Prior to the filing deadline for the defendants' suppression motions, Seth Fishman (through counsel) asked the Government generally for the responsive materials from the Government's searches (without identifying specific searches), citing Federal Rule of Criminal Procedure 12(b)(4)(B) (for purposes of suppressing evidence, the defendant may "request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discovery under Rule 16").  The Government informed defense counsel that it had produced the responsive records from each search to defense counsel in discovery and reserves the right to introduce any and all of this evidence at trial. As a practical matter, while physical evidence could not be produced, as noted above, the Government produced search inventories of seized physical items (which prior counsel specifically requested from the Government, and which were separately discussed, identified, and produced to him) and photographs taken of the seized physical items.  Rule 12 does not require the Government to "preview" its case for defense counsel in order for counsel to file suppression motions.  *United States v. Swain*, No. 08 Cr. 1175 (JFK),

affidavits in support of wiretaps of Seth Fishman's cellular phone lacked probable cause in that they did not inculpate Seth Fishman in a "scheme to defraud," did not adequately set forth exhaustion or insufficiency of alternative investigative techniques, and that every subsequent wiretap renewal and search warrant is consequently tainted as "fruit of the poisonous tree" insofar as it was derived from the initial wiretap. These arguments all fail.

    i.    <u>The Initial Seth Fishman Wiretap Application Set Forth Ample Probable Cause that Seth Fishman Participated In the Subject Offenses, And There Was No "Subterfuge"</u>

The initial agent affidavit seeking a wiretap of Seth Fishman's cellular phone adequately set forth probable cause that Seth Fishman participated in the subject offenses. The Fishman Motion essentially argues that because Seth Fishman is not alleged to have discussed doping a racehorse in violation of any racing rules or to have "had a financial or a betting interest in the outcome of particular horseraces," (Fishman Mot. at 8), and because Seth Fishman merely discussed the permissible administration of medications to racehorses, there is no probable cause that Seth Fishman committed the target offenses enumerated in the affidavit: 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy to commit mail and wire fraud), 1956 and 1957 (money laundering). (February 14 Affidavit at 6). To reach this conclusion, throughout the

---

2011 WL 4348142, at *7 (S.D.N.Y. Aug. 16, 2011). *See also Conyers*, 2016 WL 7189850, at *9–10. Rule 12(b)(4)(B) is a procedural device intended to facilitate efficient pretrial motion practice. *See United States v. de la Cruz-Paulino,* 61 F.3d 986, 994 (1st Cir. 1995); *see also* Fed. R. Crim. P. 12 advisory committee note, 1974 Amendment ("the rule is intended to be a matter of procedure"). Even had Fishman complied with Rule 12(b)(4)(B) by first identifying *specific* discoverable material which may be subject to a suppression motion, *see Conyers*, 2016 WL 7189850, at *10 ("This approach furthers the underlying purpose of Rule 12(b)(4)(B) of avoiding unnecessary motion practice without forcing the Government to reveal its trial strategy in advance"), his request would still fail. Rule 12(b)(4)(B) is not intended to give defense counsel a second bite at the apple with respect to resolved suppression motions once the Government produces an exhibit list shortly in advance of trial. This request, to the extent it is still applicable, should be denied.

Fishman Motion, Seth Fishman second guesses the probable cause determination of the issuing judge by impermissibly isolating and "dissect[ing] each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause," *Gangi*, 33 F. Supp. 2d at 306, and offering alternative, seemingly innocuous explanations for facts set forth in the affidavit, even though "innocent explanations for the same facts alleged . . . do[] not negate a finding of probable cause," *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1195157, at *9 (S.D.N.Y. Apr. 6, 2012) (citation omitted). In fact, Judge Ramos had a "substantial basis" for a finding of probable cause based on the following facts set forth in the February 14 Affidavit:

- Under applicable New Jersey racing rules, a horse may not carry in its body "any drug and/or substance foreign to the natural horse," which includes "chemical substances," as well as "anesthetics," "anti-inflammatories," and "epo." (February 14 Affidavit at 19). Under applicable New York racing rules, banned substances are considered those that are not specifically listed on a prohibited list of substances or in the rule itself, have "a pharmacologic potential to alter materially the performance of a horse, had no generally accepted medical use in the horse when treated, and [are] capable at any time of causing an action or effect, or both," within several body systems of a horse, but not a substance that (in relevant part) has "no effect on the physiology of a horse" except for nutritional purposes or to treat or prevent infections. (*Id.* at 19-20). Under applicable Florida racing rules, most substances (except those which are specifically enumerated) "cannot be administered to a horse within 24 hours of a race." (*Id.* at 20). The combination of these rules establishes that the administration of drugs—particularly those aimed at enhancing performance—on the day of a race is prohibited in multiple jurisdictions, and the New York racing rules further prohibit administering custom-made drugs intended to affect a racehorse's body systems horse beyond nutrition or the treatment/prevention of infection.

- Toll records showing communications between Fishman and Giannelli, who was described in the affidavit as a distributor of drugs to horse farms.

- A confidential source ("CS-4") was contacted by a third party in 2018 to purchase a PED created and sold by Seth Fishman, which the third party represented he or she had purchased from Seth Fishman. (*Id.* at 18-19). CS-4 purchased those vials and turned them over to yet another confidential source. (*Id.* at 19). CS-4 further stated that other Target Subjects involved in the investigation, including Jorge Navarro and Christopher Oakes, were users of Seth Fishman's products. (*Id.*).

The Fishman Motion picks at this evidence, claiming that the affidavit did not specify that the confidential source "purchased these substances based upon a representation that they would be used to enhance the performance of a racehorse," that Seth Fishman understood they would be used as PEDs, or that the vials were "recovered by agents of law enforcement, were subsequently tested, or, found to contain a banned substance." (Fishman Mot. at 10). No such specificity was required to meet the low bar of probable cause, particularly since this was one of several facts establishing probable cause in the affidavit. *See Fazio*, 2012 WL 1195157, at *8 ("The law is clear that establishing probable cause does not require meeting a particularly demanding standard." (citation omitted)). With regards to this acquisition of drugs, the circumstances of the purchase alone established probable cause. The confidential source that acquired the drug was described in the affidavit as a licensed veterinarian. (Fishman Mot. at 18). Presumably such an individual would be able to procure *legal* veterinary products intended for treatment, not for racehorse doping, without resorting to purchasing drugs from the third party, identified in the affidavit as "Conspirator-1." Conspirator-1 is described in the affidavit as a standardbred horse trainer who was previously "fined by Pennsylvania racing authorities for possession of syringes and needles consistent with the tools used for the administration of performance enhancing drugs." (February 14 Affidavit at 18). The mere fact that Seth Fishman sold drugs to Conspirator-1 itself raises the spectre that Seth Fishman was not acting as a veterinarian treating horses, but was more akin to a drug distributer. Conspirator-1's statement that two other targets of the investigation, Oakes and Navarro, used Seth Fishman's drugs (meaning drugs Seth Fishman created and distributed)—a fact that was corroborated by intercepted calls described later in the affidavit—lent credence to the notion that Seth Fishman was selling drugs for improper purposes.

29

The affidavit continued:

- Another confidential source ("CS-2") had procured from Rick Dane, Jr. "a vial of a powerful painkiller . . . intended to be more powerful than morphine" and "referred to as the 'Fishman Pain Shot,'" which Dane had obtained from Fishman's associate Lisa Giannelli. (February 14 Affidavit at 46). This same source stated to CS-2 that he knew Giannelli to be "tasked with delivering both legal and illicit veterinary substances to horse farms." (*Id.* at 46-47). Dane was described as a Standardbred horse trainer who had been "fined for a positive test for prohibited substances." (*Id.* at 46).

- A January 25, 2019 intercepted call in which Navarro discusses "this crazy fuck Seth" Fishman with Oakes, describing an injectable drug that Fishman sent to Navarro: "He sent me something with amino acid right last year. And I fucking gave it to this horse. This motherfucker galloped. Galloped." (February 14 Affidavit at 37). Navarro then asked Oakes for help in obtaining that drug, or another that Navarro could use. Oakes offered up an untestable drench that he had developed: "this drench I got dude, they can test you all day, night, before, after," and Oakes specifically stated that this untestable drench "has got a ton of those *branch chain amino acids* in it and especially made with it," touting that there is "zero chance you get caught" even when administered on "race day." (*Id.* at 38-39 (emphasis added)).

Importantly, this discussion—which the Fishman Motion pointedly ignores—punctures Seth Fishman's argument that "the substance referenced in the conversation appears to be an amino acid, an organic substance that is not alleged to be a performance enhancing drug or a banned substance." (Fishman Mot. at 11-12). First, on this call, the drug attributed to Seth Fishman is "something with amino acid"—it is not described as some purely innocuous substance, or even solely comprised of amino acid—and, more importantly, it is described by Navarro as having the effect of immensely improving the performance of a horse. Second, the subsequent conversation between Oakes and Navarro established that a drench with "branch chain amino acids in it" designed to be administered to a horse on the day of a race will not be detectable on drug tests, further supporting the probable cause determination that the potent Seth Fishman-produced drug Oakes and Navarro discussed had performance enhancing effect and may not be detectable on drug tests.

30

The affidavit continued still:

- A January 27, 2019 phone call between Navarro and Seth Fishman, in which Navarro asked Seth Fishman directly for "that amino acid injectable shit that you sent me" which prompted Seth Fishman to inquire later on the call whether Navarro could be more specific as to the drug he wanted, as Seth Fishman had "hundreds of products."

The Fishman Motion attempts to characterize this as an innocent interaction between a veterinarian and a client discussing a prior prescription to a horse that had "tied up" previously. (Fishman Mot. at 13-14). That explanation ignores the context of this and other conversations. During the call, Navarro did not refer to the specific racehorse who had had a prior medical issue; he instead referred to the product he was seeking. Fishman, too, did not respond by attempting to identify the racehorse that had experienced the issue, consulting the horse's prior medical history, or asking questions intended to diagnose any particular problem, but instead referred to his deep catalogue of drugs, stating that he had "hundreds of products." They do not discuss a particular patient-racehorse, medical issue requiring treatment, or reference a prescription. Navarro then abruptly ended the call, stating, "there is [sic] people in front of me I don't want to talk about medication in front of people, okay," further underscoring the implicit unlawfulness of their dealings. In short, Fishman was Navarro's drug dealer, not his veterinarian. His questions were geared towards fulfilling an order for drugs, not in treating a racehorse. Against this backdrop, Judge Ramos had a substantial basis to find that this call supported probable cause on the basis that this and other conversations were fundamentally inconsistent with a licensed veterinarian providing care to an animal, but more akin to a drug dealer servicing a notorious racehorse trainer like Navarro. (February 14 Affidavit at 43-44).

It is well established that "[t]he fact that an innocent explanation may be consistent with the facts as alleged . . . will not negate probable cause." *United States v. Fama*, 758 F.2d 834,

838 (2d Cir. 1985). Thus, even assuming *arguendo* that Seth Fishman's "alternative explanations" of the evidence "are not necessarily wholly implausible, they do not undermine the notion that there was at least probable cause upon which the warrant could issue." *United States v. Gotti*, 459 F.3d 296, 345 (2d Cir. 2006); *see also Fazio*, 2012 WL 1195157, at *9 (defendant "has provided several 'innocuous' explanations for the conversations on which the Government relied in their applications for wire tap authorization. However, the Court also finds plausible the non-innocuous interpretations of those conversations as provided . . . in the affidavits. Under the caselaw, where both readings exist, the minimal threshold for finding probably cause counsels in favor of crediting the non-innocuous reading." (citation omitted)); *see also id.* at *8 ("It is also clear that any doubt about the existence of probable cause must be resolved in upholding the issuing court's order." (citation omitted)); *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 483 (S.D.N.Y. 2013) ("[A]s the Second Circuit recently underscored, a reviewing court must 'grant considerable deference to the district court's decision whether to allow a wiretap, ensuring only that the facts set forth in the application were minimally adequate to support the determination that was made.' " (quoting *Concepcion,* 579 F.3d at 217 (internal quotation marks omitted))).[11]

    The Fishman Motion makes a brief argument regarding the legitimacy of the wire and mail offenses that were among the target offenses described in the wiretap affidavits. (Fishman

---

[11] The Fishman Motion quotes the portion of the February 14 Affidavit in which the affiant states the basis for his knowledge, suggesting that there was some impropriety in the affiant relying on others in preparing his affidavit, and further argues that a *Franks* hearing is required because the affiant gave inculpatory explanations of calls between Fishman and Navarro that defense counsel now argues are innocuous.  (Fishman Mot. at 14). There is nothing whatsoever improper with an affiant relaying information learned from others, or from reports and records he has reviewed, and Fishman cites no authority to the contrary. Nor is there any ground for a *Franks* hearing simply because Seth Fishman contests the agent's reasonable interpretations of intercepted calls, the content of which was presented to the issuing judge.

Mot. at 8). Alexander Chan makes related arguments, which are addressed briefly below. (*See* Chan Mot. at 21-22). Fishman first challenges the February 14 Affidavit on the basis that Seth Fishman was not indicted with having violated the Target Offenses set forth in the affidavit, but was instead charged with conspiring to violate the Food Drug and Cosmetic Act, which is not a predicate offense for obtaining a T-III wiretap pursuant to 18 U.S.C. § 2516. (Fishman Mot. at 8). This argument fails. Title III "allows the government to offer evidence [at trial] of other crimes when that evidence is obtained during the course of an investigation for an authorized offense." *Rajaratnam*, 2010 WL 4867402, at *3. The standard is whether the Government has "obtain[ed] wiretap warrants in good faith—that is, in connection with an offense for which Title III permits wiretapping—not as a subterfuge for gathering evidence of other offenses. If the government does so, any other evidence it happens to intercept will have been intercepted incidentally." *Id.* (citing *United States v. Levine,* 690 F.Supp. 1165, 1171 (E.D.N.Y. 1988)). *See generally United States v. Saint Clair*, No. 19 Cr. 790 (PKC), 2021 WL 3076677 (S.D.N.Y. July 20, 2021) (upholding search warrant of premises that set forth probable cause to search for evidence of securities fraud, money laundering, Bank Secrecy Act violations, and obstruction of justice, even though indictment charged defendant with one count of wire fraud).

Seth Fishman proffers no evidence of bad faith or "subterfuge" apart from the bare allegations in the Fishman Motion. There is no subterfuge where "[t]he wiretap applications candidly detailed the nature of the scheme for which wiretaps were sought," which each application in this case did. *Rajaratnam*, 2010 WL 4867402, at *4. Moreover, beginning with the April 30, 2019 Affidavit In Support Of Interception of Servis' Phone ("April 30 Affidavit"), and—as relevant to Seth Fishman—in the May 16 Affidavit, the various affidavits also noted that the same facts under investigation could constitute a FDCA violation. Seth Fishman's

33

argument "unrealistically assumes a gulf between" wire and mail fraud related to improperly

doping racehorses in advance of races to obtain purse winnings (the charges in each of the T-III

wire affidavits), with conspiring to distribute adulterated and misbranded drugs for the purpose

of improperly doping racehorses in advance of races to obtain purse winnings (the charges in the

operative S6 Indictment). *Id.* There is no such gulf, and the elements of mail and wire fraud

were met in each wiretap affidavit.[12] *Id.* at *6 ("[W]hen the government investigates [a crime for

which a wiretap is not authorized] for the bona fide purpose of prosecuting wire fraud, it can

thereby collect evidence of [other crimes], despite the fact that [the offense] is not itself a Title

III predicate offense. The government must still show, as six judges found that it did in this case,

that it is investigating wire fraud in good faith.").

  ii. <u>The Initial Seth Fishman Wiretap Application Sufficiently Described Limitations of Alternative Investigative Techniques, Including the Unreliability of Drug Testing</u>

   Judge Ramos properly found electronic surveillance was warranted given the lack of

reasonably available alternative investigative techniques.  The February 14 Affidavit devoted 11

pages to the subject of alternative investigative techniques and why they were unlikely to be

---

[12] The elements of a wire or mail fraud offense are, first, that the defendant knowingly participated in, devised, or intended to devise a scheme or artifice to defraud in order to obtain money or property; second, that the scheme included a material misrepresentation or concealment of a material fact; third, that the defendant had the intent to defraud; and fourth, that the defendant used or caused another to use wire, radio, or television communications in interstate or foreign commerce in furtherance of the scheme. *See* Sand, S2 Modern Fed. Jury Instructions – Crim., Instr. 10.02 (2019). In this case—as it relates to Seth Fishman, as well as to the other movants, including Chan —misstatements, deliberate omissions, or false pretenses employed by the defendant and/or co-conspirators in the form of lies to racing regulators, racetracks, owners and others to secure money from affected racetracks easily established probable cause to believe that evidence of a wire or mail fraud offense (and the movement of funds to conceal and promote those offenses, *i.e.*, money laundering) would be discovered through the use of the wiretaps.  That this same set of facts likewise satisfies the elements of a 21 U.S.C. §§ 331 and 333 does not suggest bad faith or "subterfuge," nor is it a basis for suppression.

successful in investigating Seth Fishman or Oakes. The February 14 Affidavit stated that: (1) undercover officers were unlikely to accomplish the objective's aims because "[p]rofessional horseracing networks are comprised of individuals well-known to each other, typically with longstanding ties" and that people involved in the crimes alleged "are reticent to discuss their criminal activity with outsiders," thus an undercover officer was unlikely to be fruitful; (2) why each confidential source the Government had available as part of this investigation would be unable to approach Fishman or Oakes, and the fact that "[e]ven were a source to approach FISHMAN or OAKES to arrange such a purchase, that sale would not illuminate the broader network of supply and distribution into which FISHMAN and OAKES fit;" (3) physical surveillance was not likely to achieve the objectives of the investigation as "[i]mportant aspects of the criminal activity engaged in by the Target Subjects are not amenable to physical surveillance," including because the administration of illicit substances to racehorses "most likely takes place in stables controlled by the Target Subjects, which are necessarily difficult areas to physically surveil given their location and the limited access to such spaces," and that such surveillance "rarely succeeds in gathering evidence of the criminal activities under investigation" as it does not reveal "the full membership of criminal conspiracies . . . or the full scope of target offenses." Elsewhere in the affidavit, and as illustrative of this point, the affiant discussed failed attempts by the NJRC to drug test Northern Virgin (trained by Surick, who collaborated with Fishman's direct co-conspirator Navarro to dope and evade detection), demonstrating the limitations of physical surveillance; (4) pole cameras were unlikely to be successful for the same limitations as those applicable to physical surveillance, and additionally the installation of a pole camera "in particularly interesting locations—i.e., in front of a particular stall" would likely be detected and "curtail[] the full investigation of the Target

Offenses"; (5) geolocation information would only reveal the physical location of participants in the offenses, but not "the means and methods of the Target Subjects, or of their planning and/or execution of the Target Offenses"; (6) telephone records and pen registers were unlikely to accomplish the investigation's objectives because while they would reveal limited information such as "the frequency of contact between and among the Target Subjects" they would not reveal the scope of the Target Subjects' offenses, including the types of drugs the participants used, or which horses received those drugs in advance of particular races; (7) grand jury process was unlikely to achieve the objectives of the investigation as it was unlikely to indicate that a target subject "administered a banned substance on a particular occasion or which banned substance he may have administered," and for various reasons, there was no viable witness to place in the grand jury, and any attempt to compel testimony "undoubtedly would alert the Target Subjects to the pendency of this investigation"; (8) search warrants would not be appropriate as key locations that would have evidence of the Target Offenses had not been fully identified, and a prior search warrant that was executed to surreptitiously obtain a blood draw of Surick's horse, Northern Virgin, after Surick had administered a blood builder to that horse, was only possible as a result of intercepted communications, thus, wire interceptions were necessary; (9) arrests of Target Subjects to obtain their cooperation would alert other Target Subjects to the investigation and cause them to change their behavior in a manner that would jeopardize the investigation; (10) trash searches were unlikely to yield useful information given the nature of the crimes and the low likelihood that the Target Subjects would discard incriminating evidence; (11) financial records were unlikely to achieve the objectives of the conspiracy, as bank account records would not reveal the substances administered to racehorses by Target Subjects, or the timing of such administration. (February 14 Affidavit Pages 30-32, 49-60). Finally, the affidavit detailed the

36

prior and ongoing Title III wiretaps and the limitations of such information in uncovering details of Fishman and Oakes' participation in the Target Offenses.  (*Id.*). Each of these enumerated limitations—all based on reasonable assumptions drawn from the lived experience of the investigation to date—supported Judge Ramos' interception order.

This recitation, like those in other wiretap affidavits in this case, provided a fulsome discussion of the limitations on multiple categories of alternative investigative techniques, highlighting the unique utility of the wiretap to achieve the goals of the investigation. Of course, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *Levy*, 2012 WL 5830631, at *4 (quoting *Concepcion,* 579 F.3d at 218 (2d Cir.2009) (quotations omitted)).  Nor is it necessary that agents pursue "theoretically possible" investigative techniques. *Id.* (citation omitted).  Title III "only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Diaz*, 176 F.3d at 111 (internal quotation marks and brackets omitted).  Consistent with these standards, the February 14 Affidavit detailed why, due to the nature of the Target Offenses, a wiretap was necessary.  The Second Circuit has repeatedly "approved of wire-taps in complex and sprawling criminal cases involving large conspiracies." *Concepcion*, 579 F.3d at 218 (citing  *Torres*, 901 F.2d at 232). There is little doubt, given the allegations in the affidavit, that the scheme under investigation was "complex and sprawling."  There is also no doubt, based on the descriptions of prior intercepted calls involving other Target Subjects apart from Fishman and Oakes, that the nature of this scheme relied upon the use of telephones, making wiretaps a "particularly appropriate" investigative technique. *See United States v. Pichardo*, No. 97 CR. 233 (LMM), 1999 WL 649020, at *4 (S.D.N.Y. Aug. 25, 1999) ("'[W]iretapping is particularly

37

appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." ' (quoting *Young,* 822 F.2d at 1237)); *see also Fazio*, 2012 WL 1195157, at *11 (finding necessity in multiple affidavits where affiant "spent pages detailing the alternative means that had been used or considered and why they were inadequate" and noting, "There can be no serious dispute that given the particular nature of this investigation, in which the content of communications is critical and secretive, that toll, pen register analyses, and physical surveillance here could not reach far enough.").

    Further, as established in the affidavit's description of the limitations of physical surveillance, "where the location of the subjects of the investigation precludes the use of informants or nonwiretap surveillance, wiretap warrants have been upheld." *Lilla*, 699 F.2d at 103–04 (citation omitted) (discussing state decisions on wiretaps). The February 14 Affidavit convincingly established that the scheme was complex and sprawling, that phone conversations were a significant means of committing the Target Offenses, and that the nature of the crime was such that a wiretap was necessary, and that alternative investigative techniques had been considered but had either been exhausted or "reasonably appeared unlikely to succeed if tried" given the affiant's experience with the investigation to date, and given the nature of the crimes under investigation, and where the administration of substances was expected to take place. 18 U.S.C. § 2518(3).

    The Fishman Motion quibbles with the thorough and lengthy discussion of alternative investigative techniques in the February 14 Affidavit and summarily concludes that the affidavit "utterly failed" at establishing "necessity" for a wiretap of Seth Fishman's phone. (Fishman Mot. at 16). But the Fishman Motion purposefully ignores the bulk of the information that Judge Ramos considered, based on a wishful view of how a different investigation might have

38

unfolded.  "Defendants are not entitled to second-guess the Government's investigation."  *Levy,*

2012 WL 5830631, at *9.  "The Second Circuit has repeatedly held that no 'particular

investigative procedures [must] be exhausted before a wiretap may be authorized.' "  *Id.* (quoting

*Young,* 822 F.2d at 1237 (quotations omitted)).

The Fishman Motion first claims that the Government should have "attempt[ed] to

arrange a controlled buy of products distributed by Fishman," through an undercover officer or

confidential source, citing as proof that this would have been successful *evidence developed after*

the February 14 Affidavit had been sworn out, including on the basis of a March 21, 2019

conversation, and controlled purchases in June and August 2019 through a confidential source

("CS-7").  (Fishman Mot. at 15 & Exs. B at 75-82 & F at 9).  It goes without saying that the

Government is not unreasonable in doubting that a target of a criminal investigation would be

receptive to a "cold call" from an unknown undercover officer or confidential source.  The

February 14 Affidavit set forth the reasons why introducing an undercover officer to Seth

Fishman was unlikely to be productive, and—contrary to the Fishman Motion's allegations—

specifically stated that the agents had contemplated a controlled purchase, but that even if a

source were well-positioned to arrange for a controlled purchase, "that sale would not illuminate

the broader network of supply and distribution into which FISHMAN and OAKES fit."

(February 14 Affidavit at 50).  In short, this investigative method was contemplated, found to be

an insufficient and then-impractical investigative step, and Judge Ramos—notwithstanding the

possibility of pursuing this investigative technique—still authorized the wiretap.

The Fishman Motion also ignores all the subsequent evidence developed after February

14, 2019 indicating that Seth Fishman, far from being "prepared to discuss the nature of his

business with individuals who are comparative strangers to him," (Fishman Mot. at 15), had

39

numerous conversations in which he discussed the "trustworthiness" of potential clients (which appeared to be U.S.-based). Such conversations both corroborate the reasonableness of the Government's position prior to the February 14 Affidavit, and strengthened that position in advance of subsequent applications. For example, in the April 17 Affidavit, the affiant described multiple conversations in which Fishman inquired as to whether potential customers had been vetted by Giannelli or co-defendant Rick Dane Jr., and whether or not these customers could be trusted. (*See* April 17 Affidavit at 55-56 (discussion of a text message in which Seth Fishman texted Giannelli to ask, "Can you trust" a potential customer, to which Giannelli responded, "yes."); *id.* at 56-57 (discussion of phone call in which Seth Fishman stated: "I didn't want to talk to him [a potential customer] too much because I didn't know if he was trustworthy.").

The Fishman Motion next argues that the February 14 Affidavit did not sufficiently explain whether the bank accounts of Seth Fishman or his company had been subpoenaed, and what, if anything, that evidence revealed. (Fishman Mot. at 15). Yet again, the Fishman Motion entirely overlooks the explanation provided in the affidavit as to why a financial investigation would not uncover sufficient evidence of the Target Offenses (such as evidence of when and which substances were administered to a racehorse, which is unlikely by its nature to be reflected in bank records). Even had the affidavit discussed in detail any financial investigation into Seth Fishman's or his company's bank accounts, a financial investigation would not have been a reasonable alternative to the wiretap of the Fishman Phone, for the reasons the affiant listed.

Finally, the Fishman Motion takes issue with the fact that the February 14 Affidavit did not explain whether or not "any of the trainers to whom Fishman was allegedly providing his products were [drug] tested in the aftermath of a race," and that the Government ought to have "obtain[ed] the cooperation of racing authorities in choosing those horses to test." (*Id.* at 15-16).

40

As an initial matter, the absence of any discussion of drug testing related to Seth Fishman was apparent from the February 14 Affidavit, and was nevertheless approved by Judge Ramos. Seth Fishman's "second-guess[ing] the Government's investigation" is no basis to undermine Judge Ramos' finding that alternative investigation techniques were not reasonably available. *See Levy*, 2012 WL 5830631, at *9. Indeed, the "testablility" of drugs was at the core of the investigation insofar as utilizing drugs that specifically would not "test" was understood to be a critical method in accomplishing the goals of the Target Subjects' fraudulent schemes.

Moreover, the February 14 Affidavit *did* set forth a lengthy description of the challenges of relying upon drug testing, both, because unannounced testing was subject to subterfuge, and because the drugs under investigation may not be detectable. In the "Background" section of the February 14 Affidavit, the affiant detailed an attempted unannounced, out-of-competition drug test by the NJRC of Surick's racehorse Northern Virgin. (February 14 Affidavit at 30-33). This section discussed the fact that, on two occasions, racing officials surprised Surick at a training center in order to test Northern Virgin, but that on both occasions Surick hid that racehorse in order to avoid drug testing and that—throughout this time—Surick had phone communications with Navarro and others in which Surick discussed the short window of time in which the blood builder Surick administered to Northern Virgin would be detectable on a drug test. (*Id.* at 31). Surick also instructed others to lie about Northern Virgin's whereabouts in order to conceal the fact that he had administered a blood builder and had hid that horse from the NJRC to avoid a positive drug test. (*Id.* at 32).

Later in the February 14 Affidavit, and as detailed above, the affiant described an intercepted conversation between Navarro and Oakes in which they discussed a particular drench prepared by Oakes containing "branch chain amino acids" which Oakes touted as untestable,

even if provided on the day of a race. (*See* February 14 Affidavit at 37-39 ("this drench I got

dude, they can test you all day, night, before, after . . . zero chance you get caught.")). The

affidavit detailed conversations between Target Subjects that are part of the investigation, setting

forth the inherent challenges of relying upon drug testing to accomplish the objectives of the

investigation. This fact was further underscored by the affiant's description of the limitations of

relying upon search warrants, referring back to Surick's concealment of Northern Virgin, and

stating that agents were only able to locate and obtain a search warrant for a blood draw of that

doped racehorse because agents were intercepting Surick's cell phone, over which he discussed

which horse had been doped, what Surick had administered to the horse, where Surick had

hidden the horse, and Surick's efforts (in concert with others) to conceal his actions, among other

conversations.

        The futility of relying upon drug testing in lieu of wiretaps was further substantiated by

intercepted communications post-dating the February 14 Affidavit, which only affirmed the

inherent limitations of relying upon drug testing, and the reasonableness of the affiant's position

that drug testing would not be a fruitful alternative to wiretaps given the nature of the conduct

being investigated.

        In a February 21, 2019 intercepted conversation between Seth Fishman and a customer,

detailed in the March 19 Affidavit, and in subsequent affidavits, Fishman discussed his ability to

supply an equine epogen (*i.e.*, a blood builder) that would not test positive on a drug test.  (*See*

March 19 Affidavit at 51).  Later in that same conversation, Fishman confirmed with this

customer that he had a product which he was "very confident" would not show up as positive on

any drug test because a representative of the New Jersey Racing Commission had tested a

racehorse "literally 12 hours" after the substance had been administered, the blood sample was

sent for analysis to a laboratory in Hong Kong for testing, and the drug ultimately did not test positive. (*Id.* at 53). In another call, described in the March 19 Affidavit, Fishman stated to Giannelli that he had a "broncho-dilator that never came to market" which he stated was "a lot safer than anything else people are doing because it's not on the market," clearly referring to the risk of the user getting caught by racing regulators, and not the anticipated health risks of using such a drug, given that the drug Fishman described was not commercially available, and given that Fishman and Giannelli soon after discussed the testability of drugs generally. (*Id.* at 56-57). On a March 7, 2019 call, also detailed in the March 19 Affidavit, Fishman discussed with a potential customer the benefits of using a drug that is not commercially available, that is, an uncommon drug, because "unless somebody turns you in to the race jurisdiction, no one is going to test for it because it's not known until it is known." (*Id.* at 64). Fishman stated that he, accordingly, created customized drugs for each trainer to reduce the risks of any one trainer getting caught using one of his drugs simply because a second trainer did "something stupid." (*Id.*). Later on that same call, Fishman discussed the consequences of yielding a "cloudy"— neither a positive nor a negative—drug test, and stated that such inconclusive tests are not preferred because the racing commissions then "know you are doing something wrong, [but] *they can't prove it is what it is*" so even if the trainer subject to a "cloudy" drug test keeps his or her license, the trainer will be "forever tortured." (*Id.* at 65-66 (emphasis added)). In yet another intercepted communication that same day, Seth Fishman sent text messages to Jordan Fishman and asked about the testability of "equine EPO," a shorthand for Epogen. (*Id.* at 68).

On another intercepted call on March 20, 2019, described in the April 17 Affidavit, Seth Fishman discussed labeling a drug with false directions indicating that the drug should be used "6 days out," that is, 6 days prior to a race, for the sole purpose of misleading anyone who may

find the bottle, "because it is like it's a disclaimer that it [the drug] is not a pre-race," meaning a drug that should be used a short time before the beginning of a race. (April 17 Affidavit at 72-74). On a March 21, 2019 intercepted call, Seth Fishman explicitly explained to a potential customer that he made customized products for individual customers "because obviously if these horses are being tested and they have something that somebody else has and that person is irresponsible then it becomes a problem for them," (*id.* at 77), reiterating his statements earlier that he created customized products, not to tailor his treatments to particular ailments or particular horses, but to silo product lines to reduce the collateral consequences of one trainer getting caught using Seth Fishman's drugs. On an April 5, 2019 intercepted call between Seth Fishman and a potential customer, also detailed in the April 17 Affidavit, Seth Fishman responded, when asked if administering his drugs to horses constituted doping, "Of course it's doping, the question is it testable doping . . . any time you give something to a horse, that's doping. Whether or not they test for it is another story." (*Id.* at 92-93). On an April 19, 2019 call detailed in the May 16 Affidavit, Seth Fishman and Jordan Fishman discussed formulating a particular product, with Jordan Fishman remarking that "there is no way to detect" the drug they are discussing because "there is nothing that they would be looking for which is really interesting." (May 16 Affidavit at 84). In a May 6, 2019 intercepted phone conversation, when discussing the testability of drugs by a particular international entity, the Fédération Equestre International ("FEI"), Seth Fishman related that the entity listed certain prohibited drugs, but "they [FEI] can't test for [them] period," even if those drugs are listed as prohibited. (*Id.* at 96-97 ("They can say whatever they want the question is what can they definitively test for. Because there is stuff in FEI that they can't test for period and they say they can or they list it.")).

Moreover, interceptions of the Navarro Phone both before and after the February 14

Affidavit further reinforced agents' belief that drug testing was futile in investigating individuals using custom-made drugs for the purpose of improving performance without detection. (*See, e.g.*, February 6 Affidavit at 35-59 (describing a January 13, 2019 conversation in which Navarro discussed methods to evade drug tests); *id.* at 40-45 (describing a January 16, 2019 conversation in which Navarro discussed the untestability of a drug); April 5 Affidavit at 55-58 (describing an April 3, 2019 call in which Navarro discussed with Zulueta the testability of a drug administered to XY Jet in advance of a race); May 3 Affidavit at 43-44 (describing an April 12, 2019 call in which Navarro discussed ceasing use of a blood builder on his horses out of concern that his horses were subject to increased drug testing); *id.* at 50 (describing an April 16, 2019 call in which the affiant represented his belief that Navarro had discussed pulling a horse's blood after administering a drug, which may be done "to ensure that the horse will not test positive on any drug tests administered by raceways or racing officials, or to ensure that any performance-enhancing substances administered to a horse have taken effect"); 2020 Oakes Barn SW at 19 (search warrant affidavit describing a January 17, 2019 conversation in which Navarro and Tannuzzo discussed a particular generic blood builder that Navarro uses which, unlike Epogen, is not anticipated to test positive); *id.* at 23 (describing February 18, 2019 conversation between Navarro and Zulueta discussing a drench created by Oakes and used by Navarro which Navarro claimed was "a milkshake that he makes that won't so much . . . The day of the race, the day of the race . . . he [Oakes] says you can take their blood and nothing will come out," and that unlike other drenches where "they catch you," Oakes' version would not test)).

    In short, given that "the scheme being investigated was exceedingly complex," and that there were ample intercepted conversations indicating that the drugs distributed amongst a number of the Target Subjects by design would not be detectable on drug tests, it was unlikely

that including a description of the limitations of drug testing beyond what was already described in the February 14 Affidavit (and those that followed) "would eviscerate the necessity of the wiretap." *Zemlyansky*, 945 F. Supp. 2d at 484. Even assuming that drug testing had been widely pursued, drug testing alone would not have revealed the scope of *which* (untestable) drugs were at issue, *which* trainers were purchasing drugs from Seth Fishman, or *when* these trainers were administering these drugs to racehorses in advance of races. Indiscriminate drug testing of various racehorses at various times in the hopes of yielding a positive test (ignoring for the moment that the drugs being administered were designed to be undetectable on drug tests) is not "reasonably likely" to have succeeded, or to have obviated the need for a wiretap. In sum, Seth Fishman has provided no justification for why the proposed alternative techniques would be likely to succeed, and not just be "theoretically possible." *Levy*, 2012 WL 5830631, at *9 (citing *Concepcion,* 579 F.3d at 218).[13]

---

[13] Alternatively, even were this Court to disagree with the arguments set forth above, this Court can and should find that because the agents acted in good faith in relying on the February 14 order authorizing the initial wiretap of the Fishman Phone, suppression is not required. As noted above, and as courts in this District have repeatedly held, the "good-faith exception to the exclusionary rule . . . applies in Title III cases." *Tomero*, 462 F. Supp. at 572. As such, "even if the order failed to comply with Title III's requirements," the motion to suppress should nonetheless be denied where "nothing in the record suggests the government implemented it in bad faith." *Id.* at 572; *see also Bellomo*, 954 F. Supp. at 638 (noting that "[a]lthough *Leon* does not directly address electronic surveillance, numerous courts have extended its holding to such evidence" and concluding "that *Leon* applies in these circumstances") (collecting cases); *see generally United States v. Bianco*, 998 F.2d 1112, 1125-26 (2d Cir. 1993) (extending judicially crafted exception to the Fourth Amendment exclusion rule apply recognized in *Franks v. Delaware*, 438 U.S. 154 (1978) to the Title III suppression remedy). While the Fishman Motion glibly claims that the affiant should have adopted alternative, innocuous interpretations of phone calls cited in the affidavit, as discussed above, this is simply insufficient to find that the affiant "was dishonest or reckless" and, consequently, cannot meet the high standard for a showing of bad faith. The agents involved in the investigation were entitled to rely on the fact that a judge had reviewed the Government's application, which met every requirement of Title III, and had approved the wiretap of the Fishman Phone based on that application. As such, even if this Court finds that Judge Ramos erroneously authorized the initial order of interception of the Fishman Phone (or that any other District Judge erred in authorizing the various interception extension orders), the Court should

iii.    There Is No Basis to Suppress The March 19, 2019 Extension Order of the Seth Fishman Wiretap

There is no basis to suppress the extension order authorizing continued interceptions of the Fishman Phone, which was issued by Judge Stein in reliance upon the March 19 Affidavit, for lack of probable cause.  First, given that there is no basis to suppress the initial interception order issued on February 14, the subsequent extension order issued on March 19 is not the "fruit of the poisonous tree," as Seth Fishman asserts.  (Fishman Mot. at 17).  Second, and as discussed above, Seth Fishman's presentation of possible, innocuous interpretations of calls described in the March 19 Affidavit do not undermine Judge Stein's finding of probable cause.  The availability of an alternative interpretation of certain calls between Seth Fishman and others does not preclude the agent's interpretation that these calls were made in service of the Target Offenses.  *See Fazio*, 2012 WL 1195157, at *9.  More to the point, the Fishman Motion does not allege that the affiant deliberately or recklessly falsified the descriptions of the calls to mislead the magistrate judge; Seth Fishman instead argues that both the affiant and Judge Stein were wrong for finding that the substance of the calls—which were quoted and discussed in the affidavit—supported a probable cause finding. In making this argument, Seth Fishman applies an overly-exacting standard that is not applicable for reviewing a probable cause finding.  For example, the Fishman Motion quotes text messages exchanged between Seth Fishman and Jordan Fishman in which they discuss certain components of a particular drug, claiming that this exchange "reinforces the notion that Fishman uses organic substances" and that "[n]o narcotics

nonetheless find that suppression is not warranted here because agents acted in good faith.  *But see United States v. Rice*, 478 F.3d 704 (6th Cir. 2007) (good-faith exception to exclusionary rule is not applicable to an improperly obtained warrant for a wiretap; however, as Judge Kaplan noted in *Bellomo*, the weight of authority in this District has reached the opposite conclusion).

or other drugs are mentioned." (Fishman Mot. at 17). That portion of Seth Fishman's motion simply ignores the totality of the evidence presented in the applications, including conversations about paradigmatically prohibited substances (in which it is entirely immaterial whether the substance is "organic") (*see* March 19 Affidavit at 54, 66, 68-69 (discussing "blood builders")).

In advancing its fundamentally flawed arguments, the Fishman Motion, thus, quotes several conversations from the March 19 Affidavit in which Seth Fishman and a third party discussed blood builders or other substances designed to mimic the effects of Epogen, yet entirely ignores the explanations provided in that affidavit discussing why such distribution of blood builders to those in the racehorse industry is pernicious. The March 19 Affidavit—in discussing the prohibitions set forth in various states' racing regulations—clearly set forth that a broad array of substances could be used to improperly dope a horse, including "chemical substances," any substance that "has a pharmacologic potential to alter materially the performance of a horse, has no generally accepted medical use in the horse when treated, and is capable at any time of causing an action or effect" in various of the horse's systems, among other prohibitions. (*Id.* at 21-22).

The very arguments the Fishman Motion makes in its attempt to sanitize these selectively quoted discussions are—in fact—reasons supporting probable cause to find that the Fishman Phone was being used to communicate with others, including Navarro, regarding a scheme to obtain money through the use of misrepresentations, false pretenses, and interstate wires.[14]

---

[14] Unsurprisingly, given the contents of the intercepted communications, the Fishman Motion concedes that Seth Fishman, on a particular call, described "a custom-made product intended to mimic the benefits of Epogen," and that Seth Fishman did "not appear to be prescribing substances to particular horses"; this is entirely consistent with the Government's theory of the case and, significantly, with the information set forth in the March 19 Affidavit, which undercuts any notion that Seth Fishman was operating as a veterinarian supplying drugs for a medical purpose. This and other calls described in the March 19 Affidavit support a probable cause finding that Seth

Judge Stein had a "substantial basis" for a finding of probable cause based on the

following facts set forth in the March 19 Affidavit, among others:

- The series of calls discussed above between Oakes, Navarro, and Seth Fishman, which were included in the February 14 Affidavit, discussing a particular product Seth Fishman distributed. *See supra* Part II.A.i.

- A February 19, 2019 intercepted call in which Seth Fishman discussed the testability of a substance that contained Tramadol, compounding drugs, and restrictions on shipments of "scheduled" drugs. (March 19 Affidavit at 47-50).

- A February 21, 2019 intercepted call in which a customer—with no reference to treating a horse for a medical condition—asked for a blood builder offered by Seth Fishman called "BB3," Seth Fishman discussed the testability of an "equine epogen," and later discussed the amount of "epo" that would result in "a not test" as compared to the amount necessary to cause an effect on the horse. (*Id.* at 50-52). Seth Fishman later on the call stated that "building blood is not cheap," that it is "[t]he holy grail of sports," and that in Seth Fishman's opinion, many horses entered into thoroughbred racing are not tested "out of competition," implying that these horses would likely fail drug tests. On that same call, and immediately after this discussion, Seth Fishman assured the customer that the blood builder he offered would not test positive even a few hours after it had been administered because a horse was tested "literally 12 hours" after the substance had been administered and the sample was sent for testing to a laboratory in Hong Kong, yet the substance did not test. (*Id.* at 53-55). This discussion, entirely ignored in the Fishman Motion, further underscores that Seth Fishman was not creating and selling substances to *comply* with applicable racing rules and regulations, but to *evade* drug testing that would reveal a violation of such rules. Through that evasion, Fishman and his clients attempted to falsely present their horses as eligible to participate in lucrative races, knowing that this was false.

- A February 26, 2019 intercepted call in which Fishman and Giannelli discussed starting a customer on a blood builder program, including whether or not that customer was "trustworthy," and steps Giannelli could take to vet the customer. (*Id.* at 55). On that same call, Fishman discussed a "broncho-dilator that never came to market" which he stated is "a lot safer than anything else people are doing because it's not on the market." As stated above, and given the context of this call, this conversation clearly references the risk of the user getting caught by racing commissions, and not the anticipated health risks of using such a drug, given that the drug Fishman described on the call is not commercially available,

---

Fishman was supplying customized performance enhancing drugs to those in the racehorse industry *not* to treat a medical condition in any particular racehorse, but to improve race performance.

and given that shortly after this exchange, Fishman and Giannelli discussed the testability of particular drugs.  (*Id.* at 56-57).

- A March 4, 2019 call in which Seth Fishman and another individual discussed a product Seth Fishman distributed to trainers, known as VO2 Max.  (*Id.* at 57-59).

- A March 5, 2019 call in which Seth Fishman and another individual discussed "building blood" for particular horses, (*id.* at 60-62), followed shortly after by a March 7, 2019 call with the same individual in which Seth Fishman discussed providing this individual "the EPO memetic" which "work[s] like Epogen but they're not Epogen," (*id.* at 63), including discussing a potential "5 to 10 year[]" suspension if someone were to "get an Epogen positive" due to out of competition testing, (*id.*). Fishman also discussed on this call the comparative benefits of using a drug that is not commercially available—not for any medical benefit or necessity, but to avoid getting caught, because "unless somebody turns you in to the race jurisdiction, no one is going to test for it because it's not known until it is known," and that Fishman accordingly created customized drugs for each trainer to reduce the risks of any one trainer getting caught using one of his drugs simply because another trainer did "something stupid."  (*Id.* at 64).  Fishman also discussed the need to avoid even a "cloudy," (*i.e.*, inconclusive), drug test because the relevant racing commissions "know you are doing something wrong, [but] *they can't prove it is what it is*" given the untestability of the product. On this call, Fishman discussed the need to avoid even an inconclusive test result, relating that even if a drug test result was not positive and the trainer was allowed to keep his or her racing license, the user would "be forever tortured" by the commissions.  (*Id.* at 65-66 (emphasis added)).

- A March 7, 2019 text message exchange wherein Seth Fishman discussed orders for various products, including VO2 Max and Epomimetic, and further asked: "also need to know if way to test Equine EPO," (*id.* at 68), once again, indicating that Seth Fishman was aware that his clients were involved in the racehorse industry, were subject to drug testing, and that any "epo" or "Epogen" he provided to racehorse trainers must be undetectable on drug tests so that trainers would not get caught, which is hardly the concern of a licensed veterinarian seeking to treat a horse's medical condition.

- A March 12, 2019 intercepted call in which Fishman and an individual intercepted on prior calls discussed in the same affidavit discussed an equine growth hormone.  (*Id.* at 69-72).

- A February 19, 2019 intercepted call over the Oakes Phone in which Seth Fishman and Oakes discussed supplying one of the products Seth Fishman distributed, VO2 Max, to Navarro, with Oakes acknowledging that he removed the label from the drug before giving it to Navarro.  (*Id.* at 72-73).

50

There was more than sufficient probable cause supporting a wiretap of Fishman's Phone on the basis of the March 19 Affidavit.

iv.    There Is No Basis to Suppress The Warrants Authorizing Searches of Seth Fishman's Dropbox And Email Accounts, Cellular Phones, or Premises

Seth Fishman further moves to suppress: (1) a search of a Dropbox account associated with him and/or his business; (2) a search of two email accounts associated with him and/or his business; (3) searches of electronic devices seized from Seth Fishman ; and (4) searches of three premises associated with Seth Fishman and/or his business.[15]  For the reasons explained below, suppression is unwarranted.[16]  First, with respect to the search of email accounts attributed to Seth Fishman, (*see* Fishman Email SW, Fishman Mot. Ex. E), no specific reasons are provided for suppression of those searches; the Fishman Motion merely argues that, like the Fishman

---

[15] The Government takes Seth Fishman's motions as an admission that he in fact owned and controlled the various devices, premises, and data storage facilities implicated in his motion, although Seth Fishman has not submitted his own declaration asserting his privacy interest. *United States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988) ("When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated."); *Ruggiero*, 824 F. Supp. at 391 ("a defendant must submit an "affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search."), *aff'd*, 44 F.3d 1102 (2d Cir. 1995). In the event that Fishman intends to contest his relationship to these accounts, locations, or devices, the present motion would be meritless for lack of standing.

[16] If this Court were to suppress a wiretap application authorizing intercepts of Seth Fishman's phone, the remedy would not be automatic suppression of all subsequent process obtained in reliance on the suppressed materials. Instead, and pursuant to the independent source doctrine, the Court must analyze any subsequent search warrants to determine whether, "putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause."  *See Lace*, 669 F.2d at 49 (quoting *Giordano*, 416 U.S. at 555) (Powell, J., concurring in part and dissenting in part).  Because each application draws from various wiretap orders subject to challenge, and also from sources of information entirely independent from the intercepted calls that may be subject to suppression, the Government respectfully requests the opportunity to address the impact of any motions to suppress the Court grants, and assumes in this brief that all the defendant's suppression motions will be denied as meritless for the reasons argued herein.

Dropbox SW discussed below, the supporting affidavit fails to link Seth Fishman to the email accounts sought to be searched,[17] and fails to establish probable cause that evidence of the specified crimes will be found in those email accounts.[18]  (Fishman Mot. at 20-22).    To the contrary, the Fishman Email SW set forth probable cause that Seth Fishman was involved in the enumerated crimes; linked Seth Fishman to an email account (bearing Seth Fishman's full name) based on phone subscriber records and an intercepted communication; and established that Seth Fishman used this email account to conduct his drug distribution business based on the substance of an email sent from this account that explicitly discussed certain products which Seth Fishman offered for sale as part of his scheme, including the custom-made blood builder BB3, and products that could be used "4 hours out" or "6-8 hours out"; and phone conversations with co-conspirators and others in which Seth Fishman provided this email account as his contact information in the course of discussing the Subject Offenses.  (*See* Fishman Email SW at 31-33). The Fishman Email SW also set forth probable cause that Seth Fishman was linked to another email account through which he conducted business through his company based on the name of the email account itself (which included "Seth" and the company's name), and described multiple emails sent from this account invoicing a co-conspirator for products sold, including "BB3," among other products.  (*Id.* at 34-36).  It is hardly necessary to establish which horses were receiving which drugs at which times in order to establish probable cause that *any* evidence

---

[17] Again, to the extent that Fishman actually contests his association with these accounts, the Government notes that Fishman would lack standing to contest the searches in the event that he is *not* in fact sufficiently associated. *Rahme*, 813 F.2d at 34.

[18] The Fishman Motion does not argue that there is no probable cause that a crime was committed as, indeed, there is ample proof of that in the affidavit.  Notably, the Fishman Email SW specified that one of the Subject Offenses sought to be uncovered by the search included "misbranding of drugs and devices," in addition to mail and wire fraud and conspiracy to commit the same. (Fishman Email SW at 4).

of the specified crimes would be found in Seth Fishman's email accounts.[19]  There was sufficient

probable cause to establish that the drugs Seth Fishman distributed, if administered to racehorses,

would violate racing rules in various respects, that he sought to circumvent applicable drug tests,

and that evidence of his business activities would be found in his email account.  No more is

required.  Consequently, this aspect of the Fishman Motion fails.

Second, with respect to the search of the Dropbox account linked to Seth Fishman and/or

his business, (*see* Fishman Dropbox SW, Fishman Mot. Ex. D), the only argument the Fishman

Motion articulates in support of suppression is that insufficient facts are alleged to show that

Seth Fishman "uses the Dropbox account" or that evidence of the Subject Offenses will be found

on the Dropbox account.  (Fishman Mot. at 22).[20]  Again, Seth Fishman is wrong.  The Fishman

Dropbox SW likewise included among the Subject Offenses "misbranding of drugs and devices,"

in addition to mail and wire fraud.  (Fishman Dropbox SW at 2).  The affidavit in support of the

search stated probable cause to believe that Seth Fishman used the Dropbox account based on the

fact that the Dropbox mobile application was found in a cellular phone seized from Seth

Fishman, (Fishman Dropbox SW at 23), and, further, established that the file names that

appeared to be stored on that Dropbox account corresponded with adulterated and misbranded

---

[19] The Fishman Motion challenges the notion that evidence from one source (*i.e.*, an email account) can be combined with evidence from another source (*i.e.*, intercepted calls, race entries, and proof of purse winnings) in order to establish a complete picture of the Subject Offenses. Seth Fishman's argument is based on the apparent notion that a single search must be anticipated to yield evidence of *all* elements of a crime before it may be authorized.  That is not the standard. The affiant need not show that a search would uncover *complete* evidence of a crime, only that it would uncover *some* evidence of a crime.  This, and the other warrant affidavits challenged by Seth Fishman, certainly meet the threshold of showing that some evidence of a crime would be uncovered as a result of the search.

[20] As stated above, were Fishman not associated with the Dropbox account, as he implies in the Fishman Motion, he would lack standing to challenge its search. However, his control of the Dropbox account is and was overwhelmingly clear.

drugs that Fishman manufactured and sold, and that several of those drugs violated the racing

rules in various respects or had performance enhancing effect. The application even quoted calls

between Seth Fishman and a co-conspirator in which Seth Fishman referred to the Dropbox

account in discussing information related to particular drugs. (*Id.* at 23-25).

Third, with respect to the searches of Fishman's cellular devices, the arguments in the

Fishman Motion are confused and meritless.  The Fishman Motion appears to suggest that the

March 29 Fishman Phone SW, obtained on March 29, 2019, was executed on October 22, 2019,

(Fishman Mot. at 22), but later acknowledges that there were indeed two separate search

warrants seeking to search Fishman's cellular devices on two separate occasions: first, the search

warrant obtained on March 29, 2019 authorizing an anticipatory, covert search; second, the

search warrant obtained on January 15, 2020, for devices already (overtly) seized from Seth

Fishman following Seth Fishman's arrest in October 2019.  In any event, Seth Fishman's

substantive challenges regarding each search warrant fail.  The only basis on which Seth

Fishman challenges the March 29 Fishman Phone SW is that it is "fruit of the poisonous tree"

insofar as it contains intercepted communications.  (*Id.* at 23).  Because there is no basis to

suppress the wiretaps of Seth Fishman's phone, there is likewise no basis to suppress the fruits of

this search.  Seth Fishman then (apparently, though not explicitly) challenges the January 15

Fishman Electronics SW on the basis that "the affidavit mischaracterizes certain conversations."

(Fishman Mot. at 23).  Despite this allegation, the Fishman Motion can only muster one example

of an apparently misquoted conversation, in which the agent describes an intercepted call

between Seth Fishman and another individual wherein they discuss creating and selling a

particular product, and the possibility of using the drug Tramadol.  (*Id.* at 23-24).  Perplexingly,

the Fishman Motion suggests that the affiant erred in explaining that Tramadol can be used as a

pain reliever because, in the course of that call, Fishman stated: "We can't use Tramadol because they tested that in horses easily, you know?" (January 15 Fishman Electronics SW at 10). The affiant's (correct)[21] explanation of Tramadol did not contradict or otherwise provide any misleading information regarding this conversation, in which Fishman stated that he was not using Tramadol, as that drug was testable.

The Fishman Motion entirely ignores the fact that: the October 28, 2019 Complaint charging Seth Fishman with violating the Food, Drug, and Cosmetic Act ("FDCA") was attached as "Exhibit A" to the January 15, 2020 Phone SW Affidavit in support of probable cause, (January 15 Fishman Electronics SW at 35-42); that the affidavit listed among the Subject Offenses (and consistent with prior search warrants) "misbranding of drugs and devices," (*id.* at 5); that the quoted conversations in the affidavit cite to several products that Seth Fishman custom-made and distributed—sufficiently establishing a violation of the FDCA; and that many of the discussions of these calls in the supporting affidavit explain precisely why a particular drug violates racing rules, or how Seth Fishman or others with whom he is conversing intend to circumvent drug tests or detection in their use of these drugs—sufficiently establishing a violation of the mail and wire fraud statutes. (*See id.* at 9-23).[22]

---

[21] *See* Drug Enforcement Administration, Diversion Control Division, *Tramadol* (March 2020), *available at* https://www.deadiversion.usdoj.gov/drug_chem_info/tramadol.pdf ("Tramadol was approved for marketing in the United States as a non-controlled analgesic . . . .").

[22] The Fishman Motion also makes passing reference to the inadequacy of the January 15 Fishman Electronics SW because it failed "to provide a single instance where a test performed as part of the post-race examination of racehorses disclosed a banned substance linked to the defendant." (Fishman Mot. at 25). Of course, the Government is not obliged to take any particular steps before seeking a search warrant, so whether or not post-race testing was sought is irrelevant. More importantly, and given prior intercepted conversations between Target Subjects—including Seth Fishman—it was evident that Seth Fishman designed drugs to evade drug testing requirements, such that, by Fishman's own design, drug test results would likely be futile as an investigative tool. *See supra*, Part II.A.ii.

Fourth, the Fishman Motion states generally, and without pointing to any supporting facts, that the Fishman Premises SW, (*see* Fishman Mot. Ex. F), "fails to provide the requisite probable cause to indicate that violations of the misbranding and narcotics distribution statutes had occurred; or, that the defendant was engaged in this activity."  (Fishman Mot. at 25-26). Seth Fishman mounts no substantive defense of this argument, presumably because the argument is frivolous. The Fishman Premises SW Affidavit stated that: (1) Seth Fishman, Jordan Fishman, and a known employee, were not registered with the Food and Drug Administration ("FDA") to manufacture or distribute drugs; (2) a confidential source purchased a product from one of Fishman's distributors which was not approved for use by the FDA and was not properly labeled, (Fishman Premises SW at 6-7); (3) Seth Fishman had produced misbranded drugs in the past, and had been asked to do so by an individual who was investigated, and later prosecuted and convicted, by the Eastern District of New York, (*id.* at 7); (4) a package intercepted by U.S. Customs and Border Protection addressed to Seth Fishman and one of the subject premises contained 1 kilogram of a prescription corticosteroid, (*id.*); (5) Seth Fishman and Jordan Fishman had discussed in text messages substances they "jointly prepare and manufacture," (*id.* at 10-11); (6) Seth Fishman and an employee had discussed in text messages various drugs (VO2 Max, TB7, and BB3) which "are custom-made products developed by [Seth] Fishman and others, and have not been approved by the FDA," (*id.* at 14); (7) and Seth Fishman had sent an additional text message to an employee and Jordan Fishman "giving direction for the preparation of misbranded drugs," (*id.* at 14).  Any suggestion that there was no probable cause of a crime is baseless.

Finally, and as relevant to each of these searches, the Fishman Motion fails to elucidate any facts that would undermine the agents' good-faith reliance on each of these search warrants

in conducting their searches. Accordingly, even if this Court were to find that each of the issuing magistrate judges erred in finding probable cause to search Seth Fishman's email and Dropbox accounts, phones, and premises, because there is no allegation that each respective affiant recklessly or deliberately misled the magistrate judges, this Court should find that the agents relied on the search warrants in good faith, and that the fruits of these searches need not be suppressed.

### B.    Lisa Giannelli's Motions to Suppress

Lisa Giannelli moves to suppress the April 17, 2019 Order issued by the Honorable Kimba M. Wood authorizing a wiretap of the Giannelli Phone, as well as any other wiretaps where Giannelli's oral and electronic communications were intercepted, on the basis that there was no probable cause to believe that Giannelli was involved in a scheme to defraud, or that communications regarding such a scheme would be intercepted over Giannelli's cellular phone. (Giannelli Mot. at 10-12). Additionally, Giannelli argues that the Government failed to establish that normal investigative techniques had been tried and failed or reasonably appeared unlikely to succeed. (*Id.* at 12-13; *see also* April 17 Affidavit)).

Giannelli's primary argument—that the interceptions of her own phone must be suppressed as fruit of the poisonous tree—is baseless for the reasons set forth above with respect to interceptions over the Fishman Phone. Moreover, the April 17 Affidavit plainly established probable cause for the interception of Giannelli's communications, and put the lie to the suggestion in the Giannelli Motion that Giannelli did not have "knowledge of the compounds, nor knowledge of any rule or set of rules relevant to horseracing," because she was not licensed as a trainer or veterinarian, and consequently did not have "an independent knowledge of the alleged misbranding or doping schemes." (Giannelli Mot. at 12). Judge Wood determined that

there was sufficient probable cause to authorize a wiretap based on the followings facts, among

others, included in the April 17 Affidavit:

- Background information on Seth Fishman and Giannelli, specifically enumerating that Giannelli had assisted Seth Fishman "in ordering and delivering performance-enhancing veterinary substances to horse farms located in upstate New York, among other places," and that a confidential source had acquired "a vial of a powerful painkiller for use in doping horses . . . intended to be more powerful than morphine" from co-defendant Rick Dane, who had told the confidential source that he "had obtained the particular vial from LISA GIANNELLI." (April 17 Affidavit at 25). This summary set forth the background and working relationship between Seth Fishman and Giannelli, establishing that Giannelli was familiar with Seth Fishman's operations and would be unlikely to discuss with Seth Fishman rudimentary aspects of his business, such as the intended market for his products and the intended use of his products (drugging racehorses). Indeed, it would be unusual for long-time business partners to discuss explicitly such basic notions. Such facts are instead gleaned from the context of conversations described in the April 17 Affidavit between Seth Fishman and Giannelli.

- A February 21, 2019 intercepted call and text message in which Seth Fishman and Giannelli discussed orders of BB3, a blood builder, for a particular customer. That call was preceded by Seth Fishman's discussion with that customer regarding his placing the order for BB3, in which Fishman and the customer discussed "an equine epogen out there" that "won't test," and the use of "epo" in quantities that would be "enough to get a hot test but not do anything," as well as Fishman's reassurance that he was "very confident" his blood builder would not test positive on a drug test because apparently a horse had received the drug and was "tested . . . literally 12 hours later," yet the drug testing laboratory did not detect the blood building substance. (*Id.* at 49-55).

- February 25, 2019 text messages in which Giannelli warned Fishman not to take orders from a particular customer because the customer was procuring products to provide to a trainer that Giannelli and Fishman "are not dealing with," and further discussed other potential customers. In one such exchange, Seth Fishman asked Giannelli, "Can you trust" a potential customer, and Giannelli responded, "yes." (*Id.* at 55-56). The April 17 Affidavit explained that Giannelli was "screen[ing] potential clients for FISHMAN to determine if they can be trusted to use FISHMAN's products discreetly." (*Id.* at 56).

- A February 26, 2019 phone call in which Seth Fishman and Giannelli discussed a potential customer who may be "in the claiming game," a term used in the racehorse industry to refer to claiming races, who wanted "to set up a program on a horse for a blood builder." (*Id.* at 56-57). During that call, the two discussed whether or not this individual "was trustworthy," with Giannelli reassuring Seth Fishman that he was, but that she would vet him by asking fellow co-defendant

Rick Dane. (*Id.* at 57). Fishman also mentioned on this call the existence of a drug he sold that was "not on the market," that is, not commercially available, and they further discussed the importance of avoiding a positive test result ("if their test is not spot on our guys will get [U/I] . . . they won't get a positive but they'll get a cloudy"). (*Id.* at 58-60).

- A March 20, 2019 call between Seth Fishman and an employee who also assisted Seth Fishman in his drug distribution business in which the two discussed "Lisa," *i.e.*, Giannelli, charging a customer that Seth Fishman and Giannelli had discussed previously. (*Id.* at 68). The two further discussed "a big order" that Giannelli had placed for Seth Fishman's products, including items Giannelli "wants and needs" such as "TB-7, HG Bleeder Plus." (*Id.*). The affidavit further described the fact that these drugs were not "publicly available on the mass market." (*Id.* at 69).

- Toll records for Giannelli's cellular phone which demonstrated that—consistent with the earlier description of Giannelli as a long-time collaborator with Seth Fishman in his drug distribution business—Giannelli had numerous calls and/or text messages with an employee of Seth Fishman's, discussed earlier in the April 17 Affidavit, and Dane, described as a Standardbred horse trainer whose horses had tested positive for prohibited substances on multiple occasions, and who was also discussed by Seth Fishman and Giannelli in intercepted calls as someone who assisted Giannelli in vetting potential new customers.

- The April 17 Affidavit further explained that interstate wires were made as part of this scheme. This is apparent both through the frequent use of the cellphones belonging to Giannelli (based in Delaware, selling to New York-based trainers) and Seth Fishman (based in Florida, regularly conversing about drugs with individuals in other states and countries), (*see* April 17 Affidavit at 8, 25, 77), and through the InCompass payments transferring to racehorse trainers—including Seth Fishman customer Jorge Navarro—purse winnings for racehorses entitled to prize money.

Accordingly, the April 17 Affidavit was more than sufficient to provide a "substantial basis" for the finding of probable cause by Judge Wood.

Second, the April 17 Affidavit sufficiently established that normal investigative techniques had been tried and failed or reasonably appeared unlikely to succeed, for the same reasons the February 14 Affidavit set forth sufficient necessity to wiretap Seth Fishman's Phone. *See supra*, Part II.A.ii. Giannelli claims that the April 17 Affidavit fails insofar as it does not discuss the potential to conduct controlled buys, introduce an undercover officer or confidential

informant, conduct a financial investigation that would reveal "the source of supply or network of distribution," conduct physical surveillance, or why "warrants on phone providers" could not yield "the same electronic communications." (Giannelli Mot. at 12). On the facts, Giannelli is, simply, incorrect, and Giannelli's expansive view of the "necessity" requirement under Title III is not the law.

The April 17 Affidavit stated that prior Title III interceptions of phones related to other defendants, including Navarro, Surick, Oakes, and Fishman, had not achieved the objectives of the investigation and were not a reason to preclude intercepting the Giannelli Phone. This section of the affidavit specifically stated that interceptions to date "did not provide context to the sourcing or development of prohibited substances by Fishman and Giannelli, or the extent of their distribution of prohibited substances to other trainers," and that the prior thirty-day periods of interception over the Fishman Phone (during which he was overseas for at least part of the time) "yielded material but incomplete information regarding Fishman's distribution of performance-enhancing substances to trainers and owners . . . [or] Fishman's contacts with employees and/or coworkers entrusted to carry on Fishman's development of homemade performance-enhancing substances in his absence." (April 17 Affidavit at 97-100). This portion of the affidavit further explained that interception of the Giannelli Phone (and continued interception of the Fishman Phone) was warranted because the racing season was anticipated to begin in the New York area soon, and as Giannelli operated in the New York area, "it is anticipated that Fishman and Giannelli will be solicited by trainers and owners for performance-enhancing substances in advance of races in, among other places, the Northeast and Midwest regions." (*Id.* at 100). Further, because "Fishman and Giannelli will be compelled to replenish their stock of performance-enhancing substances" and "that unidentified Target Subjects and/or

victims will contact Fishman and Giannelli in the next thirty days," interception was necessary. (*Id.*).

The April 17 Affidavit then detailed, across an additional 13 pages, the various other investigative methods that had been considered or executed, and which were not reasonably available alternative investigative techniques vitiating the need for a wiretap of the Giannelli Phone. These techniques specifically discussed the use of undercover officers, confidential sources,[23] physical surveillance, pole cameras, geolocation data, telephone records and pen registers, search warrants (including covert blood draws of the type conducted on Northern Virgin), grand jury subpoenas, collection of financial records, and review of prior T-III intercepts. (*See* April 17 Affidavit at 97-113). These detailed discussions were more than sufficient to establish that alternative investigation techniques were not reasonably available in lieu of a wiretap of the Giannelli Phone, as found by Judge Wood in authorizing the wiretap of the Giannelli Phone.[24]

---

[23] An attempted controlled purchase conducted by an undercover officer or confidential source was not a reasonable alternative investigative tool insofar as it would (1) be unlikely to work in light of Giannelli and Fishman's screening of "untrustworthy" clients; and (2) not illuminate the broader network of distribution or their source(s) of supply.

[24] Giannelli further seeks suppression of any other wiretap over which she was intercepted, without enumerating which orders of interception she seeks to challenge beyond that obtained for interception of communications over her cellular phone. (Giannelli Mot. at 10). Apart from her own phone, Giannelli was only a party to calls intercepted over the Seth Fishman Phone; consequently, Giannelli only has standing to challenge the February 13, 2019 Order of Interception of Seth Fishman's Phone, the March 19, 2019 Order of Interception of Seth Fishman's Phone, the April 17, 2019 Order of Interception of Seth Fishman's Phone, and the May 16, 2019 Order of Interception of Seth Fishman's Phone, on the basis that she was a participant on intercepted calls with Seth Fishman during those time periods. For the same reasons enumerated above, *see supra*, Part II.A, Giannelli's motion to suppress the wiretaps of the Seth Fishman Phone fail.

### C.    Jordan Fishman's Motion to Suppress

In addition to joining any motions to suppress wiretaps of cellular phones over which Jordan Fishman was intercepted (all of which are meritless, as discussed above), Jordan Fishman additionally moves to suppress any evidence obtained pursuant to the Cell Site Warrant. The defendant's motion is meritless on the substance, but, in any event, the motion is moot as the Government does not intend to use Jordan Fishman's historical cell site information at trial. *See, e.g.*, *United States v. Hester*, No. 19 Cr. 324 (NSR), 2020 WL 3483702, at *14 (S.D.N.Y. June 26, 2020); *United States v. Mathieu*, No. 16 Cr. 763 (LGS), 2018 WL 5869642, at *1 (S.D.N.Y. Nov. 9, 2018); *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *18 n.22 (S.D.N.Y. Dec. 11, 2017); *United States v. Conyers*, No. 15 Cr. 537 (VEC), 2016 WL 7189850, at *1 (S.D.N.Y. Dec. 9, 2016).

### D.    Erica Garcia's Motions to Suppress

Defendant Erica Garcia moves to suppress evidence obtained through the court-authorized wiretap of the Navarro Phone and evidence obtained through the court-authorized search of Garcia's vehicle and phone, which motions are joined by Zulueta.  In support of her motion to suppress the wiretap evidence, Garcia primarily makes three arguments: (1) the initial wiretap application dated January 7, 2019 lacked probable cause to believe Navarro had committed one of the target offenses specified; (2) the application failed to establish that normal investigative procedures had been tried and had failed or reasonably appeared to be unlikely to success if tried or to be too dangerous; and (3) the application contained material omissions.  In support of her motion to suppress evidence obtained from the search of her vehicle and her phone, Garcia argues that the application for the search warrant contained stale information and material omissions and misstatements.  Each of these arguments lacks merit and should be

denied without a hearing.

i.    The Navarro Wiretap Application Set Forth Ample Probable Cause that Navarro Participated in the Subject Offenses

The January 7 Affidavit seeking a wiretap of Navarro's phone set forth ample probable cause to believe that Navarro was then participating in the subject offenses. At the time of the initial application, as noted in part above, the Government had already established significant evidence that Navarro was engaged in both a scheme to obtain money from racetracks through fraud committed using his own stable of doped horses, and that Navarro's doping operation involved his illicit dealings with Surick.  Among other information, discussed below, the affidavit presented the following evidence:

- On or about August 5, 2018, CS-2 met with Surick at the Monmouth Park Racetrack. Surick, who had been in conversation with Gindi, informed CS-2 that Navarro was administering two substances prohibited under the racing rules of New York and New Jersey to Navarro's horses shortly after they raced. (January 7 Affidavit at 20).

- On or about August 4, 2017, a video of Navarro and Gindi was made publicly available on YouTube.  In the video, Gindi referred to Navarro as the "Juice Man" before both celebrate the racing victory of a horse, whose performance was attributable to "the juice." (*Id.* at 20-21).

- On multiple occasions, including on or about October 30, 2018, November 5 and 6, 2018, and November 8, 2018, there were multiple intercepted communications between Navarro and Surick in which they discussed transferring possession of a "machine," believed by investigators to be a "shock machine" that can be used to enhance a horse's race performance in violation of New Jersey racing rules. (*Id.* at 22-26).

- On or about December 18, 2018, Surick was intercepted describing to another co-conspirator how he had provided Navarro with "trays of red acid," which based on other information obtained during the investigation was believed to be a substance unapproved for use on horses by New Jersey racing rules. (*Id.* at 23 n.6).

- The doping and concealment of Northern Virgin, including Surick's advising Navarro that he had administered a drug to one of his horses (Northern Virgin) and asking how long this drug would be detectable in the horse's blood.  Navarro advised Surick that the racehorse would likely test positive on a drug test for up to three days after administration.  Approximately four minutes later, in another call with a third party, Surick referenced Navarro's prolific use of that same drug: "I just talked to Navarro he

says I gotta get [U/I] you know he uses it [the drug] like fucking water, three days they can't see that horse." (*Id.* at 26-29).

- The next day, on or about December 19, 2018, Navarro ordered 24 bottles of a substance to be administered to his racehorses. (*Id.* at 29-30).

In challenging the existence of probable cause, Garcia selects several pieces of the evidence and attempts to argue that each piece, considered alone, is insufficient to indicate that Navarro participated in any of the subject offenses. In doing so, Garcia ignores the important context that the facts of the affidavit provide each other and urges the Court to do precisely what the caselaw has specifically directed reviewing courts not to do: "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause." *Gangi*, 33 F. Supp. 2d at 306; *accord Salas*, 2008 U.S. Dist. LEXIS 92560, at *12 (same).

For example, Garcia argues that during the December 19 conversation between Navarro and Surick during which Navarro asked Surick to provide him with 24 bottles of a substance, there was no definitive statement of what substance Navarro purchased, whether it was performance enhancing, or whether Navarro intended to administer the substance in violation of horseracing rules. However, Garcia completely ignores the context in which this call took place. Surick had previously admitted that he distributed two different prohibited substances to Navarro in or about August 2018. Then, the day before the call, Surick admitted to another co-conspirator that he had provided Navarro with "trays of red acid." Also on the day before the call, Surick, in a panic, had confided in Navarro that he had recently administered a banned substance to a racehorse and sought Navarro's advice on avoiding regulators' detection of the drug. Not only was Navarro familiar with the drug Surick had administered to Northern Virgin—revealing a familiarity and prior course of conduct —but also advised Surick on the

likelihood of the drug testing positive on a drug test.  Furthermore, minutes after that

conversation with Navarro, Surick stated to another co-conspirator that the substance that he was

hiding from regulators was one that Navarro "uses [] like fucking water."[25]  These demonstrate

the reasonableness of the affiant's position that the 24 bottles ordered by Navarro were a

performance-enhancing drug.[26]

Garcia also argues that (1) Surick's inculpatory admissions regarding Navarro's use of

drugs similar to that administered to Northern Virgin should be afforded less weight because

they were uncorroborated by additional evidence, (Garcia Wiretap Mot. at 22); and (2) that there

was an innocent explanation for Navarro's celebration of a "Navarro" racehorse's victory

attributed to "the juice," (*id*. at 23).  Even if Garcia can now craft innocent explanations for the

facts set forth in the January 7 Affidavit, it is well established that "[t]he fact that an innocent

explanation may be consistent with the facts as alleged . . . will not negate probable cause."

*Fama*, 758 F.2d at 838.[27]  Thus, Garcia's "alternative explanations" of the evidence "do not

---

[25] Garcia argues that minutes earlier, when Navarro asked Surick, "[w]hy do you wanna fuck with that shit, man?", Navarro was disclaiming his use of the prohibited substance. (Garcia Wiretap Mot. at 8, 23).  However, this interpretation of Navarro's question is strained given the subsequent statement by Surick, only minutes later, and previous evidence from CS-2 and intercepted communications that Surick had provided illicit substances to Navarro for use in Navarro's horses. The more natural reading of the call is that Navarro is chastising Surick for using the drug *in a detectable manner*, rather than for using the drug (which Navarro used himself) at all.

[26] This assumption is further reasonable given that Surick is a fellow trainer, not a veterinarian, pharmacist, chemist, or anyone else who would be expected to legally distribute bottles of drugs.

[27] The so-called innocent explanations proffered by Garcia regarding Navarro's discussions are totally undermined by later calls in which Navarro clarifies that his preference is not to use the "real" "epo" Surick used on Northern Virgin, but the generic version—not because Navarro was compliant—but because Navarro knew the "real" version of Epogen was testable within a few days of administration, and Navarro preferred undetectable performance-enhancing drugs.  (*See* 2020 Oakes Barn SW at 19 (affidavit describing intercepted call in which Navarro states to Tannuzzo in an intercepted call: "But this is the generic. The real one, you got 3 days. Alright, that's why NICK SURICK called me, 'George, I'm in trouble, I did the real one, what do I do' I said they can't pull blood the first three days. The fourth day they see a cloud but they don't know

undermine the notion that there was at least probable cause upon which the warrant could issue."
*Gotti*, 459 F.3d at 345; *see also Fazio*, 2012 WL 1195157, at *9. In any event, Garcia is plainly
incorrect that other evidence – including Surick's course of conduct, his confiding in Navarro,
and Navarro's own statements noted above – did not corroborate Surick's statements or
otherwise provide context for Navarro's "juice" celebration.

      Other attempts to selectively attack individual assertions in the affidavit are similarly
misguided. Garcia argues that there was no evidence to suggest that Navarro used or possessed
the shock machine he received from Surick in violation of horseracing rules. First, Garcia
overlooks the fact that, as set forth in the affidavit, in many jurisdictions, a shock machine could
only be possessed by veterinarians in the horse racing industry, and/or used under the
supervision of a veterinarian. (January 7 Affidavit at 22).[28] The use and possession by Navarro
and Surick, neither of whom were veterinarians, was therefore already problematic and reflects
their disregard for applicable racing rules, probative in itself of the scheme to defraud through
the use of drugs. Second, context again comes into play: the discussion of the shock machine did
not take place between two physiotherapists; it took place between two racehorse trainers, one of
whom had admitted to a confidential source that he had distributed prohibited substances to the
other for the purpose of enhancing racehorse performance. Third, Surick and Navarro's
discussions of the "shock machine" was inextricably linked to their dealings in illicit drugs. As
the quoted calls make plain, the bartering of the shock machine (one device for obtaining an
illegal advantage in the racing industry in an effort to fraudulently obtain money) for drugs was

_____

what the fuck it is . . . . Now 5 days you are good. Now with those one here, they can't find
anything.")).

[28] *See also* N.Y.C.R.R., Title 9, Section 4043.14; N.J. Admin. Code § 13:70-14A.18(b); Md. Code
Regs. 09.10.03.03(C); 810 Ky. Admin. Regs. 8:010 § 20(5).

the topic of conversation between Surick and Navarro. (*See* January 7 Affidavit at 24 ("Navarro: Yeah because I have to close on a house and everything so let's meet up so I can give you the machine and we can square up on our deal."); *see also id.* at 29-30 ("Surick: I'll do that bill today and then I'll put that bottles [of drugs] on there. You tell me what it is and I'll send you the difference." / Navarro: Please. Because I need money, man, I need money. . . . And I'll be there some time in two weeks and I'll give you the machine, okay? / Surick: Yeah, I'm not worried about that. As long as it's safe.")). Garcia's piecemeal attacks on individual assertions ignore completely the "totality of the circumstances" standard, and affords no deference to the issuing judge. *See Fazio*, 2012 WL 1195157, at *8; *Zemlyansky*, 945 F. Supp. 2d at 483.

ii.     The Navarro Wiretap Application Sufficiently Described the Limitations of Alternative Investigative Techniques

Judge Berman properly found that interception of communications was warranted given the lack of reasonably available alternative investigative techniques. The January 7 Affidavit devoted 11 pages to the subject of alternative investigative techniques and why they were unlikely to be successful in investigating Navarro and his network of co-conspirators. Garcia selects four of the discussed alternatives and claims—without regard to practicality or the facts of this investigation—that law enforcement should have been required to explore them further before seeking a wiretap order. Specifically, Garcia claims law enforcement: (1) neglected to recruit sources who knew Navarro personally; (2) should have conducted physical surveillance of these admittedly covert and closely held doping operations; (3) should have sought search warrants for various physical premises in the midst of an ongoing, covert investigation; and (4) should have reviewed bank records. These claims are untethered to reality and ignore the requisite common sense and practicality that Judge Berman properly applied.

First, a willing individual who could detail with first-hand knowledge the entire scope of

Navarro's operation, including the conduct and intent of each of his co-conspirators, and provide evidence corroborating all the information provided, *and* do so without alerting Target Subjects or others to the existence of the investigation, would certainly have been a useful alternative investigative tool.  But such sources were not available in January 2019.  The January 7 Affidavit described how the confidential sources known to law enforcement at the time were able to provide some historical information valuable to the investigation.  However, their knowledge was limited and their ability to engage in proactive investigation constrained; as alluded to in the context of CS-3, because the Target Subjects were sensitive to even suspected cooperators, the use of sources was limited. (*See* January 7 Affidavit at 33 ("I believe that SURICK's suspicions were raised that CS-3 is working with law enforcement, and that as a result CS-3's arrangement with SURICK ended—along with all communication—in early October.")).

Following the initiation of intercepts pursuant to the January 7 wiretap order, when law enforcement was able to cultivate sources that had access to Navarro, that access was also limited.  For example, as discussed in the March 7 Affidavit, the FBI managed to recruit CS-5 (initially identified as "CS-4" in the March 7 Affidavit, at page 63), but that source did not have access to Navarro's network of suppliers for his illicit substances, nor access to Navarro's regimen of administering those substances to his horses. (*See also* May 29 Affidavit at 106-07 (describing the same limitations for this source, now denoted as "CS-5," as well as limitations regarding another source, identified as "CS-6")).  To embrace now Garcia's insistence that the FBI should have recruited sources who knew Navarro personally would create an unrealistic universal mandate that law enforcement recruit sources who know each of the targets personally before a wiretap can be authorized, which is contrary to what the law actually requires.  *See, e.g.*, *Lilla*, 699 F.2d at 104 (no requirement "that any particular investigative procedures be exhausted

before a wiretap be authorized"). Judge Berman did not err in authorizing the January 7 Affidavit, and subsequent issuing Judges did not err, on this or any basis.

Second, it is unclear what physical surveillance Garcia hoped law enforcement would conduct and difficult to understand how such surveillance was likely to achieve the objectives of the investigation. As described in the January 7 Affidavit (and above, *see supra*, Part II.A.ii), important aspects of the subject criminal activity were already known, and likely would continue, to take place in enclosed areas that would be difficult to surveil successfully.

Moreover, the January 7 Affidavit explained that surveillance by itself was unlikely to unearth evidence of criminal activity, but could be important corroboration when used in conjunction with other investigative steps, such as to confirm meetings among Target Subjects or between confidential sources and targets. With these explanations, the January 7 Affidavit satisfactorily described how physical surveillance was unlikely to achieve the objectives of the investigation. *See e.g.*, *Lilla*, 699 F.2d at 103–04 ("where the location of the subjects of the investigation precludes the use of informants or nonwiretap surveillance, wiretap warrants have been upheld." (citation omitted)).

Third, contrary to Garcia's assertions, physical search warrants were indeed obtained as part of the investigation, and as evident from the search warrant affidavits, interceptions were critical in establishing probable cause to justify the relevant search. Remarkably, Garcia's motion entirely ignores the course of events that resulted in the covert physical search of the barn in which Surick had attempted to conceal Northern Virgin, the horse about whom he called Navarro in a panic on December 18, 2018. (*See* January 7 Affidavit at 28). As that course of events demonstrated, the Target Subjects in this case were minutely focused on evasion of detection, including through the physical removal of a horse that might have been subject to drug

testing. The events of December 18 and 19, 2018, moreover, provided a clear indication of the critical importance of ongoing, covert surveillance of communications, *i.e.*, the wiretap, to obtain information that would make physical searches fruitful. Without the Surick wiretap, the location and identity of the doped horse, Northern Virgin, would have been unknown. *See also infra*, Part II.F.iii (discussing the original Oakes barn search). Each reviewing judge, unlike Garcia, appreciated this context and appropriately understood the limitations of physical searches and physical surveillance in the course of this investigation.

Fourth, much like Garcia's claim regarding physical search warrants and surveillance, Garcia's contention that further review of bank records would achieve the objects of the investigation is easily punctured, given the nature of the scheme under investigation. As pointed out in the January 7 Affidavit, bank accounts records would not reveal the substances administered to racehorses by Target Subjects, or the timing of such administration. The Affidavit properly informed that a financial investigation was underway, but also explained the limitations of the investigation. (*See* January 7 Affidavit at 40).

Most importantly, however, Garcia's wish list of investigative steps that Garcia believes law enforcement should have taken distorts the purpose of Section 2518(3)(c), which only requires that "the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Diaz*, 176 F.3d at 111. This is exactly what the January 7 Affidavit did: it described in detail the many different steps taken thus far in the investigation and advised the authorizing judicial officers of the difficulties inherent in the use of various law enforcement methods. It did not claim that any of the steps was impossible, but rather that they were attempted, with varying levels of success, or contemplated but were unlikely to succeed. Each of the reviewing District

70

Judges properly found that the interception of communications was therefore warranted.

    iii.    <u>The Wiretap Applications Did Not Contain Material Omissions</u>

Garcia's final challenge to the wiretap interceptions is that the applications contained omissions that were material to the District Judges' decisions to initially grant and then renew the wiretap orders.  Specifically, Garcia cites: one piece of information that Garcia argues should have been included in all of the applications, *i.e.*, that the FBI interviewed an individual who stated, in substance, that Navarro was connected to veterinarians involved with doping horses before races (referred to by Garcia as "CS Halfback," although Garcia appears to acknowledge that this person was never signed up as a FBI confidential source); and two pieces of information that were disclosed in renewal applications but that Garcia argues should have been included in earlier applications, namely, that (1) the FBI obtained a search warrant for an email account belonging to Navarro, and (2) the FBI recruited two individuals to assist with the investigation of various targets, including Navarro (CS-5[29] and CS-6).  Garcia's challenge fails because the alleged omissions of these pieces of information were either not omissions, not material to the District Judges' determinations of whether probable cause existed, or both.  Furthermore, because Garcia has not made the requisite showing of substantial evidence of intent to mislead the issuing District Judges, the motion must be denied without a hearing.

    a.    *The Omission of A Single Interview of A Potential Source (Halfback) Was Proper and Not Material*

In arguing that each affidavit improperly omitted the mention of a lone interview of a potential source, referred to as "Halfback," Garcia fails to specify a single piece of information that Halfback could have contributed to the investigation that would have changed the District

---

[29] As noted above, CS-5 was originally referred to as "CS-4" on page 63 of the March 7 Affidavit.

Judges' analyses. Garcia, thus, has not carried her burden of establishing that this omission was in any way material. Indeed, she cannot.

On or about June 29, 2018, the FBI for the first time interviewed an individual who had been referred to the FBI as a potential source for information, referred to as "Halfback." During the course of the interview, Halfback described that he knew Navarro and that Navarro had once offered Halfback a job working with Navarro's horses. (Adams Decl. Ex. M ("Halfback 302"). Halfback stated that Navarro had connections with several veterinarians Halfback knew to be involved with doping horses before races, but did not provide information regarding Navarro's personal participation in the administration of illicit substances to his horses nor his participation in a scheme to defraud. (*Id.*). As Garcia correctly surmises, the FBI elected not to sign up Halfback as an FBI source.

Garcia argues that all of the Navarro wiretap applications should nonetheless have mentioned the lone FBI interview with Halfback. This argument is meritless. An affidavit is not required to chronicle every single step taken during the course of an entire investigation. *See United States v. Ray*, --- F.Supp.3d ----, 2021 WL 2134861 at *16 (S.D.N.Y. May 26, 2021) ("[A] search warrant affidavit need not 'include . . . every piece of information gathered in the course of an investigation.'" (*quoting Awadallah*, 349 F.3d at 67-68)). If it were otherwise, an authorizing judicial officer would be subjected to a voluminous discovery production every time an application were submitted. Rather, because "[a]ll storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *Vilar*, 2007 WL 1075041, at *27. It was completely reasonable that the application did not include mention of Halfback, a witness who at the time had been interviewed a single time and was deemed unlikely to advance the goals of the investigation. In fact, Garcia fails to

specify a single piece of information that Halfback could have contributed to the investigation that would have changed the District Judges' analyses. Instead, had the Navarro wiretap applications referred at all to Halfback, it would merely have been as a means of reiterating the same point regarding the limitation on confidential sources, generally, which were expressly provided in those applications. Accordingly, the absence of a description of Halfback, in the midst of a discussion of the limitation of confidential sources, generally, did not deprive the District Judges of a "substantial basis" for making the requisite probable cause determination, and Garcia has failed to establish otherwise.

> b. *The Disclosure of the Email Search Warrant in Renewal Applications was Proper and Not a Material Omission*

On or about February 5, 2019, the Honorable Henry Pitman issued a warrant authorizing the search of an email account hosted by Google and believed to be used by Navarro (defined *supra* as the "Navarro Email Search Warrant"). On or about February 28, 2019, Google provided the search warrant return to the FBI. (Adams Decl. Ex. F (Letter from Google dated February 28, 2019)). The FBI quickly began a pertinence review of the contents and on or about May 7, 2019, the FBI completed the separation of the pertinent emails in the account from the entire email account return. (Adams, Decl. Ex. N, (FBI 302 dated May 31, 2019)).

Meanwhile, the FBI was also in the process of obtaining authorizations to intercept communications on Navarro's phone. As referenced above, the initial application for Navarro's phone was authorized on January 7, 2019. The January 7 Affidavit, of course, did not mention the Navarro Email Search Warrant, which had not been obtained by that point. Applications to renew the wiretap on the Navarro Phone were submitted on February 6, 2019 and March 7, 2019. Neither application mentioned the Navarro Email Search Warrant; the next applications to renew the wiretap on the Navarro Phone, dated April 5, 2019 and May 3, 2019, contained a footnote

stating that the FBI had "obtained a search warrant for the content of an email account associated with NAVARRO. Agents are in the process of reviewing the search warrant returns for evidence of the Subject Offenses," consistent with the state of the review at that point. (April 5 Affidavit at 73; May 3 Affidavit at 74). The final affidavit submitted to renew the wiretap on Navarro's phone, dated May 29, 2019 (after the agents' pertinence review was completed), and the supporting affidavit advised that "law enforcement agents obtained a search warrant for the content of an email account associated with NAVARRO, which agents have reviewed. A search of that account provided valuable information regarding the Subject Offenses, including veterinarians such as FISHMAN who supplied NAVARRO with performance-enhancing substances, instructions provided to administer performance-enhancing substances, and the billing and invoicing practices of those veterinarians." (May 29 Affidavit at 117). Judge Nathan, armed with the knowledge that the agents had undertaken and completed a review of a Navarro-related email account, nevertheless appropriately found that alternative investigative techniques (including in particular this email review) were unlikely to achieve the goals of the investigation. (*Id.* at 130).

Garcia argues that the failure to disclose the existence of the Navarro Email Search Warrant until the wiretap application dated April 5, 2019 constitutes an intentional or reckless material omission, but does not substantiate this supposition. Garcia's challenge could only apply to the renewal applications dated February 6, 2019 and March 7, 2019, as the initial affidavit pre-dated the search warrant, and the later applications disclosed that the search warrant had been obtained. Notably, and as stated above, the FBI had not received any search warrant returns as of February 6, 2019, and had received the returns less than a week prior to March 7, 2019. Separately, Garcia's argument should also be rejected for two reasons.

First, the existence of the warrant and its then-unknown fruits were immaterial to the issuing judges' review of the February 6 and March 7 Affidavits. In each case, the relevant affidavit discussed Navarro's use of email, specifically, that Navarro and Seth Fishman had held a conversation in which they discussed Fishman emailing an invoice to Navarro. (*See* February 6 Affidavit at 52-53). In each case, the relevant wiretap affidavit described limitations that applied equally to the likely contents of a business email account, including the unlikelihood of such a source of evidence disclosing the full extent of Navarro's (or Fishman's) doping operation. Emails to Navarro's email account would have been unlikely to describe the timing of administration of certain drugs, the specific content of illicit drugs (invoices, for example, even if accurate, are imperfect reflections of the intended use of a substance), the identity of the various horses into which Navarro was injecting illegal substances, or the details of Navarro's collaboration with Surick or others for whom no indication of email communication existed. Unsurprisingly, therefore, when the Navarro Email Search Warrant was specifically disclosed in the applications dated April 5, 2019, May 3, 2019 and May 28, 2019, three different District Judges found that normal investigative procedures would not achieve the objectives of the investigation. Often, when discussing materiality, the parties and the reviewing court are left to conjecture whether information, if disclosed, "would [] have changed the judge's mind." Not so here. Judge Daniels, Judge Preska and Judge Nathan were all presented with the information regarding the Navarro Email Search Warrant that Garcia argues Judge Ramos and Judge Batts should have received, and all three concluded that the outcome need not change: the wiretap authorization was approved.

Second, Garcia fails to carry her substantial burden of demonstrating that the nondisclosure of the warrant on Navarro's email account was the result of recklessness or an

intentional effort to mislead the reviewing judges. Any such attempt at that showing is undercut both by the fact that each affidavit expressly provided each issuing judge with quoted communications regarding the very email exchange that provided the basis for the email warrant, demonstrating that email was used in the course of the conspiracy. That showing is further undercut by the immateriality of the purported nondisclosure.

Finally, Garcia acknowledges that the FBI stated in multiple applications that it had received the return for the Navarro Email Search Warrant, even before the FBI had had an opportunity to review (or complete its review of) what it had received, further eroding any basis for assuming that the affiant acted in bad faith, or with reckless disregard. The discussion in the April 5 Affidavit entirely erodes any plausible basis for believing that the FBI intended to conceal the fact that it had obtained the Navarro Email Search Warrant in the first instance.

     *c.*  *The Disclosure of CS-5 and CS-6 in Renewal Applications was Proper and Not a Material Omission From Earlier Applications*

Garcia argues that the absence of CS-5 in the February 6 Affidavit, and of the redundant CS-6 prior to the May 29 Affidavit (when CS-6 was mentioned for the first time), constituted material omissions. This argument fails for the same two reasons set forth above with regard to the propriety of the disclosure of the Navarro Email Search Warrant.

First, Garcia fails to make any showing that information available through CS-5 or CS-6 would be material in the reviewing courts' determination as to the likely inadequacy of alternative investigative techniques.[30] Garcia cites no information that CS-5 or CS-6 could have contributed to the investigation that would have changed the District Judges' analyses on the

---

[30] Garcia acknowledges, correctly, that these confidential sources were introduced to the FBI only after the initial wiretap on Navarro's phone. (*See* Garcia Wiretap Mot. at 13).

limitation of confidential sources, generally.  In fact, even hypothetically inserting the facts *actually* developed through these sources, most pertinently CS-5's observation of Navarro in Dubai, does not suddenly render the use of confidential sources an investigative tool that would obviate the need for a wiretap of the Navarro Phone. Garcia makes no argument, and can make no argument, that CS-5 had or was likely to gain insight into the sourcing of Navarro's various drugs, his methods for ensuring that those drugs would be untestable, or Navarro's arrangements with other trainers or drug distributors such as Surick, Oakes, or Gregory Skelton. The use of confidential sources with limited access to the Target Subjects was insufficient to achieve the goals of the investigation, as disclosed to each of the issuing Judges; neither CS-5 nor CS-6 change that ultimate analysis.

That conclusion is supported by the fact that the March 7, April 5, May 3, and May 29 applications were approved notwithstanding the inclusion of information regarding CS-5 and his access to Navarro (or, as of the April 5 Affidavit, his travels to Dubai with Navarro) in the supporting affidavits. Similarly, the May 29 Affidavit described for the first time CS-6's involvement in the investigation (which largely mirrored that of CS-5), yet Judge Nathan *still* found that the requirements for a wiretap authorization had been satisfied.  The putative omissions were and remain immaterial to the District Judges' analyses for the simple reason that even *with* this disclosure, a wiretap was authorized, and a fulsome disclosure would have included the limitations of using CS-5 and CS-6 as sources of information.

Second, Garcia fails to carry her substantial burden of demonstrating that the nondisclosure of information pertaining to CS-5 and CS-6 was the result of recklessness or an intentional effort to mislead the reviewing judges. The disclosures of information in periodic reports and wiretap extension applications, coupled with the lack of materiality in the purported

omissions, is entirely inconsistent with Garcia's assertion that the Government intentionally or recklessly withheld information from reviewing Courts. Garcia does not remotely carry her burden of showing either materiality or intent. *Klump*, 536 F.3d at 119. To the contrary, the timing of disclosures, taken in the context of the overall investigation and the fulsome discussions as to the limitation of alternative techniques generally, strongly undercuts Garcia's baseless claim that the Navarro wiretap affidavits were submitted with an improper intent to mislead each reviewing Judge, or with reckless disregard for the truth. *Awadallah*, 349 F.3d at 68.

iv.     The Searches of Garcia's Vehicle and Phone Were Proper[31]

On March 5, 2020, the Honorable Lurana S. Snow, United States Magistrate Judge for the Southern District of Florida, issued a search warrant for a search of Garcia's vehicle in reliance upon an agent affidavit. (Garcia Search Mot. Ex. A (March 5, 2020 Search Warrant Application for Search of Garcia's Vehicle (the "Garcia Vehicle Affidavit"))).  After describing the background of the investigation generally, including that the FBI had been conducting an investigation since 2017 into various fraudulent schemes centered around professional horseracing and the provision of controlled and banned substances to racehorses, the Garcia Vehicle Affidavit set forth information specifically pertaining to Garcia, including:

- Garcia was a veterinarian who has historically sourced, distributed, and administered PEDs to racehorses under Navarro's care, at Navarro's direction, and that Garcia did so to increase Navarro's horses' chances of winning competitive races, while avoiding detection by racing regulators and racetracks.

---

[31] As with Seth Fishman, Garcia does not provide a sworn affidavit setting forth the basis for her standing to challenge the searches discussed in her motion. The Government again takes the motion as an admission that Garcia controlled both the cellphone at issue, as well as the vehicle. In the event that Garcia contests her relationship to those premises, the present motion would be meritless for lack of standing.

- Prior to parting ways with Navarro, between in or about January and April 2019, Garcia was intercepted on multiple calls discussing with Navarro Garcia's administration of PEDs, including the misbranded and/or adulterated PEDs "Monkey" and "red," also known as "red acid," to horses under Navarro's care. The Garcia Vehicle Affidavit explained, for example, that "'red acid' refers to a set of customized PEDs not approved by the FDA that are designed, in part, to reduce inflammation in joints, thereby improving a horse's race performance" and that "'Monkey' is a code name used for a particular blood builder that functions in a manner similar to erythropoeietin."(Garcia Vehicle Affidavit at 7, 9). The affidavit went on to describe how in February 2019, Navarro was intercepted in several communications trying to procure such PEDs to administer to his horse because he was concerned his horse would not perform well at an upcoming race." (*Id.* at 8.)

- Garcia was at the time still employed as an equine veterinarian and advertised her availability for on-site services at various racetracks.

- Garcia had continued to remain in touch with people connected with Navarro, including Navarro's assistant trainer and two individuals who own horses trained by Navarro, with whom Garcia had telephonic contact at least in or about January 2020.

- Garcia continued to practice veterinary medicine and stored veterinary equipment and what appear to be bottles of drugs in her vehicle.

- Garcia's cellular telephone was in the vicinity of a racehorse training complex used by both Navarro and Servis on multiple dates in February 2020.

(*Id.* at 8-9). The Garcia Vehicle Affidavit then summarized a few selected communications

intercepted between Garcia and Navarro, including:

- A call on or about January 14, 2019, in which Navarro instructed Garcia to administer adulterated and/or misbranded drugs, such as "Monkey," to certain of his horses.

- A text message on or about January 21, 2019, in which Navarro instructs Garcia to administer "red" to one of his horses.

- A call on or about January 31, 2019, in which Navarro instructed Garcia to administer "red" to one of his horses.

- A call on or about February 13, 2019, in which Navarro instructed Garcia to administer several drugs, including "Monkey" to one of his horses.

- A call on or about February 28, 2019, in which Navarro and Garcia discuss which drugs to administer to which horses in order to avoid a "positive."

79

- A series of text messages on or about March 19, 2019, in which Garcia expressed that she was not inclined to assist another horse trainer (whose veterinarian would not inject a horse within six days of a race), not because Garcia was a conscientious and upstanding veterinarian, but because: "I don't need the money—I work for you because I trust/love you [*i.e.*, Navarro]." In one message, Garcia also mentioned SGF-1000, which is the name of a particular adulterated and/or misbranded PED used by race horse trainers, including Navarro.

(*Id.* at 14-18).

On or about March 27, 2020, the FBI submitted an affidavit to the Honorable Sarah Cave, United States Magistrate Judge for the Southern District of New York, in support of a search warrant for a phone belonging to Garcia, (*see* Garcia Search Mot. Ex. D (March 27, 2020 Search Warrant Application for Search of Garcia's Phone (the "Garcia Phone Affidavit"))), which was issued that day. The Garcia Phone Affidavit similarly described the background of the investigation, including that the FBI had been conducting an investigation since 2017 into various fraudulent schemes centered around professional horseracing and the provision of controlled and banned substances to racehorses. The Garcia Phone Affidavit also set forth, among other things, that:

- Garcia was a veterinarian who has historically sourced, distributed, and administered PEDs to racehorses under Navarro's care, at Navarro's direction.

- Prior to parting ways with Navarro, between in or about January and April 2019, Garcia was intercepted on multiple calls discussing with Navarro Garcia's administration of PEDs, including the misbranded and/or adulterated PEDs "Monkey" and "red," also known as "red acid," to horses under Navarro's care.

- Garcia had continued to remain in telephonic contact with people connected with Navarro, including Navarro's assistant trainer as recently as January 19, 2020, and two individuals who own horses trained by Navarro, on or about January 6, 2020 and January 19, 2020.

(Garcia Phone Affidavit at 8).

    *a. The Information Set Forth in the Affidavits Was Not Stale*

Garcia first argues that both affidavits failed to establish probable cause because the

evidence presented was stale insofar as the searches of Garcia's vehicle and phone were conducted in March 2020, eleven months after she parted ways with Navarro. (Garcia Search Mot. at 10-11). This argument fails for two reasons.

First, and most importantly, Garcia's participation in the criminal conduct of distributing and administering adulterated and/or misbranded drugs to racehorses was far from a one-time occurrence or isolated act. A warrant may lack probable cause "where the facts supporting criminal activity have grown stale by the time the warrant issues." *United States v. Raymonda*, 780 F.3d 105, 114(2d Cir. 2015). But there is "no bright-line rule for staleness," *Walczyk*, 496 F.3d at 162, it depends "on the basis of the facts of each case," *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981). "The two critical factors in determining staleness are the age of the facts alleged and the 'nature of the conduct alleged to have violated the law.' " *Raymonda*, 780 F.3d at 114 (quoting *United States v. Ortiz*, 143 F.3d 728, 732 (2d Cir. 1998)). "[T]he kind of property sought" and "[t]he length of criminal activity" are other factors that the Court considers. *United States v. Singh*, 390 F.3d 168, 181–82 (2d Cir. 2004). Facts of past criminal activity that by themselves are too stale can be sufficient if the affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence. *Fama*, 758 F.2d at 838; *United States v. Barlin*, 686 F.2d 81, 87–88 (2d Cir. 1982). Where the affidavit "present[s] a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant." Martino, 664 F.2d at 867 (2d Cir. 1981); *see also Smith*, 9 F.3d at 1014 (in investigations of ongoing narcotics operations, intervals of weeks or months between last described act and date of warrant do not necessarily make information stale); *United States v. Pitts*, 6 F .3d 1366, 1369 (9th Cir. 1993)

(information not stale where last reported narcotics sale took place four months before search warrant issued).

The Garcia Vehicle Affidavit detailed at least six instances over the span of four months where Garcia discussed with Navarro administering such substances to racehorses. In addition, the relationship between Garcia and Navarro was not one of two strangers coming together incidentally to commit a single, discrete criminal act, but one of trust that had developed over time. Taken together, the facts in the affidavit establish ongoing criminal activity over an extended period of time. In such circumstances, "the passage of time between the last described act and the presentation of the application becomes less significant." *Martino*, 664 F.2d at 867. Courts in the Second Circuit have repeatedly upheld findings of probable cause where the criminal conduct being investigated was carried out over a substantial time period, even where the passage of time between the last described act and the presentation of the application was weeks or months. *See e.g., Diaz*, 176 F.3d at 109 ("in a case involving an ongoing narcotics operation . . . 'intervals of weeks or months between the last described act and the application' for a wiretap do not necessarily make the information stale") (citations omitted); *Rowell*, 903 F.2d at 903 (gap of 18 months did not render information stale).[32]

---

[32] In a footnote, Garcia argues that the "type of evidence seized" from Garcia's vehicle weighed against a finding of probable cause. (Garcia Search Mot. at 11 n.2). To the extent Garcia is arguing that it was unreasonable to believe that illicit substances would be found (*i.e.*, the "type of evidence [to be] seized") in her vehicle because they were "easily disposable and transportable" and "will eventually expire," this argument is misguided. It was not necessary that original bottles of substances that Garcia was administering to Navarro's horses would be found in Garcia's vehicle. Rather, agents were authorized to search for and seize the same types of drugs, including any misbranded and/or adulterated drugs (including non-FDA approved drugs), which were likely to be present in her vehicle because the facts in the affidavit established a fair probability that Garcia was continuing to practice as a purported "veterinarian," frequented horse training facilities, and had been observed transporting bottles of substances in her vehicle. Moreover, and as the Government will present at Garcia's trial, the "type of evidence [actually] seized" from Garcia's vehicle fully substantiated the Government's *ex ante* understanding of what was likely to be in the

Second, both affidavits contained assertions that even though Garcia had broken from Navarro, Garcia continued to communicate with Navarro's assistant trainer and two individuals who owned horses trained by Navarro as recently as January 2020, indicating that she may have resumed providing services to Navarro-trained horses, notwithstanding her personal break from Navarro. Garcia's only response is to argue that the affidavits were deficient because the content of her conversations with Navarro's associates is unknown. (Garcia Search Mot. at 11). In so arguing, Garcia misapprehends the probable cause standard, which requires only that information indicate a "fair probability" (and not conclusive proof) that contraband or evidence of a crime will be found in a particular place. Given that Garcia had historically sourced, distributed and administered PEDs to racehorses under Navarro's care, had been intercepted engaging in such conduct for four months between January 2019 and April 2019, was continuing to practice as a purported "veterinarian," and had been to the horse training facility affiliated with Navarro and Servis on multiple dates in February 2020, Garcia's then-recent communications with Navarro's associates take on a much different import. Within this context, there was a "fair probability" that evidence of a crime would be stored on Garcia's phone (including evidence of the communications that she had exchanged with Navarro in early 2019)[33] or that contraband or evidence of a crime would be found in Garcia's vehicle (including drugs sourced prior to the execution of the warrant).

---

truck, and included misbranded and adulterated drugs obtained from, among other places, Medivet (Kegley Jr.'s company) and Racehorsemeds. *See United States v. Robinson et al.*, 20 Cr. 162 (JPO).

[33] As explained in the Garcia Phone Affidavit, "[c]omputer files or remnants of such files can be recovered months or even years after they have been created or saved on electronic devices such as the Subject Devices….the ability to retrieve [] information from the Subject Devices depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and computer habits." (Garcia Phone Affidavit at 17).

### b.   *The Garcia Affidavits Did Not Contain Material Omissions or Misstatements*

Garcia finally attacks the affidavits on the basis that they contained material omissions and misstatements.  Garcia argues that the affidavits: (1) should have mentioned that laboratory tests had not been conducted to determine whether "Monkey" and "red acid" contained banned or performance enhancing substances; (2) should have mentioned that the reason Garcia and Navarro had parted ways was due to, as Garcia claims, her advice to a colleague to report a sick horse to authorities; (3) misleadingly stated that "[b]ased on the frequency and regularity with which they discuss administering PEDs to racehorses, I believe NAVARRO, SERVIS and GARCIA, have continued to source transport, store and administer PEDs to racehorses under their control up to the date of this Affidavit"; and 4) further misstated that Garcia "did not practice medicine in order to examine, diagnose, and treat legitimate health problems in NAVARRO's horses." (Garcia Search Mot. at 10-13). None of these alleged omissions and or purported misstatements were material or untrue.

Garcia's arguments regarding the two alleged omissions (related to drug testing and Garcia's split with Navarro) fail.  There is no "necessity" requirement for a search warrant, and consequently no obligation to explain the status of any particular investigative step. Nor is there any reason to think that Garcia's split from Navarro – a fact that *was* included in the search warrant, (*see* Garcia Phone Affidavit at 8) – could have impacted the probable cause finding for the searches, even assuming that Garcia's explanation for the split is accurate.[34] "The task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing

---

[34] Even according to Garcia, the two did not part ways because Garcia refused to continue doping horses with "Monkey" or "red acid," but (according to Garcia) because she defended the actions of a colleague in reporting a sick horse. The material information (*i.e.*, the split itself) was included.

judge] a 'substantial basis' for making the requisite probable cause determination." *Clark*, 638

F.3d 89 at 93 (quoting *Gates*, 462 U.S. at 238).  Accordingly, neither "omission" was material to

the magistrate judges' determination of probable cause.

Garcia's argument regarding the two alleged misstatements, as to Garcia's continuing

participation in the offenses and her disregard for legitimate medical practice, is also meritless.

As noted above, the affidavits laid out the bases for each of those beliefs.  For example, the

Garcia Vehicle Affidavit detailed numerous calls in which Navarro, Servis and Garcia were

intercepted discussing the administration of "orange," "Monkey" and "red acid," and numerous

communications where Navarro (a non-veterinarian) directed Garcia (a self-described

"employee" of Navarro – not an independent veterinarian employed by a separate veterinary

practice, as she held herself out to be) to administer "Monkey" and "red acid" to horses without

any discussion of the horses' health.  Based on the facts set forth in the affidavits, it was properly

left to the magistrate judges to determine whether or not the affiant's belief was justified and/or

whether such a conclusion mattered to their determination of whether probable cause existed.

Additionally, even if the Court were to find that these alleged omissions and

misstatements were material, Garcia presents no indication at all that they were made with any

intent to mislead the magistrate judges.  Garcia bears the high burden of establishing both

materiality and intent to mislead, and has not established either.  Accordingly, Garcia's motion to

suppress the evidence obtained from her vehicle and phone should be denied without a hearing.[35]

---

[35] Garcia additionally argues that the good faith exception should not apply to the search of
Garcia's vehicle because Garcia claims the seizure of items from her vehicle was overbroad.
Garcia's argument is baseless because it relies on the false premise that FDA-approved drugs are
beyond the scope of the warrant.  The warrant authorized the seizure of "[a]ny misbranded and/or
adulterated drugs." (Garcia Search Mot. Ex. B. Page 3 (Garcia Vehicle Search Warrant)).  As
explained earlier in the Garcia Vehicle Affidavit, a drug may be misbranded or adulterated if
(among other things) "drugs requiring a prescription are administered without a valid prescription,

### E.    Jason Servis and Alexander Chan's Motions to Suppress

As with each of the charged defendants in this case, defendants Servis and Chan engaged in the administration of prohibited drugs that they intended to be *untestable*, notwithstanding their contemporaneous understanding that those drugs were, nevertheless, effective performance-enhancing substances. Servis and Chan focus their motions on the Government's representations concerning SGF-1000 and Clenbuterol in wiretap applications, each of which fall within the category of drugs that Servis, as a trainer, and Chan, as a veterinarian, abused in an effort to increase horses' racing performance. Servis and Chan's respective motions ignore the ample evidence, reported in each wiretap application, reflecting that SGF-1000 was promoted as containing *some* purportedly potent drug capable of increasing a horse's performance and that Servis' abuse of Clenbuterol (or more precisely, an "[ir]regular" Clenbuterol and unprescribed Clenbuterol) was similarly intended as an illegal performance enhancer, regardless of whether a laboratory could successfully detect the use of those drugs on Servis' racehorses or discern the components of SGF-1000. Even if one inserts into the relevant affidavits[36] the cumulative disclosures advocated by Servis and Chan regarding purported historical drug tests conducted by third parties, the wiretap affidavits would be unaffected given the intercepted discussions regarding these drugs that were included in the affidavit, the materials promoting SGF-1000 as a

---

that is, not in the usual course of a veterinarian's professional practice, or not administered pursuant to any prescription at all," or "if a drug's labeling is deficient in some respect." (Garcia Vehicle Affidavit at 3-4). Accordingly, just because a drug has been approved by the FDA does not mean it was outside the scope of a misbranded drug administered by Garcia outside the usual course of her professional practice.

[36] The affidavits which Servis and Chan claim to be deficient on the basis described above are the April 30, 2019 and May 29, 2019 Affidavits In Support of Interceptions of Servis' Phone, and the June 27, 2019 and July 30, 2019 Affidavits In Support of Interceptions of Servis and Rhein's Phones, which are appended as Exhibits 1-4 to the Declaration of Rita M. Glavin In Support of Servis' Motion to Suppress.

PED, and the agents' experience with the investigation.

As in the case of the other movants, Servis and Chan make related claims regarding other investigative steps that, they assert, were legally required before seeking a wiretap. These arguments, along with the arguments regarding purported material omissions, are meritless.

Finally, the defendants make arguments overlapping with those of other defendants regarding the sufficiency of evidence quoted in relevant affidavits to support a finding of probable cause that interception of communications would yield evidence of the Target Offenses listed in relevant wiretap applications. All of these arguments fail.

     i.     <u>There Is No Basis to Suppress The Wiretaps For The Affidavits' Discussion Of SGF-1000</u>

As discussed above, this investigation has long focused not on drugs that are readily detectable by racing officials, but on trainers and others' use of drugs that are, by their design or method/timing of administration, intended to be both potent and untestable. *See supra* Part II.A.ii. Every Judge to consider the applications in this case has been well aware of that context, and the review of the wiretap affidavits in this case was conducted against that backdrop. This context was, of course, clear in the initial Servis wiretap affidavit, which included for example, the following information:

- With respect to Kentucky racing rules, in particular, the April 30 Affidavit specifically noted that one relevant rule proscribed the use of any substance that "might mask or screen the presence of a prohibited drug, or prevent or delay testing procedure." (810 Ky. Admin. Regs. 1:018(2)(2); *see also* April 30 Affidavit at 23).

- A discussion of co-defendant Navarro's intent to use drugs that were untestable, and his discussion of illicit drugs with certain other trainers (including Servis). In particular, Navarro (Servis' direct co-conspirator) and co-defendant Nicholas Surick had specifically discussed the illegal use of Epogen by Surick, and the notion that, had Surick conformed to Navarro's methods, Surick's actions would not have risked detection by racing officials. (*See* April 30 Affidavit at. at 35-37).

87

- A discussion of Navarro and co-defendant Christopher Oakes' conversations regarding the use of a "drench" developed by Oakes for administering illegal substances to horses with "zero chance you get caught" regardless of racing officials' efforts to detect that administration ("they can test you all day, night, before, after [but will not detect the drug]. . . ").  (*Id.* at 42-43).

- A disclosure of prior intercepted calls over other cellphones, including calls reflecting "discussions of the practice of administering performance-enhancing substances or techniques to race horses in violation of applicable administrative codes, and their success in sourcing (or, in the case of [Seth] FISHMAN, developing) prohibited substances *that are undetectable by normal drug tests*." (*Id.* at 75).

As the wiretaps on Navarro's phone made clear, this information, developed in the course of the overarching investigation, was not a separate world of fraud involving wholly unrelated players, but was the context for the very conspiracy in which Servis himself was involved through his interactions with, among others, Navarro. As discussed below, Servis aided and assisted Navarro in conducting Navarro's own doping operation, and the means of methods of Navarro's operation shared with Servis, as Servis worked to conduct an overlapping fraud with the horses under his control.

At the time of the initial Servis wiretap on April 30, 2019, the evidence made amply clear that Navarro, Servis, and others understood that "SGF" was a performance-enhancing drug, and one that was discussed in the context of other such substances. For example, on March 3, 2019, Navarro and defendant Michael Tannuzzo engaged in the following conversation:

> Navarro:  What I'm going to do is tap his ankles, put him in a series every week with SGF. I'm just trying my vet to give me a good price man because I want to fucking charge to fucking tap every week.

> Tannuzzo:    You're going to tap him every week.

> Navarro:  Yeah with SGF that's what I did with XY Jet. I'm going to call my vet up north to see, my surgeon to see how he did it to XY Jet and that's it. Don't worry man you're in good hands don't worry.

> Tannuzzo:     You're talking about the HGF not the SGF.
>
> Navarro:  Yeah yeah yeah whatever the SGF whatever. The thing that you sent me the syringe.
>
> Tannuzzo:     Yeah.
>
> Navarro:  Yeah. Yeah and he [a horse] is getting one of those SGF 1000 whatever. He's getting one today.

(Adams Decl. Ex. G).

As relayed in the April 30 Affidavit, on March 5, 2019, Navarro and Servis discussed drugs, and made their first mention (to each other) of a drug that they, like Navarro and Tannuzzo, also referred to as "SGF.":

> Navarro:  And if you know something new, if you know about something new don't forget about your man ok? Don't forget about your man.
>
> Servis:   I'll tell you what, Jorge I'm using that fucking uh shot what is it SGF?
>
> Navarro:  Oh yeah yeah yeah I got uh I got more than 12 horses on that so I'll let you know ok?
>
> Servis:   *I've been using it on everything almost.*
>
> Navarro:  Jay we'll sit down and talk about this shit. *I don't want to talk about this shit on the phone ok*.
>
> Servis:   Alright you're right.

(April 30 Affidavit at 58) (emphasis added)).

Thus, as of the date of the initial wiretap application for the Servis Phone, probable cause plainly existed to believe that the Servis Phone was being used to discuss Servis and Navarro's use, administration, concealment, and distribution of drugs that they intended as performance enhancers. Probable cause further existed to believe that Navarro and Servis both understood the need for secrecy in the administration of such substances ("I don't want to talk about this shit on

the phone ok."). Navarro, in particular, was among the defendants who had expressly discussed the concept of "untestable" drugs with other co-defendants, as discussed above. Probable cause existed, moreover, to believe that Navarro and Servis were each using "SGF" as one such drug, and that each understood the importance of concealing their use of that drug from investigators, which is fundamentally inconsistent with the notion that they were discussing a licit drug. Thus, whatever the content of the drug "SGF," as it was identified as of the April 30, 2019 wiretap affidavit, the FBI and the issuing judge reasonably understood it to be a performance-enhancing substance and understood that Servis and Navarro intended to use, and conceal it, as such.

Servis and Chan employ the convenient argument that the Government could not know, and therefore could not represent to the Court, their belief regarding the chemical composition of SGF-1000 absent drug testing. That is simply not the case. Agents were and are entitled to rely on an array of information in drawing reasonable conclusions regarding the drugs that were used by the Target Subjects: agents are not confined to drug test results, particularly in the context of purportedly untestable drugs.[37]  Given the manner in which this drug was discussed among non-veterinarian Target Subjects in intercepted conversations (Target Subjects who had discussed amongst themselves and with others the distribution of other performance-enhancing drugs), and given the promotional material advertising SGF-1000 as a drug containing growth factors, [38]

---

[37] For example, many wire affidavits obtained in investigations of controlled substances contain statements in which the affiant draws conclusions regarding the controlled substance discussed by interceptees based on their use of slang terms to denote the drug – there is no presumption that a positive laboratory test for heroin, for example, is necessary to understand the nature and context of intercepted calls about a substance consistently touted as a powerful, injectable.

[38] As noted in the various wiretap affidavits, unapproved, unprescribed "growth factors" run afoul of multiple relevant racing jurisdictions' rules and regulations. The New York Gaming Commission had, at the time, promulgated rules relating to banned substances, including Title 9, N.Y.C.R.R., Section 4043.1, *et seq.*, entitled "Drugs Prohibited and Other Prohibitions." These New York rules incorporated, in part, the bans on substances set forth in the Association of Racing

90

among other things, (Glavin Decl. Ex. 5 (Medivet Webpage)), the affiant had a firm basis to describe his beliefs regarding SGF-1000, and never represented that the Government had gleaned this knowledge as a result of drug testing. (*See, e.g.*, April 30 Affidavit at 59). Indeed, the Servis Motion includes exhibits that demonstrate that the FBI's discussion of "SGF" was *correct*. (*Compare, e.g.*, Glavin Decl. Ex. 5 (Medivet Webpage) (describing SGF-1000 as containing unspecified "Regenerative Proteins, Cytokines, Peptides, potent Growth Factors and Signaling Molecules" and to be used "during training and performance") *with* April 30 Affidavit at 59 ("Based on my training and experience and my participation in this investigation, including my review of prior and subsequent intercepts, I have learned that SGF-1000 is a performance-enhancing substance known as a growth factor that promotes tissue repair.")). By any measure,

_____

Commissioners International's Model Rule ARCI-011-015 Version 7.0 (approved December 9, 2016). The New York rule thus banned "other doping agents," defined as "a substance that is not described in subdivision (a) of this section or the ARCI Prohibited List, has a pharmacologic potential to alter materially the performance of a horse, has no generally accepted medical use in the horse when treated, and is capable at any time of causing an action or effect, or both, within one or more of the blood, cardiovascular, digestive, endocrine, immune, musculoskeletal, nervous, reproductive, respiratory, or urinary mammalian body systems . . .; but . . . not a substance that is considered to have no effect on the physiology of a horse except to improve nutrition or treat or prevent infections or parasite infestations." *See* Model Rule ARCI-011-015 Version 7.0 (approved December 9, 2016) of the Association of Racing Commissioners International, Inc., *available at* https://www.gaming.ny.gov/pdf/legal/ARCI%20Prohibited%20Substances%20List%20Version %207.0%20(2016-12-09).pdf   (last visited Aug. 24, 2021).   New York Racing Regulations Sections 4043.12(c)(5) and 4043.16 provide, moreover, that certain substances are listed as prohibited, and may not be used at any place or time, absent certain exceptions.  For example, for a doping agent that is a "protein- or peptide-based agent or drug that may . . . enhance the performance of a horse beyond such horse's natural ability," the substance must be administered only in a "time, place and manner specifically permitted in writing by the [New York Racing] commission" and must be "for a recognized therapeutic use." Further, any drug administered during training must be done pursuant to a valid veterinarian-client-patient relationship after a veterinarian examines the horse, and "the veterinary judgments of the veterinarian" must be "independent and . . . not dictated by the trainer or owner of the horse."  New York Racing Regulations § 4043.16. Other jurisdictions provide for similar bans, though one of Servis' primary jurisdiction of competition at the time of the wiretap applications was New York.

the representations regarding SGF-1000 were not misstatements, let alone material

misstatements. [39]

Moreover, neither the Servis nor Chan motions point to any purportedly "withheld"

information that would contradict a finding of probable cause to believe that the Servis Phone

was likely to receive and transmit communications reflecting the scheme to use illicit drugs to

defraud others of purse winnings, including with respect to SGF-1000. Servis and Chan

primarily point to news and other reports (many obtained after the arrests in this case) relating to

third-party testing which had failed to detect specific prohibited substances in the drugs that

Servis and Navarro nevertheless plainly intended, and used as, performance-enhancing

substances.  In particular, the Servis and Chan Motions speculate that the FBI knew or should

have known that third parties who had tested what they believed to be SGF-1000 had failed to

detect whatever its performance-enhancing components may have been.[40] Their arguments elide

---

[39] Even if Servis and Chan were correct that the descriptions of SGF-1000 in the April 30 and May 29 Affidavits were fundamentally inaccurate, their motions still fail.  Under the *Franks* standard, Servis and Chan would still have to demonstrate that the affiant "entertained serious doubts as to the truth of his allegations," *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted), a standard they cannot satisfy given the promotional material advertising SGF-1000 as containing several growth factors, and the suspicious manner in which SGF-1000 was discussed in intercepted calls.  Further, if this Court were to measure materiality by "correcting" the affidavit, *Lahey*, 967 F. Supp. 2d at 711, the "corrected" description of SGF-1000 would *still* support a finding of probable cause, as the affidavit would instead state that the affiant believed, based on prior intercepted conversations and promotional literature available online regarding SGF-1000, that SGF-1000 contained, among other substances, growth factors, but that no drug testing of SGF-1000 had occurred as part of the investigation because the affiant had not yet procured a sample of the drug, and that in any event drug testing may not conclusively establish the contents of the drug given that many in the racehorse industry use drugs that can circumvent drug tests.

[40] Chan additionally points to the fact that the FBI, after becoming aware of Servis' activities and of SGF-1000 as one of his drugs of choice, began to obtain samples of blood drawn from Servis-trained horses. (*See* Baum Decl. Ex. H). Of course, those samples were obtained in June 2019, *after* the initial wiretap on Servis' cellphone. Chan does not allege that any drug test results were obtained prior to the conclusion of these wiretaps, nor could he do so. Servis, moreover, fails to note these (and other) efforts in making the wholly unsupported contention that the FBI

92

over: (1) the timing in which such testing came to light in reporting that post-dates the wiretaps in this case; (2) the limited utility of drug tests given Target Subjects' prior discussions of using untestable drugs, as discussed below; (3) the nature of the entities purportedly conducting tests, which, in certain cases were not organizations the Government would subpoena for this information (*e.g.*, potentially complicit entities, as discussed below with respect to Medivet); (4) the investigative reasons described in every affidavit discussing the risks and limitations of employing grand jury subpoenas, which counsel against subpoenaing private entities or third parties, (*see, e.g.*, April 30 Affidavit at 69-70); or (5) the fact that the Government included in its affidavits intercepted conversations between Rhein and others disclosing *precisely this information*, which is discussed in more detail below.

Ultimately, even had the FBI requested such test results from these independent entities or known about those tests in advance of the wiretap affidavits, it would not change the fact that probable cause existed to believe that Navarro, Servis, Rhein, and others were using products, including SGF-1000, that they intended and understood to be an untestable performance-enhancing drug, and that they were using that drug to obtain money from racetracks using false statements and under the false pretense of racing horses that had not received proscribed substances, including SGF.[41]

---

purposefully slowed its investigation after obtaining the Servis wiretap.

[41] The Servis Motion refers in particular to pre-investigation testing done by the Racing Medication & Testing Consortium ("RMTC"). (Servis Mot. at 6). In September 2019, Medivet, in an effort to convince the RMTC to "delist" SGF-1000 as a prohibited substance, conveyed partial results of Medivet's own recent testing of SGF-1000; the information provided to RMTC *excluded* portions of the original drug testing results reflecting a cocktail of substances contained in SGF-1000. On August 8, 2019, Medivet's representative received a report from Industrial Laboratories reflecting a negative finding (at that time) for certain growth factors, and detection of, among other things, low levels of acepromazine, levamisole, detomidine, pyrilamine, lidocaine, MEGX, xylazine, and caffeine; Medivet's reaction was to request that the negative and positive findings be split into two

93

Servis and Chan's motions focus particularly on the affiants' purported omission from the June 27, 2019 and July 30, 2019 affidavits of a June 2019 email by a drug testing laboratory, which stated (in substance) that a sample of SGF-1000 had been tested by that laboratory previously (unconnected to the Government's investigation) and had not been found to contain a detectable amount of growth factors. Certain quotations from the June 27 Affidavit are useful in illuminating the issuing judge's probable cause finding by demonstrating: (1) that Servis and Kristian Rhein fully understood SGF-1000 to have performance-enhancing effects notwithstanding the testability of that drug; (2) that each of Servis and Rhein understood and relied for purposes of evasion on falsifying medical records and on the untestable nature of SGF-1000; and (3) that the very information that the defendants' current motion complains of *was in fact disclosed* to the reviewing court.

---

separate reports. (Adams Decl. Ex. H (Aug. 8, 2019 report of Industrial Laboratories,); *see also id.,* Ex. I (September 3, 2019 email to Industrial Laboratories on behalf of Medivet, requesting separate certificates of testing results)). On September 10, 2019, Medivet, through counsel, conveyed the *negative* findings to the RMTC, while withholding the positive findings. (Adams Decl. Ex. K (Sept. 10, 2019 letter and attachment from Medivet to RMTC)). As of October 14, 2019, Medivet had learned that a subsequent test of SGF-1000 *did* result in findings reflecting the presence of a specific growth factor, *See* Adams Decl. Ex. J (Oct. 14, 2019 Industrial Laboratories testing results); at trial the Government intends to show that this latter result was not among the documents provided to the RMTC, notwithstanding prior representations to RMTC regarding the contents of SGF-1000. This series of events underlines at least two points in support of the FBI's wiretaps. First, the reasonableness of the FBI's view that SGF-1000 was likely both performance enhancing and generally untestable is reflected by the fact that even the drug's manufacturer required a specific battery of tests to identify the substances that it understood, *ex ante*, to be constituents of its product. Had the FBI or the reviewing Courts been unreasonable in approaching the case from that perspective, one would not expect the FBI's premise to be borne out by Medivet's own testing. Second, and as discussed in more detail below, the duplicity with which Medivet treated the RMTC only further emphasizes that standard, overt techniques of investigation were unlikely to penetrate this sophisticated, concerted effort to hide relevant facts regarding the intent of the defendants, and the untestability of drugs used by these defendants, precisely as anticipated and perceived by the investigating agents – the agents and issuing judges were reasonable in that respect, as well.

As discussed in the June 27 Affidavit for interception of the Servis Phone, on June 5, 2019, members of the New Jersey State Racing Commission conducted unannounced out-of-competition testing of one of Servis' horses, "Maximum Security." "Maximum Security" and additional horses trained by Servis had also been tested as part of an unannounced out-of-competition test that occurred on or about Monday, June 3, 2019. On June 5, 2019, Servis and co-defendant Henry Argueta (a trainer working under Servis' direction) held a conversation in which Servis professed to be concerned that the Commission was looking for evidence of illegal "clen," *i.e.*, Clenbuterol ("I think they are looking for Clen. That's what I think. He runs the 16th. That's going to be 11 days."). (June 27 Affidavit at 72). Shortly after that conversation with Argueta, however, Servis called Rhein to discuss an additional concern with the testing, namely the possibility that the Commission would discover Servis' use of SGF. At 1:55 p.m., Servis called to confirm that Rhein was alone and available to talk:

> Rhein:     Sir.
>
> Servis:    You got a minute.
>
> Rhein:     Sure sure sure.
>
> Servis:    Are you by yourself?
>
> Rhein:     Yeah yeah yeah I just walked out of the barn.

One minute later, the two spoke again:

> Servis:    Hey. So they've been doing some out of competition testing which I have no problem with. Um they took Maximum Security Monday and they came back again today. But Monday he got the "KS" I just want to make sure we are all good with that.
>
> Rhein:     Wait what did he get?
>
> Servis:    I'm sorry I said "KS" the... you know your shot the...
>
> Rhein:     Oh the SG…

Servis:     Yeah that stuff.

Rhein:     *Yeah no no no the Jockey Club tested it and I met the guy who tested it way back when. It comes back as collagen. They don't even have a test for it.*

Servis:     It will probably come up with Dex [ph] probably right.

Rhein:     Yeah that's it. It will be Dex. It will be Dex. It will be like that's it. And I've had it. I had them pull some stuff and I was like "oh shit" I wonder what will happen. Nothing. Nothing. I mean and the guy said SGF doesn't even test close thank god. But the only thing will be the AZM and you can just say he was like hives or something but...

Servis:     Right but they're not even going to ask me about it.

Rhein:     They won't even.

Servis:     Because you're allowed to have that anyways. Dex I mean.

Rhein:     He's allowed. He's allowed. So [U/I] I don't know. I've done it. *I've had it tested. Jockey Club did it and I've had at least three different times it's been tested on horses that I gave it the day before and nothing.* Not a word.

Servis:     Yup.

Rhein:     *There's no test for it in America.  There's no testing.  There's nothing.*

Servis:     Okay that's fine.

Rhein:     There's nothing you did *that would test*.

Servis:     So Monday they took Max and they got three other horses. Actually the got two they were looking for Sunny Razor and I told them he's at Belmont. I think they got him today Henry [Argueta] said. But they took a two-year old filly that ran the other day and finished fourth. Um and I'm thinking why the fuck would they want to take her. But maybe they are just doing random or maybe looking for Clenbuterol I don't know.[42]

Rhein:     Yeah that's what I am wondering. I'm wondering if it's Clenbuterol they are looking for.

---

[42] As discussed further below, the defendants' concern with racing authorities' scrutiny of their use of Clenbuterol undermines their current professed view that the substance is entirely innocuous.

Servis:    Right because Parx you are not allowed to have it on the grounds.

       …

Rhein:    That's really an odd thing and that horse I guarantee has never had any shit that. I mean I know because I met the guy inadvertently when the Jockey Club took a box of the SGF. They took it and I met the guy and I met the guy down at the conference and he goes *"The Jockey Club" and he saw the hat that I had on was the same company and he goes "Oh man I just tested a box of that stuff" and I go "What stuff" and he goes "Medivet. You've got a hat on. SGF. Yeah Jockey Club sent it to me out in California. Yeah it came back as just a bunch of collagen. Nothing interesting [U/I]. These guys think it's got something that can be like a performance enhancing drug." He goes "There's nothing in it," and he was the actual head of the testing lab.*

Servis:    Yeah I think you told me.

Rhein:    Yeah so you are golden. And like I said we have had it done two or three times here. Nothing.

Servis:    Okay.

Rhein:    Shit I just had that I gave to some horses and they just took it.

Servis:    Well that's what I'm saying that horse got it Monday.

Rhein:    Yeah.

Servis:    And then they come in and test it [U/I].

Rhein:    No but they won't. It's.. you know I promise. It's never been anywhere, anyway, anyhow and I got guys going through FEI testing. Which is the French International Federation that is a 50 million times stricter because these guys are giving it for their horses in the Grand Prix. They give it to them. The Grand Prix jumping. So I have like three horses that are gold medal... well medal winning horses in the Olympics an they are all on it. And they go right through the box for FEI and its far stricter than anything we got.

Servis:    Alright Kristian. Just want to make sure.

(June 27 Affidavit at 72-77 (emphasis added)). Nothing in the affidavit calls into question the accuracy of Rhein's report to Servis that SGF-1000 had been tested and that none of its component substances had been detected by the array of tests to which it had been subjected. It is

97

also clear from Rhein's representations that he was not assuring Servis that SGF-1000 complied

with applicable racing rules, or had no illicit contents—instead, Rhein reassured Servis that the

drug *would not show up on drug tests*, further underscoring the affiant's reasonable belief that

drug tests of SGF-1000 would be fruitless.  (*See id.* (Rhein: "They don't even have a test for it.";

"There's no test for it in America."; "There's nothing that you did that would test."; "I got guys

going through FEI testing . . . And they go right through the box for FEI and its far stricter than

anything we got")). In other words, the drug that Rhein and Servis appreciated for its

performance-enhancing qualities would not be, and apparently had not been, detected by

investigating laboratories.

On the same day, following his conversation with Rhein, Servis placed a call to another

individual regarding falsely listing "dex" on veterinary records to obscure his use of SGF-1000 –

the drug that Servis now claims was innocuous:

> Servis:    Yeah. So I just want to give you a heads up. So they pulled blood on some
> horses Monday one of them is Maximum Security and then they pulled it again
> today. Um... and I talked to Kristian [Rhein]. I mean the shots shouldn't be a
> problem because you know it may come up as Dex. I don't know if you cover
> your ass if they want to look at a bill and see if the horse why he got Dex or
> some . . .
>
> . . .
>
> Servis:    I just wanted to give you a heads up with the Dex because that horse you gave
> it to him Monday I think right.
>
> Individual-1:   Yeah he got the Dex Monday.
>
> Servis:    Yeah I don't know if they might try to put why did he get Dex it's not on the
> bill or something.
>
> Individual-1:   Nah [U/I] put it down. [U/I] put it down. Got it.

(*Id.* at 79).

On the following day, June 6, 2019, Servis and Rhein continued their conversation about

SGF-1000, and the wiretap affidavit submitted on June 27, 2019 again disclosed the untestable

nature of that drug:

Rhein:     On what we were talking about the other day. There is no problem with it, but, like somebody squealed around here about it.

Servis:     Okay.

Rhein:     So, that is the only thing that we should be cautious of. I got a . . . I got a couple of . . .

Servis:     That's the SGF?

Rhein:     Uh huh.

Servis:     Ok.

Rhein:     So somebody squealed. Not that it is testing, or that . . . there's no . . . *it's untestable*. It's that they were crying about it. I don't know why. They didn't tell me who. But somebody is crying about it.

Servis:     Ok.

Rhein:     So it's just, just that we know. I just wanted to let you know that I, you know . . . The guy said this is a big, higher up official. I was like, "What are they? Is it some weird test? Or is something coming back?" And he was like, "No, not at all."

Servis:     Ok, I just . . . like I said they pulled blood the same day that he got it, that is what threw me off.

Rhein:     Yeah, well, this was the . . . I'm not worried in the sense of anything going wrong with it because . . . Like I said, *the guy already tested it, so it's not that*. It's more people crying.

Servis:     Right, right.

Rhein:     It's more people crying about it and I am sure, as you well hear. Believe me, more people come up to me and bitch and cry about you. They are like "Oh, he is cheating, he is cheating, he is cheating." I was like "Yep, sure." I said, "They test all of his horses over and over and over again."

Servis:     I know, I hear it all the time.

Rhein:     I know you do. So, but... between you and me because the testing, they called

99

me from the test center here and I was like "What's up?" They go "Do you know anything?" So what they called it, they called it "growth hormone." They were like "You're using some sheep growth hormone." I go "No, it has no growth hormone what-so-ever in it." And I said "*It tested as collagen, which is a protein*. A a fine... there is nothing wrong with it." I told him the name of the gentleman that did it in California. I said "His name is [redacted]." He goes "Oh, I know him." I said "The Jockey Club had it tested." They were all freaked out, they thought it was this, they thought it was that. I said "So, it has been tested up and down." And he said "Listen, somebody dropped a dime on me." And I was like "What?" They are like "Yeah." So all we need to do... I'm not going to say anything to anything else. I'm just going to tell Alex [Chan] and people like that. *Like it is not on any of our bills, it never is.*

Servis:     What about, is it on your truck?

Rhein:     No, nah, I don't take it on my truck. I just, when they call for it I just have it, come and get it.

Servis:     Well, if you want us to back off I mean I have no problem with that.

Rhein:     No, no. No, no, I mean, I'm going to find out some more. I just wanted you to know. I mean, I'm not worried. *I am not worried because it has been tested, you know*. And the person that just called me is the guy who tests. So I'm not worried about that. We do it further out. I mean all those things. So I am not trying to be clever, or tricky or anything. This guy said "Listen, I am letting you know." And I said...

Servis:     Right, somebody dropped a dime on you.

            . . .

Rhein:     *Put it this way, they have no test period, but we don't get close. We never do. I mean I don't get close with it.*

Servis:     Yeah, we are ten, twelve days.

Rhein:     Exactly, the rules of New York say anything outside of seven days is anything that is not listed. And this is truly listed as a biologic so if they really want to fight, guess what, a biologic in New York is forty-eight hours.

Servis:     Right.

Rhein:     Because that's all it is.

Servis:     The only thing I was concerned with is, is it FDA approved?

100

Rhein:      Well, no, no. Not that I know of.

Servis:     That's the only thing I was thinking, I don't . . . does it have to be?

Rhein:      Well, no, because, no.  I mean, there is so many things.  That is the beauty of being a veterinarian.  As a veterinarian you are allowed to use any drug that you think would be . . . and this is not even considered a drug.  It has no drug in it, it is literally just a purified protein from a sheep's placenta.

Servis:     Right.

Rhein:      So, I was like, look this isn't a drug, this isn't manufactured. So the Federal Drug Administration, they wouldn't approve it anyway, just because it is not a drug. Yeah, so, I just want to beware. I am not like "Oh my God" panicked.

Servis:     Yeah, because I use it down here.

Rhein:      Shit, I love the stuff. I mean, you should see like tendons.

. . .

Rhein:      He [an individual about whom Servis had previously complained] is such a little bitch. He just is a little sawed-off bitch. I worked for him. I mean I worked for him. He had me shock waving horses. He would leave me these notes. They were hidden in his drawer and then we used to use Decadurabalin. I used to use Winstrol [a steroid] and he was like "don't you dare put that on the bill."

Servis:     Wow.

Rhein:      I'm like... you know... so this guy, he talks out of both sides of his mouth.

Servis:     Yeah he does and one day somebody is going to write a fucking book. It is going to be a groom or a vet somebody and he is going to hang them all out.

Rhein:      Yeah, believe me we could. I was there. I mean, I know these hypocrites. I mean I did all these guys work. I know who was using and who was not, who needed to, who didn't, I mean. I don't say it lightly, but shit. I was doing [several other individuals], I had all those barns. I was doing all their lameness. And these guys were the first ones that wanted you to do it, "hey what can we do?"

Servis:     Yeah.

Rhein:      And then they were like... so... we will be fine. *Like I said, it is never on a bill. It is never on a bill. That is the problem.*

101

Servis:    I have been billing it Baycox in Florida and here.

Rhein:    Oh, good. Good, no, I think we do... ours are totally innocuous so... and I bill a lot of mine as like acupuncture. I'm an acupuncturist. I'm a trained, I'm a licensed acupuncturist. So, that is for me why I do it. They can't say I am not. I have my advanced degree for equine acupuncture so.

(*Id.* at 80-86 (emphasis added)).

Again, nothing in the June 27 Affidavit contradicts what is plainly stated, repeatedly, in the quoted calls above: namely that a sample of SGF-1000 had been previously tested for prohibited substances (multiple times) and that the tests had not detected a prohibited substance. Notwithstanding that testing, however, the evidence made clear, and probable cause plainly existed to find, that Servis, Rhein, and others understood that their use of SGF-1000 was an effective performance-enhancing substance, that it contained some elusive combination of prohibited substances, and that its untestable nature combined with falsified medical records and bills relating to SGF-1000 were critical to their continued fraudulent scheme. The context of these conversations indicated, not that Rhein or Servis were using a product they believed to be compliant with racing rules, but one that would not be detectable (*i.e.* would not result in a positive test).

Notably, the probable cause to support a finding that interception of Servis' communications would result in evidence of a wire fraud scheme extended beyond SGF-1000 in the June 27 Affidavit (as it had in the prior affidavits). For example, on June 6, 2019, Servis and Argueta discussed Argueta covertly injecting unspecified substances into Servis' horses in the early morning hours to avoid detection. (*Id.* at 89). On June 10, 2019, Servis and Argueta again discussed the administration of unspecified drugs, and specifically joked about Argueta's supposed method for covertly discarding drugs if needed. (*Id.* at 89-92 ("Argueta: Yeah, I take a

102

shower and put it on my body [laughs]. / Servis: Right, so you just put it in a cup and then you have your little syringe? . . . Right, that stuff is good, huh?")).

These conversations extending beyond SGF-1000 also involved Alexander Chan. On June 17, 2019, at 1:56 p.m., Servis and Alexander Chan (identified at that time only by his telephone number, and later determined to be Chan), discussed Rhein's administration of the drug Tildren, which Chan explained was permitted only for horses of either three or four years and older, depending on the relevant jurisdiction. Chan explained that "Kristian [Rhein] has been giving some to like two year olds still at like half dose but I'm not game because it's one of those things that's easy to test for but it's just they can't mark it property so they don't really know when you gave it.  But you know now that they have the rule that it should be 4 and up and you really have no excuse if they found it in your two year old.  You know what I mean, but if like it was a 4 year old then you could be like 'Oh man, it got it sometime before I got the horse,' or something like that.'" (*Id.* at 96-97).

The final extension of the wiretaps on Servis and Rhein's cellphones was obtained on July 30, 2019. (Glavin Decl. Ex. 4 (July 30, 2019 Agent Affidavit In Support of Order of Interception of Servis and Rhein's Phones ("July 30 Affidavit"))). Much of the description of probable cause to believe that those cellphones would be used to communicate regarding the defendants' wire fraud scheme was the same as that in earlier affidavits. As it pertains to the motions filed by Servis and Chan, the July 30 Affidavit included certain additional facts regarding SGF-1000. For example, Rhein and Tannuzzo discussed the supply and administration of SGF-1000 (as well as another misbranded drug, TB-1000) on June 29, 2019. (*Id.* at 97-98). Following the quotation of that call, the affidavit notes the agent's understanding—consistent with Servis' own claims in his motion—that "SGF-1000 is advertised as containing growth

factors, including fibroblast growth factor, hepatocyte growth factor, and growth hormone releasing factor." (*Id.* at 99).

Rhein and convicted co-defendant Michael Kegley Jr., the sales director for the company that compounded and sold SGF-1000 and TB-1000, also discussed testing of SGF-1000 in the context of on-going regulatory scrutiny of Jason Servis. In this conversation, Rhein himself acknowledged a fear that SGF-1000, *notwithstanding prior "clean" tests*, might well contain growth *hormone* in addition to the advertised growth *factors*:

> Make sure there is no growth hormone in there because *if they are calling it that* and it is in there then we'll – we need to – but I can't imagine there is. There's no - I can't - I don't think a fetus [*i.e.*, the source of the purported sheep placenta from which SGF-1000 is derived] has growth hormone in it. There's just – I don't - I don't think fetal placenta membranes have growth hormones. You know, I'll do some research tonight but I don't believe that's correct. I think it could have something that stimulates it. . . . Well here's the thing is, I don't think it does. And just because they can test for it, it doesn't mean they will. Now if it has growth hormone, I mean, it costs them a lot of money to test. A lot of money. And then the second thing is, how long is something in there. Well if we're giving it five to seven days out then we're fine. It's not gonna hang around. It's—*nothing hangs around long*. EPO doesn't hang around that long.

(*Id.* at 119-20 (emphasis added); *see also id.* at 125-26 ("Yeah, well, that's when your Dad called me. So [a Kentucky veterinarian] didn't get it [SGF-1000] [tested] for growth hormone. And I was like . . . So I said, 'all we have to prove is there's no growth hormone, that's it.' Cuz that's all they're saying. And if we, we prove that, cuz fuck, right now, I told your Dad, 'We don't want those results going out, cuz right now it's not saying [U/I] growth factor.' . . . And I'm like, fuck it, I don't know why it works . . . .")).

Rhein and others beside Servis continued to discuss their efforts to hide the administration of certain drugs. With Chan, in particular, Rhein discussed the fact that their administration of SGF-1000 was not to be committed to writing in their records (*See, e.g.*, *id.* at 123 ("The main thing is just that it will never—we're just not writing it down and we just need

them to not say a lot about it.")). With others, Rhein discussed efforts to conceal the possession of his drugs (*Id.* at 103 ("I keep it [a performance enhancing paste sold by Rhein] hidden in the honey graham box."); *see also id.* at 103-17 (reciting multiple calls between Rhein and people other than Servis regarding the administration of various drugs, including efforts to "backdate" the records reflecting the administration of certain drugs)).

    In an effort to salvage their claim regarding the purported "omission" of an email from a drug testing laboratory, Servis' motion claims—incorrectly—that the July 30 Affidavit in support of the final extension of interceptions of Servis and Rhein's Phones "dismissed Rhein's statement" as a lie by claiming that Rhein had "falsely reassur[ed]" Chan, referring to the statement that SGF-1000 had been "tested at two independent labs [and] there's nothing to find." (*See* Servis Mot. at 27-28). Servis' Motion does not mention that the affidavit's reference to Rhein's "false reassure[ance]" was specifically *not* directed toward the fact of prior testing and prior negative results, but rather toward the false legal conclusion that SGF-1000 was in compliance with racing regulations notwithstanding Rhein's prior admissions that he was, in fact, unaware of the precise contents of SGF-1000, and the obvious concern by Rhein, Servis, and others that their use of SGF-1000 would be discovered. The Servis Motion's quotation is removed from the actual sentence in which it appeared in an effort to manufacture a claim that the affidavit does not, in fact, make.  At no point did the July 30 Affidavit, or any of the prior affidavits, contradict Rhein's statements that SGF-1000 had been previously tested and had resulted in no positive finding for substances subject to those tests.  Given the affiant's inclusion of Rhein's own (repeated) statements regarding the results of prior testing of SGF-1000, any additional mention of the drug testing laboratory's email referencing a prior test it had conducted of a purported sample of SGF-1000 for a third party would only have reinforced the *untestability*

of SGF, not SGF's compliance with racing rules. The issuing judge was well aware of Rhein's representations regarding prior testing of SGF-1000, and the results of such testing, which were not rebutted by any contradictory test results, and nonetheless authorized the wiretap.

In short, the point that the defendants believe ought to have been disclosed—namely, that SGF-1000 did not test positive for prohibited substances based on third party drug tests—*was disclosed*, repeatedly, through Rhein's own intercepted statements, without contradiction by the affiants, as discussed above. Thus, the defendants can point to no omission of information, let alone omission of information "clearly critical" to assessing the legality of the wiretap affidavit. *See Reilly*, 76 F.3d 1271. Moreover, the very fact that this particular drug – as noted above, just one among several that formed the basis for the District Court's repeated findings of probable cause—was "untestable" (and discussed as such) was *affirmative evidence* of the defendants' means of succeeding in the administration of a substance that they fully understood to be proscribed. Indeed, had the affidavits included the cumulative fact that Servis and Rhein advocate, that disclosure would have *strengthened* the various applications' discussions of the inutility of drug testing as an alternative means of investigation, by further demonstrating that obtaining data from laboratory testing of custom-made drugs was unlikely to achieve the ends of the investigation into the defendants' scheme to defraud, whereas interception of communications was substantially more likely to reveal the true intent and methods of fraud conducted by these and other defendants. *See Rajaratnam*, 719 F.3d at 155 ("On a more fundamental level, we cannot conclude that the government omitted certain information about the SEC investigation with 'reckless disregard for the truth' when it is clear that fully disclosing the details of that investigation would only have strengthened the wiretap application's 'necessity' showing.").

106

Chan's motion largely repeats the same points as the Servis motion, and is meritless for the same reasons as Servis' motion, but emphasizes the claim that the Government should have done more to investigate the use, and history of testing, of SGF-1000 before seeking a wiretap of Servis' phone (a point discussed further below with respect to alternative investigative measures). By focusing on the timing of the FBI's efforts to investigate SGF-1000 and Navarro and Servis' use of that product, Chan's motion inadvertently highlights the unique utility of the wiretap on Navarro's cellphone, and, later, on Servis and Rhein's cellphones, in determining the scope, membership, means, methods, and roles of those involved in the Title III target offenses. The initial indication of Servis' involvement with Navarro was not related to his abuse of SGF-1000, "irregular" Clenbuterol, or other drugs, but rather was initially related to his apparent role as a "look out" for Navarro's own doping operation. (*See id.* at 57-58). Chan's speculation that the FBI should have been investigating a co-conspirator and a drug that was not under discussion until mid-way through the Navarro interceptions fails to carry his burden of demonstrating a purposeful or reckless omission or failure to pursue alternative investigative techniques, especially when viewed in the context of the actual investigation as it unfolded.[43]

The defendants fail entirely to carry their burden of demonstrating an omission—let alone a material omission coupled with indicia of recklessness or an affirmative effort to mislead the court—in their arguments about SGF-1000.

    ii.    <u>There Is No Basis to Suppress the Wiretaps On the Basis of The Affidavits' Discussion Of Clenbuterol</u>

---

[43] Chan also complains that the wiretap applications did not include the results of any blood draws on Servis' horses—for the same reasons discussed above regarding SGF, this argument fails—but notably Chan does not allege that results for such blood draws were available prior to the conclusion of the wiretaps, and indeed they were not. His point is moot.

Among the early interceptions of incriminating communications between Servis and Navarro was a discussion that reflected Navarro's provision of an irregular (as opposed to "regular") Clenbuterol to Servis, and Servis' desire to use that drug, if and when Navarro could provide it in a covert manner. (April 30 Affidavit at 52-53). The same early conversations revealed Servis' willingness to tip off Navarro about racetrack officials and Navarro's indication that a racetrack insider was similarly willing to tip him off about anti-doping scrutiny. (*Id.*). With respect to Navarro's use and distribution of "irregular" Clenbuterol, Navarro and Servis engaged in the following conversation:

<div style="margin-left:2em">

Navarro:  Yeah he's going to—he's going to look at Gastroguard. Make sure they label he's going to confiscate them going to take them. He's going to make sure . . . he can could be a dickhead about thyroid thyroid oil. Okay.

Servis:   Okay.

Navarro:  Alright besides that the Clenbuterol is not there huh.

Servis:   I left a little bit with 14 day withdrawal because . . . *no not that the regular.*

Navarro:  Okay you left the regular one. *Not the other one.*

Servis:   No no.

Navarro:  Okay good good.

Servis:   You got my message yesterday right.

Navarro:  Yeah yeah I got it.

Servis:   I mean

Navarro:  But also the head of security was looking for me, he's a good friend of mine, so I think he was going to tell me too.

Servis:   Okay.

Navarro:  Just just just follow everything he does cause he could be a fucking dick head.

Servis:   Ok.

</div>

108

Navarro:     Alright the only thing—any medications, pills and stuff you have to have it under lock.

Servis:      That was the only thing we didn't have cause [U/I] didn't go in today, [U/I] said [U/I] got to have everything locked up.

Navarro:     Yeah yes that's the only thing and I have cases of Gastroguard – I – he confiscated all that three years ago, but he gave it right back to me, cause I had an attorney and everything that I was going to sue him and ah like generic Gastroguard so everything has to be labeled.

Servis:      He gave [U/I] a bunch of shit about generic acid. I got expensive colt that went to to Palm Beach equine. They want omeprazole with uh something else in it.

Navarro:     Yeah yeah yeah he could be a fucking jerkoff about that. He could be a fucking jerkoff

Servis:      I mean Jorge [U/I] time to bullshit around about regular Clenbuterol. Them horses the three win the other day they are just on regular.

Navarro:     Yeah well I

Servis:      You know how long.

Navarro:     Well it came in already. I have it at home but fuck I'm afraid. *I'm afraid to bring it over*.

Servis:      *No I'm scared to death right now*.

Navarro:     Hahaha.

Servis:      The horses are running like crazy.

Navarro:     Buddy you're killing them buddy. You're killing them.

Servis:      But I ain't doing it. I'm fucking just regular.

             . . .

Servis:      *Okay but when the dust settles I'd like to get some*. Get Rigo and my guy to [U/I] or something.

(*Id.* at 52-53 (emphasis added)). As one element in a large mosaic of evidence establishing

probable cause that the Servis phone was being used to discuss efforts to commit fraud by both

109

Navarro and Servis, the affidavit's discussion of Clenbuterol was both brief and accurate.[44] The

initial Servis affidavit contained one paragraph of information regarding Clenbuterol usage, all in

the context of Navarro using an "irregular" Clenbuterol, *i.e.,* not the FDA-approved Clenbuterol,

but a drug that by definition was unlikely to be a medically appropriate drug, and was instead an

unapproved version of Clenbuterol used for performance enhancing effect. (*Id.*). The discussion

also demonstrated that Servis wished to obtain the same drug—not through a veterinarian and a

valid prescription—but through fellow trainer Jorge Navarro, "when the dust settle[d]" from

regulatory scrutiny of Servis' operation. (*Id.*). Neither Chan nor Servis point to any rule that

would allow for *unprescribed*, let alone "[ir]regular," Clenbuterol to be distributed and

administered by trainers for purposes having nothing to do with the health of their horse, as the

affidavit's quoted call plainly indicates was Navarro and Servis' arrangement.[45] Moreover, the

Servis motion concedes that Clenbuterol *can* have a performance-enhancing effect, (*see* Servis

Mot. at 18-19, *see also id.* at 17 n.14 (acknowledging that no level of Clenbuterol is permissible

if present in a horse's blood plasma on raceday)), but raises a factual dispute regarding whether

Servis in fact violated Clenbuterol rules, without actually confronting the fact that probable cause

existed, as of the initial wire intercept and thereafter, to find that communications over the Servis

---

[44] Even setting aside the accuracy and propriety of the affidavit's discussion of Clenbuterol, removing all reference to this drug would not change the fact that the affidavit would have still established probable cause that the Servis Phone was being used to communicate with at least Navarro regarding Navarro's efforts to evade detection of his own doping practices. *See Canfield*, 212 F.3d at 718 ("If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate.").

[45] *See, e.g.*, 9 NYCRR § 4043.16(a) (effective Aug. 1, 2018) ("No drug may be administered except in the context of a valid veterinarian-client-patient relationship between an attending veterinarian, the horse owner (who may be represented by the trainer or other agent) and the horse."); 9 NYCRR § 4043.16(b) (effective Aug. 1, 2018) ("No prescription drug may be administered except as prescribed by an attending veterinarian.").

phone were likely to reveal evidence of wire fraud, including evidence relating to the abuse of unprescribed and/or "irregular" Clenbuterol distributed by Navarro.[46]

In subsequent affidavits, Clenbuterol (both the "irregular" and unprescribed "regular" versions) continued to be one of several avenues of investigation furnishing probable cause to believe that the Servis, and later the Rhein, phones were used in the commission of a wire fraud offense. In addition to the same conversation recounted above, the May 29 Affidavit recounted a conversation between Navarro and another trainer in which Navarro (not a licensed veterinarian) was directing the trainer to administer Clenbuterol, described as a "banned or restricted substance," *see* May 29 Affidavit at 63, to several horses. The June 27 Affidavit included reference to text message communications between Servis (not a licensed veterinarian) and another individual ("Employee-1"), in which Servis was directing an underling to administer "clen" or "clenx" to various horses, including to horses running within 14 days of the date of the drug's administration. (June 27 Affidavit at 99-100). Finally, the July 30, 2019, affidavit included the foregoing conversations, along with additional conversations on July 4 and 5, 2019 between Servis and Employee-1, and between Servis and co-defendant Henry Argueta, in which Servis discussed the covert possession and transfer of unspecified substances. Among other things, Servis informed Employee-1 that Servis would hide a substance in a trash can for Employee-1 to receive. (*See* July 30 Affidavit at 80).

---

[46] The other references to Clenbuterol in the initial Servis wiretap application are related to information regarding Navarro's abuse of that drug, as reported by a confidential source, and to the telephone contact between Servis' phone and that of a telephone belonging to his brother, who was publicly reported to have violated Pennsylvania racing rules around the use and abuse of Clenbuterol. (April 30 Affidavit at 60; *see also* PAULICK REPORT, *'This Isn't Me': Servis Refutes Recent Clenbuterol Positives*, June 7, 2016, *available at* https://www.paulickreport.com/news/people/isnt-servis-refutes-recent-clenbuterol-positives/ (last visited August 18, 2021)).

The Servis Motion cites the May 29 Affidavit's reference to a New Jersey "4 day" withdrawal rule for Clenbuterol as evidence of an intentionally misleading and material statement; it is neither. Earlier versions of the New Jersey Medication Guidelines for Race Horses (2008) referred to Clenbuterol among other therapeutic substances that could be administered up to 96 hours before a race.[47] Separately, New Jersey rules and regulations that incorporated the 2014 ARCI Controlled Therapeutic Medication Schedule, version 2.1, provided that on the day of a race no horse could carry in its body threshold amounts of drugs as set forth in those ARCI rules, including Clenbuterol, which was listed as having a 14 day withdrawal guideline. N.J. Admin. C. 13:70-14A.1.[48] In New York, the 2016 version of the ARCI rules was incorporated through 9 N.Y.C.R.R. 4043.12(a). The New York regulation in place at the time provided, among other things, that "[t]he substances and methods listed in the ARCI prohibited list *are prohibited*, may not be used *at any place or time* and may not be possessed on the premises of any racing or training facility under the jurisdiction of the commission *except as a restricted therapeutic use*." *Id.* (effective Aug. 1, 2018; later amended June 2, 2021) (emphasis added). The relevant ARCI Rules incorporated in New York listed Clenbuterol as an "anabolic agent," and provided "anabolic agents are prohibited."[49] "Restricted thereapeutic use," moreover,

---

[47] *See* N.J. Dep't Law and Pub. Safety, Medication Guidelines for Race Horses 2008, *available at* https://www.nj.gov/oag/racing/downloads/medical-guidelines-08.pdf (a "Quick Reference" guide presenting suggested withdrawal times for therapeutic (*i.e.*, not unprescribed drugs unrelated to the health of the horse) medications).

[48] *See also* 2014 ARCI Controlled Therapeutic Medication Schedule, Version 2.1, *available at* https://www.racingcommission.nd.gov/sites/www/files/documents/horsemen/arci-controlled-therapeutic-medication-schedule-version-2.1.pdf.

[49] *See* Model Rule ARCI-011-015 Version 7.0 (approved December 9, 2016) of the Association of Racing Commissioners International, Inc., at 1-2, *available at* https://www.gaming.ny.gov/pdf/legal/ARCI%20Prohibited%20Substances%20List%20Version%207.0%20(2016-12-09).pdf  (last visited Aug. 24, 2021).

was defined as, among other things, requiring that a drug be validly prescribed—"irregular" Clenbuterol and the heedless dosing of horses across a barn with that drug for purposes of enhancing performance obviously fall outside of valid "therapeutic" use. *See* 9 N.Y.C.R.R. 4043.12(b)(5).

Servis fails to carry his substantial burden of showing that the affidavit's reference to a "4 day" withdrawal time for Clenbuterol in New Jersey was intentionally misleading, even if it were inaccurate as to validly prescribed Clenbuterol, which, of course, Servis was not using. Moreover, subsequent references to the 14 day withdrawal time does not reflect any ill intent by the affiants insofar as the previously-described four-day period was, if anything, more favorable to those trainers using (validly prescribed) Clenbuterol. In any event, the references to New Jersey withdrawal times were immaterial for purposes of assessing probable cause to intercept Servis' communications in light of the manner in which Servis was overheard abusing "[ir]regular" Clenbuterol and other drugs (including SGF-1000 and various unspecified substances), and the additional jurisdictions that proscribed or limited the use of Clenbuterol even in a validly prescribed form.[50]

---

[50] Servis' motion notes that in an email search warrant affidavit, the affiant incorrectly grouped separate conversations when discussing Rhein and Servis' use of email to communicate with each other, including about the administration of illegal substances and the alteration of veterinary bills to disguise that fact. (*See* Servis Mot. at 21 n. 20). The Government agrees that Servis' reaction— "he's going to b[e] a problem" —appears to be in reference to one of Servis' owners, rather than to Rhein's circulation of New York State regulations expressly prohibiting the practices in which Rhein and Servis were engaged. However, that error was not intentional nor ultimately material to the substantial and unchallenged recitation of probable cause for that warrant. First, the error appears to have been due to the format of records provided by Empire Veterinary Group, that were produced to the Government in response to a subpoena and that appear to have mixed at least two and possibly three conversations—two regarding the New York rules and one intermingled conversation regarding Servis' owner. Second, it is indisputable that Servis used his email address (the Comcast account) to forward the New York state guidance to Rhein (the Gmail account), and that that fact alone, even absent a reaction by Rhein or Servis, provided probable cause to find that the email accounts were being used for the purposes described in that warrant. (*See* Adams Decl.

113

With respect to the final period of interception over the Serivs and Rhein Phones, the July 30 Affidavit further recounts an additional conversation on July 10, 2019, between Servis and Argueta in which Servis directly acknowledges the problems with his use of that substance:

Servis:    Be careful man.  Henry with that.  Really careful because.

Argueta:   Yes.

Servis:    *Because we are getting really good.*

Argueta:   Yeah no.

Servis:    All we need is a problem like that.  Oh with the Derby and shit.  Oh my god.

Argueta:   Yeah.  Then they glad they are looking for us in the tree.

Servis:    Yeah they will.

Argueta:   They are going to be in the tree looking for you with their binoculars. [U/I]

Servis:    What.

Argueta:   The mounts right after the road.

Servis:    Right.

Argueta:   They'll be over there.  They be there looking for you.

Servis:    No they'll be in a can or a car with black windows you won't be able to see in.

Argueta:   Haha.

Servis:    You know what I am saying.  But they can see out.

Argueta:   Yeah but that are they going to see.  Nobody going to see nothing.  What are they going to see.  Nothing.

Servis:    Right.

---

Ex. L (Empire Veterinary Records, as produced to the Government and subsequently produced in the same format to defendants)). Third, this email exchange was one of several that provided a basis for Judge Cott's probable cause finding. (*See* Glavin Decl. Ex. 20 at 28-29).

Argueta:   We don't do nothing ha ha.  They can look wherever they want to look.

Servis:    *It means that Clen is supposed to be for Sunny Ridge*.

Argueta:   Yeah but what it's legal.

Servis:    I know but [Individual] [ph] told me it's *supposed to be for whatever you got the prescription for*.  [U/I].

Argueta:   Yeah it might be having a problem but it's legal.  *It's a 14 day rules*.

Servis:    *Yeah but it's not.  In New York it's supposed to be for a horse you have a prescription for and you have to get permission from the Gaming Commission to even get a prescription*.

Argueta:   Yeah I know.  Yeah that's a little problem but the rest . . . it's little it's *not like you're doing something very illegal*.

Servis:    Yeah but I know but what I'm saying is they [U/I] it out.

Argueta:   The only problem you get is what you don't report about it.  That's it.

Servis:    Yeah it's not reported right.

Argueta:   That's it.  What else can they do.

Servis:    Well they might do shit.

Argueta:   Okay.

Servis:    Got to be careful.

Argueta:   Yup.

Servis:    Like Navarro is doing it at midnight.

Argueta:   What do you mean?

Servis:    He's got . . . Quachi says he sees him 11 o'clock at night.

Argueta:   Probably right.  [U/I] It's like daywatch like nightwatch.

(*Id.* at 86-88 (emphasis added)).

These conversations make plain that the reviewing courts reasonably found probable

cause that the Servis and Rhein Phones would be used to communicate regarding a scheme to obtain money and property by means of false statements and fraudulent pretenses through the use of interstate wires or shipments in the mails, *i.e.*, a scheme to commit mail and/or wire fraud. Discussions of Clenbuterol, although relatively limited in the context of the affidavits' discussion of Servis' overall doping activities, were not based on any material omission of information. The facts recounted in each of the affidavits regarding Clenbuterol demonstrated, from the initial interception of Servis' phone going forward, that Servis and others were using the Servis Phone to discuss the unprescribed administration of Clenbuterol (and of an "[ir]regular" version of that drug obtained from Navarro), and to discuss the covert administration of that and other drugs (including discussions that expressly referred to the tried-and-true methods that Navarro used to dope his own horses). Chan and Servis' arguments regarding Clenbuterol, like their arguments regarding SGF-1000, are no basis for suppression.

iii.     Reasonable Availability of Alternative Investigative Methods

Servis and Chan's motions with respect to alternative investigative techniques entirely abandon common sense and rely on the false notion that, as of the time of the initial wiretap, Servis was entirely unconnected to a broader, ongoing investigation, particularly that of Jorge Navarro. The motions propose a world in which the FBI had not expended considerable efforts to infiltrate the criminal enterprises engaged in the Target Offenses—enterprises that the FBI by this time understood to engage in covert coordination for the provision of illicit substances while maintaining a high degree of "operational security." To the contrary, the focus on Servis arose from incriminating conversations involving Servis intercepted over the Navarro Phone, during which the two revealed *precisely* the level of sophistication, covert action, wariness of outsiders, and general lack of transparency that rendered other investigative methods inadequate to advance

116

the overall goals of the investigation. (*See, e.g.*, April 30 Affidavit at 57 ("How are we going to

do this Jorge we can't do this in the middle of the barn. Shit that will bad.")). The lessons learned

from this investigation regarding alternative investigative techniques were disclosed in detail in

each wiretap affidavit, and approved repeatedly by multiple successive judges.

The list of proposed alternative techniques that Chan and Servis offer in their *post hoc*

wishlist are patently inadequate from the perspective of the investigators and the reviewing

judges operating with a commonsense view of the investigation in full. For example, Servis

proposes that covert barn searches were among the required steps that the FBI should have taken

against Servis specifically in the lead-up to a wiretap application. Setting aside the danger and

logistical difficulties in arranging for a covert entry onto the property of an operating business

with multiple employees working at unspecified hours, it is a long stretch to suggest that the FBI

would have been able to develop the information to identify the opportune time for conducting

such a search without detection, absent real-time information about the goings-on of the Servis

operation, *i.e.*, that such a search would have been possible without a wiretap.

The information used to obtain warrants for the covert blood draws on Surick and, later,

Oakes' horses, was not and could not reasonably have been derived from financial records,

confidential sources, testing records maintained by racetracks, or (doctored) medical records

maintained by complicit veterinarians.  Rather, the probable cause for those searches, including

probable cause as to the blood draws on *specific horses*, was available only because the FBI had

obtained wiretaps on Surick and Oakes' phones, respectively.  (*See* Oakes Mot. Ex. 1 at ¶ 17-20;

*see also* Adams Decl. Ex. C (December 18, 2018 Search Warrant Application for Entry to Surick

Barn and Blood Draw ("Surick Barn Search Affidavit"))). The goals of the investigation were

furthered uniquely by the interception of communications that these defendants considered

117

closely held; they could not have been furthered otherwise.

The defendants' supposition that the FBI could or should have recruited additional confidential sources with access to Servis and/or Chan's inner operations, access to their expressions of fraudulent intent, or access to their means and methods of sourcing and administering illicit drugs is similarly divorced from reality. Among the initial intercepted communications over the Navarro Phone involving Servis were discussions of their efforts to keep a close hold on information and to work together to avoid infiltration or scrutiny of their illegal operations. (*See* April 30 Affidavit at 51-53 (discussions between Servis and Navarro regarding the presence of racetrack officials in their barn areas ("Eagle Landed? All clear") and Servis' desire to obtain drugs from Navarro only after assuring himself that he was under less scrutiny ("when the dust settles I'd like to get some"))). The same series of conversations makes clear that even an attempt at recruiting officials at certain racetracks carried a risk of premature disclosure of the investigation and the destruction or concealment of evidence. (*Id.* at 52 ("Servis: You got my message yesterday right / Navarro: Yeah yeah I got it . . . but also the head of security was looking for me, he's a good friend of mine, so I think he was going to tell me too.")). The suggestion that confidential sources could have been identified, recruited, and successfully inserted into this sophisticated criminal conspiracy is a fantasy version of how an actual investigation unfolds, and far from the "practical and common sense manner" with which a court reviewing a wiretap affidavit in the first instance must approach its analysis. *Diaz*, 176 F.3d at 111.

Servis' motion points to a single confidential source with access *not* to Servis, but to co-defendant Michael Kegley Jr., as a purported example of the FBI's ability to achieve the goals of the investigation without resort to covert surveillance through a wiretap. (Servis Mot. at 42).

118

Among other things, and as disclosed in the July 30 Affidavit, (*see* July 30 Affidavit at 128 n. 47), this source obtained promotional materials relating to Medivet and SGF-1000. In early July 2019, the same source obtained from Kegley Jr. a sample of SGF-1000 and discussed Rhein's involvement in the sales of SGF-1000 and Rhein (and others') willingness to lie to regulators if and when questioned about sales of Medivet products. (*Id.*). Servis does not establish that this source was privy to discussions about the means by which *Servis* was purchasing, shipping, inventorying, or falsely billing drugs, including but not limited to SGF-1000. Nor was access to Kegley Jr. the equivalent of achieving insight into the *actual* content of SGF-1000 (as discussed above, even Rhein disclaimed actual knowledge of its contents), which itself was only one among many questions relevant to the offenses under investigation. For example, although the Servis Motion notes that Kegley Jr. informed the source that Medivet had purchased the formula and rights for their product from Australian companies and organizations, the Servis Motion neglects to mention that Kegley Jr. offered this explanation in the course of explaining to the source Kegley Jr.'s view that "Australia had a weaker regulatory environment compared to the United States and PEDs developed there would not come under scrutiny from the Food and Drug Administration," that is, that Australia was *unlikely* to have information that would achieve the goals of the investigation. (Glavin Decl. Ex. 25 at 5 (Bates Stamped page USAO_20CR160_00268173)). In short, this source, like the others described in the affidavits, was not in a position to achieve the goals of the investigation. The actual formula for this particular drug (just one of many being abused by Servis and others) and the actual means of Servis' source of SGF-1000 (again, one among many aspects of this investigation) were not reasonably achieved through the use of confidential sources not interacting directly with Servis. Nor is it remotely plausible that a single source who was not, himself or herself, a Target

119

Subject, would be reasonably anticipated to have or gain access to the full scope of Servis' illicit administration of substances to racehorses.

Servis and Chan further suggest that subpoenaing racetracks or laboratories for test results was required prior to seeking interceptions over the Servis or Rhein cellphones. Of course, this argument runs headlong into the defendants' claims about the *lack* of positive tests concerning these drugs, suggesting that such a step would have been unlikely to achieve the goals of the investigation. In an investigation of drugs designed and intended to be *untestable* (as evidenced by all the intercepted discussions regarding the untestability of such drugs by Navarro and Servis, and later Servis and Rhein, among others), seeking the results of drug tests is obviously of limited utility in establishing either the fact of doping or the defendants' means, methods, or intent. It also ignores the fact that in the initial intercepts between Servis and Navarro, Navarro had specifically stated that his fraudulent scheme may have been aided by corrupt connections at a certain racetrack. (*See* April 30 Affidavit at 52). This *further* ignores information—again obtained prior to and disclosed in the April 30 Affidavit—indicating that Servis may have had his own corrupt connections with racetrack security that may have foiled any attempts to search his barn or obtain drug tests through racetrack or racing/gaming commission officials.  (*See, e.g.*, April 30 Affidavit at 49-50 (a February 18, 2019 intercepted conversation between Navarro and Tannuzzo in which Navarro stated that Servis had tipped him off about a barn search and speculated, "I guess Jason Servis got someone in security that called him up and told him.")).

Ultimately, the defendants' arguments regarding alternative techniques simply ignore the many months of investigation, including use of subpoenas, the execution of search warrants, the use of confidential sources, and other methods, that revealed that the conspiracy in which Servis

(and later Rhein) was implicated thrived on secrecy, sophisticated evasion of anti-doping tests, relatively less sophisticated physical concealment of containers of drugs (in Servis' trash can, for example), wariness of outsiders, and efforts to falsify paper trails that might otherwise point to illegal activity. The reviewing courts appropriately authorized the wiretaps in light of the limitations of alternative investigative techniques given the complexity of the scheme at issue, all founded on the extensive learning developed through the investigation of Surick, Navarro, Seth Fishman, and Servis himself in the period preceding the Servis and Rhein wiretaps.

Taken in the full context of this investigation, and viewed with the requisite common sense and practicality, Servis and Chan's motions fall far short of meeting their burden in asking this Court to forego the substantial deference owed to the prior reviewing courts in this case. *See Gigante*, 979 F. Supp. at 963 ("In subsequently reviewing these determinations [probable cause and necessity], the trial court must accord substantial deference to the findings of the issuing judicial officer, limiting its review to whether the issuing judicial officer had a 'substantial basis' for making the requisite findings.") (citing *Wagner*, 989 F.2d at 71); *see also Concepcion*, 579 F.3d at 217 (agreeing that Second Circuit precedent looks to whether the court that issued the wiretap order abused its discretion, and whether the affidavit was "minimally adequate" to support that judge's decision to issue the order).

iv.    <u>Legal Sufficiency of Wire Fraud as a Target Offense and Use of the Target Cellphones</u>

Chan argues that the wiretaps did not describe probable cause to find that interceptions would lead to evidence of wire or mail fraud. Of course, that a Grand Jury has indicted both Servis and Chan for wire or mail fraud in part on the basis of evidence developed through the wiretap is in obvious tension with that argument. In any event, the probable cause that the Target Subjects in each of the Servis and Rhein wiretap applications—chief among them Servis, Rhein,

121

and Navarro—were engaged in a scheme, conducted in part through the use of interstate wires or mail, to obtain money from racetracks through false statements and the false pretense of running horses that were not doped, is overwhelmingly evident.

Chan briefly argues that because it was possible that purse winnings from tainted races *could* be received by hand, rather than by wire transfer, this possibility negates probable cause as to the use of interstate wires. (Chan Mot. at 22). That possibility, of course, is not dispositive of the question as to whether probable cause existed to believe that the relevant cellphones were being used to commit a wire or mail fraud scheme through use of, among other things, *interstate phone calls* between conspirators who were stabling horses and racing in multiple different states. "Probable cause is not a particularly demanding standard. It is clear that only the probability, and not the prima facie showing, of criminal activity is the standard of probable cause." *Scala*, 388 F. Supp. 2d at 401 (internal quotation marks and citations omitted)). Moreover, an issuing court's determination of probable cause is entitled to "substantial deference," *Wagner*, 989 F.2d at 72, and any doubt about the existence of probable cause must be resolved in favor of upholding the issuing court's order. *See Gates*, 462 U.S. at 237 n. 10.

Among other things, the reviewing courts could appropriately conclude that sophisticated, nationwide racing operations conducted by Navarro and Servis would use interstate wires to collect the large payments they were obtaining on a regular basis. Moreover, the reviewing courts were presented with ample evidence that the *intercepted calls* themselves were being used by Servis, Navarro, and others to discuss doping operations with co-conspirators located throughout the United States – those, too, were interstate wire communications sufficient to establish the use of interstate wires.

Somewhat relatedly, the Chan motion further argues that there was no probable cause to

122

believe that the targeted cellphones were being used for a criminal purpose or were commonly used by a person engaged in the Target Offenses. (Chan Mot. at 28). As Chan acknowledges, the Servis phone was subscribed in the name of Servis' wife, was listed as a contact number for Servis' business, and was initially intercepted during the Navarro wiretap in a way that revealed that Jason Servis (not his wife) was using the phone. (*See, e.g.,* April 30 Affidavit at 52-53). Moreover, and as described above, those initial intercepts over the Navarro Phone revealed that Servis and Navarro were using the Servis Phone to discuss the evasion of anti-doping regulators and Servis' desire to obtain "[ir]regular" drugs from Navarro once "the dust" had settled from then-ongoing regulatory scrutiny, calls that Chan characterizes as "innocuous." (*Id.* at 29). The two conversed on the Servis Phone several times during a short period from February 18 through March 5, 2019, each time regarding Navarro and/or Servis' efforts to either obtain drugs or to evade anti-doping scrutiny. Servis was also in contact with his brother, who had also been implicated in the illegal use of Clenbuterol, and with a horse owner whom the investigation had independently identified as a participant in illegal doping practices. (*See* April 30 Affidavit at 60-62). This was certainly sufficient to demonstrate the Servis Phone's use for a criminal purpose.

In the initial Rhein affidavit, Rhein is properly identified as related to Medivet, the company engaged in the then-ongoing sales of SGF-1000 and other drugs. (*See* June 27 Affidavit at 31). Rhein is also identified expressly, and by implication through quoted calls, as the veterinarian engaged in facilitating Servis' then-ongoing doping scheme. (*See, e.g., id.* at 35, 72-86). The content of those calls, moreover, established that Rhein and Servis' fraud had been a regular and ongoing scheme. (*E.g. id* at 82 ("Like it [SGF-1000] is not on any of our bills, it never is.")). Rhein, moreover, was in contact with co-defendant Michael Tannuzzo who, like Servis, was engaged in assisting Navarro with Navarro's doping activities, reasonably suggesting

that Rhein's own doping operations extended beyond regular contact with Servis. (*Id.* at 102).

Likewise, the pattern of communications, and the substance of those communications, were more than sufficient to establish that the Servis and Rhein "probably had used and would continue to use their cell phones to engage" in the target offenses. *Solomonyan*, 451 F. Supp. 2d at 636.

### F.    Christopher Oakes' Motions to Suppress

Defendant Oakes has filed two motions, one seeking to suppress the wiretap interceptions of his phone and the other seeking to suppress the fruits of two searches of his barn, conducted in 2019 and 2020, respectively. The arguments presented in each motion largely echo those discussed above and are equally meritless.

### i.    The Oakes Wiretap Interceptions was Founded on Ample Evidence of Oakes' Participation in an Ongoing Wire Fraud Scheme

The interception orders authorizing wiretaps of the Oakes Phone were based on sufficient probable cause, as set forth in affidavits supporting each wiretap application. The FBI first obtained an order of interception over Oakes' cellphone on February 14, 2019 on the basis of the February 14 Affidavit discussed above with respect to Seth Fishman's motions, *see supra*, Part II.A.[51] By that date, and as described above, the FBI's investigation had revealed substantial efforts by Navarro and others, including Oakes and Fishman, to obtain various performance enhancing drugs; ensure that they were "untestable" or otherwise concealed from racing officials; and to obtain money through racing doped horses under the false pretense that the horses were not doped. The February 14 Affidavit explained that Navarro was a Florida-based trainer and that his co-conspirator Surick was a New Jersey based trainer, and that Navarro in

---

[51] The Oakes Wiretap Motion refers to February 13, 2019, as the date of the affidavit and order. In fact, the affidavit was submitted and the order signed on February 14, 2019.

particular had entered horses for competition at tracks in New Jersey, New York, and Florida. (February 14 Affidavit at 21, 25). As the Oakes Wiretap Motion acknowledges, the February 14 Affidavit disclosed that public media and confidential sources had reported on the sale and use of performance enhancing drugs by both Navarro, Oakes, and Fishman extending long before the initial interception of communications over the phones of any of these defendants. (*See* February 14 Affidavit at 18-19 (describing CS-4's 2018 reports of sales of performance enhancing drugs in 2018, as well as Oakes and Navarro's use of the same Fishman products); *id.* at 24 (describing the 2017 "Juice Man" video depicting Navarro)).

The Oakes Motion also quotes many of the facially incriminating conversations between Navarro and Surick, on the one hand, and Navarro and Oakes, on the other, although Oakes takes an unreasonably sunny view of those conversations. For example, the February 14 Affidavit described the interceptions of conversations between Navarro and Surick during which the two discussed owners' fear of dealing with horses associated with Navarro, (*id.* at 27 ("there [sic] scared coming from you")); discussed the use and trading of a shock machine, (*id.* 28-29); the distribution of unspecified drugs in large quantities, (*id.* at 33 ("How many bottles, 25?")); and the use of Epogen and methods for avoiding positive drug tests for that drug, (*id.* at 30-32. *See also id.* at 32 n.12 (quoting conversation between Surick and co-defendant Christopher Marino, in which Surick states that Navarro frequently uses Epogen or an Epogen mimetic while also avoiding positive tests: "you know he uses it like water, three days they can't see that horse")). From those conversations, as discussed above, probable cause plainly existed to find that Navarro and others working with him, including Oakes, were engaged in doping horses with performance enhancing drugs entirely outside of the context of safe and valid therapeutic

125

medication.[52]

The February 14 Affidavit then quotes several communications between Oakes and Navarro indicating clearly Oakes' use of the Oakes Phone to discuss, among other things, his assistance in Navarro's scheme to defraud through the use of banned performance enhancing drugs. Far from an innocuous discussion of legitimate "amino acids" or "nasogastric intubation" of food or supplements, as Oakes suggests, (*see* Oakes Wiretap Mot. at 3 n.2), the first quoted communication is specifically about obtaining an "injectable" drug containing "amino acids" developed by "this crazy fuck Seth [Fishman]." (February 14 Affidavit at 37-38). That injectable drug (being administered not by a veterinarian, but by Navarro himself, (*see id.* at 37 ("I fucking gave it to this horse")), had the stated effect of causing a remarkable increase in the performance of the affected horse: "This motherfucker galloped. Galloped." (*Id.*). Oakes conspired with Navarro on that call to obtain and administer that same drug: "Oakes: Yeah I think he [Fishman] is in Dubai right now. Uh let me check. I'm just trying to check in my head what exactly you are talking about because you want to do the same thing if it worked before." (*Id.*),

On the same call, and immediately following Oakes' offer to assist Navarro in obtaining this injectable Fishman drug, Oakes agreed to provide Navarro with a "drench." Nothing about the context of this call suggests that Navarro and Oakes, who were in the midst of a conversation

---

[52] Notwithstanding Oakes' claim to the contrary, this was particularly true of drugs that Navarro and others referred to in code, including color coding such as the "orange stuff." (*See, e.g., id.* at 34-35 ("Zulueta: Well, I'm going to give him [a horse] five [ccs] to the vein, and five in the back, that's it. Look, they get soak wet in sweat when I give it to them in the vein. / Navarro: Yes / Zulueta: They get soak and wet in sweat. / Navarro: And are they racing good when you do that? / Zulueta: Yes, yes, they are racing good when I put five and five. . . . / Zulueta: You have to – you have to be careful. What kind of steroids are you giving them?"); *see also id.* at 35 ("Zulueta: Yeah, you should be happy—happy—happy that you are not winning all of them; otherwise, you will be arrested.")).

about performance enhancing drugs, were referring to the nasogastric intubation of a horse for the purpose of administering innocuous substances or food. Rather, Oakes referred to his "drench" as something that racing officials could not detect in anti-doping testing: "Yeah, this drench I got dude, they can test you all day, night, before, after . . . ." (*Id.*). Indeed, Oakes' description of his "drench" only reinforces the understanding that the prior discussion of Fishman's injectable amino acid compound was in reference to a performance enhancing drug. (*See id.* at 37 ("Oakes: And the drench I use has got a ton of those branch chain amino acids in it and especially made with it. It works just like the good stuff *and zero chance you get caught*." (emphasis added)). Oakes noted on the call that his formula was capable of evading detection even if administered on "race day." (*Id.*).

Oakes claims that this call reflects a material omission of information relating to a portion of the call not quoted in the February 14 Affidavit, referring to which individual would ultimately administer the drench. The claim is baseless. The final quoted portion of the call reflects that Oakes would prefer that he not be the one to provide Navarro's requested drug, but that he was willing to assist if Navarro's alternative sources of supply were unavailable. (*Id.* at 39 ("For whatever reason he can't . . . I'd rather not do it but if you get stuck and there's no way the guy's going to do it I'll come down and do it for you.")). Oakes complains that the affidavit excludes a portion of this conversation in which Navarro – not Oakes – ponders asking Navarro's veterinarian to administer Oakes' homemade performance enhancing drench. (Oakes Wiretap Mot. Ex. 6). That portion of the call is not remotely exculpatory or otherwise material, however, insofar as whether or not the veterinarian proposed by Navarro was willing to administer this illegal drug, Oakes stood ready to step in. (*Id.* Ex. 6 ("Ask the vet first. Either way we will get it to you.")). The omitted portion further reflects Oakes' willingness to ship

127

Navarro a performance enhancing, undetectable substance, that Oakes himself predicted a veterinarian might well be unwilling to administer. (*See* February 14 Affidavit at 39 ("if you get stuck *and there's no way the guy's going to do it*" (emphasis added)). This was not a conversation about Oakes' preference that Navarro obtain legitimate medical advice and authorized therapeutic medicine, *i.e.,* that Navarro ask a veterinarian "before he provided the medications at issue," as Oakes would have it. (Oakes Wiretap Mot. at 3; *see also id.* at 21 ("Mr. Oakes asked Navarro to ask his veterinarian before he would bring the medication.")). Rather, it was a conversation contemplating whether a veterinarian would administer Oakes' drench, and Oakes' willingness to administer that drench in the likely event that a (legitimate) medical professional *refused* to administer that bootleg concoction. Thus, inclusion of the redacted portion of this conversation only bolsters the probable cause finding that Judge Ramos was already positioned to make.

The February 14 Affidavit then quotes a February 10 call between Oakes and Navarro. (February 14 Affidavit at 40-43). In that call, Oakes offers to distribute a drug, "acid," to Navarro. Although the Oakes Wiretap Motion characterizes this call as reflecting merely that Oakes has access to this drug from a veterinarian, (Oakes Wiretap Mot. at 4), it neglects to mention that Navarro and Oakes (who is not a veterinarian) were discussing Navarro's desperate effort to obtain that drug *not* from a veterinarian in the course of his or her professional, therapeutic practice, but rather from Oakes himself. (*See* February 14 Affidavit at 40 ("Navarro: I need it tomorrow. I'll meet you anywhere you want.")).

The call then turned to the topic of a doctor whom both Oakes and Navarro knew, and from whom Navarro was then attempting to obtain a performance enhancing drug. (*Id.* at 39-42; *see also id.* at 42 ("Navarro: . . . So like you [OAKES] said, I was like holy shit, what the fuck is

128

this? I talked to him two weeks ago. Alright. I'm like, 'Doc, what's going on? When can you send me a new batch off that block?' He said 'Jorge, [i]t's stronger now and better than the one before.'")).[53] Navarro also recounted to Oakes that a person who "makes the blood stretch," (*id.* at 40), had been wary of dealing with Navarro because of Navarro's association with Surick. (*Id.* at 41). In the course of that conversation, as quoted in the affidavit, Oakes sympathized with this unnamed person, stating "he hates fucking Nick Surick dude" and "you know the guy, trust me. He hates that fucking guy." (*Id.* at 41). Immediately below the call, the affidavit summarizes the content of the conversation, expressly noting that "Navarro and Oakes discussed their mutual disdain for" Surick. (*Id.* at 42).

Oakes complains that the affidavit did not include a portion of this call in which Oakes expresses his dislike of Surick. (Oakes Wiretap Mot. at 4). However, the affidavit did include a quote from Oakes disparaging Surick ("you know the guy, trust me. He hates that fucking guy") and then emphasizes exactly the point that Oakes claims was omitted: "Navarro and Oakes discussed their mutual disdain for" Surick. (*Id.* at 42). Oakes argument is baseless; the substance of the information that he claims ought to have been in the affidavit *was* in the affidavit. Moreover, Oakes' distaste for Surick is entirely immaterial insofar as the basis for concluding that Oakes was engaged in a scheme to obtain money through fraudulent pretenses hinged on Oakes' collaboration with people other than Surick.

The March 19 Affidavit,  seeking a thirty-day extension of the Oakes wiretap was likewise proper. In addition to the information set forth above, the affidavit included the calls

---

[53] As this conversation, along with earlier information obtained in the course of the investigation of Surick and Navarro, make clear, Navarro and Oakes' reference to obtaining drugs from veterinarians ("Doc") does not remotely equate to obtaining legitimate drugs for therapeutic purposes, particularly considering the manner in which the effects of these drugs is discussed.

quoted in the Oakes Wiretap Motion at page 11, which plainly reflected probable cause to

believe that Oakes continued to use his phone to discuss the same fraudulent scheme as

described above. Those calls included a continuation of Oakes' conversations with Navarro

about his untestable "drench" and calls with Fishman in which Oakes discusses removing a label

from one of Fishman's products that Oakes intended to re-distribute to Navarro. (*See id.*),

However, the Oakes motion neglects to quote several of the more damning portions of the calls

quoted in the March 19 Affidavit. Those included:

- A February 22, 2019 call with co-defendant Ross Cohen in which Oakes sought to obtain drugs from Cohen (not a veterinarian, but a New York-based trainer, as described in the Affidavit, (*see* March 19 Affidavit at 79)), including a "pink thing" that Oakes confirmed was a "painkiller." Cohen described its efficacy modestly: "It's okay. I'm not saying it lights the world on fire. You know, it's not [Seth] Fishman's fucking frozen pain, you know." (*Id.* at 78). Oakes, while acknowledging that Fishman's "frozen pain" drug was "better," nevertheless directed Cohen to send the drug to Oakes home in Florida. (*Id.*).

- A March 2, 2019 call in which Oakes asks a veterinarian to take Oakes' own concoction and "throw my stuff in a set of [horses'] knees." This drug was described *not* as red acid, but as Oakes' personal concoction simulating that drug. (*Id.* at 80).

- A March 10, 2019 call in which Oakes directed an underling to retrieve a large number of "bleeder" pills ("grab like 30"). (*Id.* at 85).

- A March 11, 2019 call in which Oakes discusses "blood shots," *i.e.*, blood building performance enhancing drugs, to specific horses, including "Rockstar Angel." Oakes directed his underling: "We should probably, uh, get some blood shots into those fucking things [*i.e.*, the horses ostensibly under Oakes care] tomorrow, too." (*Id.* at 85).

With respect to the March 19 Affidavit, Oakes points to the purported "omission" of a

discussion regarding a drug that Oakes notes, consistent with the Government's own disclosure

in a periodic report on the ongoing wiretap, that the drug in question can be legitimately

administered. (Oakes Wiretap Mot. at 21-22). The importance of this fact to Oakes, and its

purported materiality, is obscure. The mere fact that Oakes occasionally *also* administered drugs

that can, under some circumstances, be legitimately administered, does not bear on whether

probable cause existed to find that Oakes was also obtaining, distributing, and abusing drugs that were intended to be untestable, illegal performance enhancing substances through which he would defraud others of money, or assist others in so doing. As with the February 14 Affidavit, the March 19 Affidavit easily satisfied a probable cause finding that Oakes was using the Oakes Phone to communicate with others regarding obtaining, distributing, and concealing the abuse of various performance enhancing drugs, and that Oakes and others did so with the intent of defrauding others of money through false statements and pretenses regarding that practice.

ii.    Alternative Investigative Techniques Were Adequately Addressed In the Oakes Wiretap Applications

Oakes, like the other movants, claims that the February 14 Affidavit and the March 19 Affidavit made insufficient showings regarding the availability of alternative investigative techniques. For largely the same reasons set forth above in the Government's response to Seth Fishman's motion, Oakes' argument on this point lacks merit. The Oakes affidavits provided the reviewing District Judge with extensive details regarding the investigative steps taken up to the time of the respective applications, and a detailed discussion of the likelihood that alternative investigative techniques would fail to achieve the goals of the overall investigation.

Contrary to Oakes' motion, (Oakes Wiretap Mot. at 24), each of the affidavits discussed the limitations on confidential sources, including the confidential source originally identified as CS-4, (*see* February 19 Affidavit ("Even were a source to approach FISHMAN or OAKES to arrange such a purchase, that sale would not illuminate the broader network of supply and distribution into which FISHMAN and OAKES fit."); *see also* March 19 Affidavit at 91 (same); Oakes Wiretap Mot. at 24). The notion that illicit drug sales could be instantly revived by a confidential source without arousing suspicion does not comport with the "common sense" and practical approach by which the reviewing Judges were obliged to assess these applications. Nor

is it remotely plausible that the Government can simply approach co-conspirators in the hope that they will quietly and effectively "flip" on the very people with whom they are committing crimes. (*See* Oakes Wiretap Mot. at 24 (suggesting that the FBI ought to have recruited Oakes' co-conspirator)). None of Oakes' remaining arguments fare any better. For example, in the context of investigating untestable drugs that are being actively concealed from investigators and racetracks, simply relying on drug testing by the defrauded racetracks was obviously an ineffective method of investigation, for the reasons discussed above regarding the limitations of drug testing. (*See* Oakes Wiretap Mot. at 24).

Finally, the March 19 Affidavit does not contain the omission regarding confidential sources about which Oakes speculates. (*Id.* at 25). Specifically, the "CS-4" referred to in the February 14 Affidavit, and in all portions of the March 19 Affidavit *except* one portion on page 92 of that affidavit, is the licensed veterinarian with historical information about Fishman, Oakes, and others, as described in that affidavit. (*See* March 19 Affidavit at 19). On page 92 of the March 19 Affidavit, a separate source, who is described as having been recently recruited and cooperating with the investigation for reasons different than those disclosed as to CS-4, was mistakenly *also* denoted "CS-4" in the same application (in subsequent applications, this source is referred to as "CS-5," and is the CS-5 discussed above). Oakes makes a vague, unsubstantiated claim the Oakes Wiretap Motion that this second source was in unspecified ways "involved" in "helping" Oakes train horses. (Oakes Wiretap Mot. at 25). That unsworn, nonspecific claim is obviously insufficient to carry Oakes' substantial burden of showing an intentional or reckless omission of a fact that, had it been disclosed, would have been likely to impact Judge Stein's review of the March 19 Affidavit. Moreover, the individual with whom Oakes held a conversation on March 1, 2019, as reflected in Exhibit 9 to Oakes' motion and cited in this

132

portion of Oakes brief, *was not a confidential source*. It appears that Oakes' argument is based on a misidentification of the confidential sources.[54]

### iii.    No Basis to Suppress the Fruits of the 2019 Oakes Barn Premises Search

Oakes further moves to suppress the fruits of both searches of his barn, the first of which occurred surreptitiously in or about March 2019, the second of which occurred in connection with Oakes' arrest in or about March 2020.[55]  Oakes claims that each search warrant is deficient because each lacks probable cause insofar as there is no proof that the drugs in question, obtained from a veterinarian, were improperly obtained or administered, and that the affidavits further make material omissions insofar as they do not adequately explain applicable racing rules.  (*Id.*).  Oakes further seeks suppression of the initial March 2019 search on the basis of various perceived flaws with delaying notice of the warrant.  (*Id.* at 24-30).  Each ground is baseless.

Oakes first challenges the affidavit seeking a covert search of his barn area to collect samples of certain drugs and conduct blood draws of horses located in Oakes' barn area.  (*See* Oakes Mot. Ex. 1 (March 13, 2019 Search Warrant Application for Search of Oakes' Barn (the "2019 Oakes Barn SW"))).  Oakes' chief complaint is that the affidavit fails to establish that Oakes was dealing in "prohibited substances," and that the recitation of the applicable rules withheld material information (an argument largely repeated in the Oakes Wiretap Motion).

---

[54] Even assuming that this person were a source, and assuming the truth of Oakes' unsworn assertion that he had then-current access to Oakes' training facilities and access to Oakes' doping practices, the likelihood that this individual (friendly to Oakes and without apparent connection to Fishman, Navarro, or others) would have been in a position to achieve the goals of the investigation is approximately zero.

[55] Oakes, like Fishman and Garcia, neglected to include a sworn affidavit stating his privacy interest in the searched premises.  To the extent Oakes intends to deny his connection to the premises, he lacks standing to contest these searches.

(Oakes Mot. at 12-19).  To the contrary, the 2019 Oakes Barn SW set forth the following

regarding Oakes' use of prohibited substances:

- "In or about 2014, the Pennsylvania Harness Commission banned OAKES from racing for a period of time after one of the horses under OAKES's care tested positive on a drug test."  (2019 Oakes Barn SW at 7).

- A confidential source was offered an opportunity to purchase performance-enhancing drug by Seth Fishman, and was told by the third party that Oakes and Navarro used Fishman's performance-enhancing drugs.  (*Id.* at 9).

- A January 25, 2019 call in which Navarro solicits from Oakes a drug for a horse that "ties up," requesting something similar to an injectable "amino acid"-based product Navarro had received previously.  Oakes also offers to provide Navarro with an untestable "drench"[56] comprised of amino acids (among other things), that will be undetectable in a drug test even if administered on race day ("zero chance you get caught").  (*Id.* at 14-15).

- A February 10, 2019 call between Oakes and Navarro in which they discuss obtaining various bottles of products, including those obtained through veterinarians, but does not discuss them in the context of treatments; rather, they discuss these products' effects on horses as being variously "really, really good," of the type that "makes the blood that makes them stretch," "stronger now and better" than "red acid," which Navarro previously used.  (*Id.* at 16-17).

- A February 19, 2019 call in which Oakes and Seth Fishman discuss Oakes providing Navarro with "VO2 Max,"[57] originally supplied by Seth Fishman, but which Oakes had altered by removing the label and cap, so that Navarro would not know its source.  (*Id.* at 18-19).

- A March 10, 2019 call in which Oakes and another individual discuss "a whole bunch of drenches" in the "medicine room" of Oakes' barn.  (*Id.* at 20).

---

[56] The Oakes Motion claims that the affidavit unfairly casts Oakes in a negative light, pointing to the discussion of "drenches" as one indication of this.  (Oakes Mot. at 17).  As with many other of Oakes' arguments, this ignores the intercepted conversation between Oakes and Navarro in which Oakes brags that his drench is untestable on drug tests.  While the method of "drenching," like injecting a legal drug for therapeutic reasons, can be innocuous, (*see* 2019 Oakes Barn SW at 17), that is not the subject of Oakes and Navarro's discussions.

[57] The Oakes Motion need not have pointed out that "VO2 Max" is the measure of blood oxygenation, as this point was made in the affidavit.  (2019 Oakes Barn SW at 16).  It is apparent from the conversation that they are discussing a product that Seth Fishman supplies.

- A March 10, 2019 call in which Oakes and another individual discuss various medications, including "three of the yellow, you know the amino fucks" and "a big bag of the bleeder pills." (*Id.* at 21-22).

- A March 11, 2019 call in which Oakes discussing entering two horses into races on Friday (March 15) at the Yonkers racetrack. (*Id.* at 22-23).

- A March 11, 2019 call in which Oakes and another individual (who does not appear to be a veterinarian) discusses the two horses scheduled to race and discusses giving them "blood shots" after they "train on Wednesday" (March 13, *i.e.*, two days before the race) and whether one of the horses "might really fucking blow up" because she has never received any drench or blood shot. They then discuss providing that horse with "the pills," and their prior administration of a drench to one of the horses. (*Id.* at 23-24).

The Oakes Motion then picks at the margins of the affidavit, protesting that had certain information been included, it would have undermined probable cause. For example, Oakes claims that "the affidavit attempts to connect Mr. Oakes . . . to Nick Surick," although "[t]here is no indication in the affidavit" that Mr. Oakes was aware of Surick's practices. (*Id.* at 12-13). Oakes' complaint fails to distinguish between probable cause as to the conspiracy *as a whole*, and probable cause as to Oakes and his barn in particular. Oakes' connection to Navarro, who was actively engaged in assisting Surick and others in doping horses, is not overstated or misrepresented.[58] Oakes points to the same call reflecting his and Navarro's "mutual disdain" for Surick, described above. (2019 Oakes Barn SW at 14-15). Given that no allegation is made in the affidavit that Oakes and Surick had direct dealings, and given the affiant's affirmative

---

[58] The Oakes Motion mentions that the affidavit describes "intercepted phone calls between Surick and Navarro from over a year ago" in connection with the 2019 Oakes Barn SW. (Oakes Mot. at 12). This is presumably an error, as there were no wiretaps of Surick or Navarro's cellphones until in or about October 2018, several months before the March 2019 search of Oakes' barn. As to the affidavit's inclusion of Surick and Navarro's discussion of a shockwave machine, again, the affidavit did not overstate the substance of their conversations, and cited to the New Jersey rule prohibiting "shocking" horses within 10 days of a race. (2019 Barn SW at 11 n.8). No misrepresentations or omissions were made.

representation that Oakes did not care for Surick, a longer discussion of the call would have been immaterial to the probable cause determination. This is particularly so because Surick's inclusion in the affidavit was not in service of providing probable cause as to Oakes directly, but to show the extent of the conspiracy, its means and methods, its participants, and to explain the atypical request to surreptitiously search Oakes' barn and conduct blood draws on two of his horses with the aid of a veterinarian, given that such a technique—covertly drawing blood from a horse—had been successfully attempted as part of the same investigation. The inclusion of details regarding Surick were, at worst, irrelevant to the Court's probable cause determination and, fairly read, supported probable cause of the existence of the conspiracy.

Second, Oakes objects that the description of the New York racing regulations was not fulsome enough, and did not account for a sufficient number of definitions and exceptions enumerating substances that "can even be administered right before a race" or "doping agents" that may be administered pursuant to "a valid therapeutic, evidence-based treatment plan." (Oakes Mot. at 14 (citing 9 N.Y.C.R.R. § 4043.12)). This argument turns on its head what the New York racing regulations permit and restrict; including a full description of the prohibitions under New York's rules would have made no difference and, consequently, any omission is immaterial.[59] It is not the case that, in New York, any drug may be administered to a racehorse unless specifically prohibited "or only at certain times before a race." (Oakes Mot. at 14). In the days and hours before a race, only enumerated substances may be administered and even then,

---

[59] The 2019 Oakes Barn SW describes only the New York regulations applicable to thoroughbred horses, and not those applicable to standardbred horses as well. This is not material; as discussed herein, even had the agent described the New York regulations applicable to standardbred horses, it would still support probable cause to conduct the search, and Oakes' representations regarding the applicable drug regulations is inaccurate.

pursuant to certain restrictions. 9 N.Y.C.R.R. § 4120.2(b). *And* there are certain substances that are "prohibited at any time," including "any substance . . . that is capable of abnormally enhancing the oxygenation of body tissues." 9 NYCRR § 4120.17(c). Significantly, the only substances that may be administered on "race day" are "topical applications" that do not contain "drugs" and "antibiotics, vitamins, electrolytes, and other food supplements . . . so long as they do not contain any other drug or by their nature, exhibit drug-like actions or properties." 9 NYCRR § 4120.2(a). Even had these specific prohibitions been included, the issuing judge fairly concluded that Oakes was discussing prohibited substances based on the context of Oakes' discussions; Oakes' protestations that the affidavit did not go far enough to explicitly link the discussed drugs to the New York rules ignores the reasonable interpretation of the intercepted calls, and leans on innocuous interpretations that may be spun by Oakes today, but were not required of the issuing judge. *See Fazio*, 2012 WL 1195157, at *9.[60]

    iv.    <u>No Basis to Suppress the Oakes Premises Search Warrants for Delaying Notice</u>

Oakes further challenges the 2019 barn search on the basis that the search warrant did not cite to an additional statute authorizing delayed notice and was thus technically deficient, and that notice was delayed too long. The argument is meritless.

---

[60] For that same reason, there was no error in omitting mention of the *possibility* that these drugs were lawfully provided by a veterinarian, as there is no indication from the calls that this was the case. In any event, the affidavit did mention that Oakes was receiving drugs from at least one veterinarian, and it was nonetheless clear that these were *not* medications being lawfully prescribed as part of a valid therapeutic treatment plan, so no discussion on this point was required, as discussed above. Similarly, Oakes is incorrect that the laboratory results obtained as a result of conducting the search and blood draws validate Oakes' theory that his horses received no prohibited substances. Oakes boasted that the substance he administered to those horses were untestable. Laboratory results showing that, in fact, no substances screened for by the test were detected is wholly consistent with Oakes' own claims over intercepted calls. This argument also ignores the application of New York racing regulations, which prohibit administration of prohibited substances, irrespective of whether the substance is detectable on a drug test.

Federal Rule of Criminal Procedure 41 provides that notice of a search may be delayed if "authorized by statute." Fed. R. Crim. P. 41(f)(3). 18 U.S.C. § 3103a(b) allows for notice to be delayed up to thirty days after a warrant is executed "or on a later date certain if the facts of the case justify a longer period of delay" if "the court finds reasonable cause to believe that providing immediate notification . . . may have an adverse result" as that term is defined in section 2705. 18 U.S.C. § 3103a(c) permits extensions of the period of delayed notification up to 90 days "for good cause shown."

"The Second Circuit has declined to engraft a notice requirement onto the Fourth Amendment separate and apart from Rule 41." *United States v. Scully*, 108 F. Supp. 3d 59, 88–89 (E.D.N.Y. 2015) (citing *United States v. Pangburn,* 983 F.2d 449, 455 (2d Cir. 1993) ("We prefer to root our notice requirement in the provisions of Rule 41 rather than in the somewhat amorphous Fourth Amendment "interests" concept developed by [*United States v. Freitas,* 800 F.2d 1451 (9th Cir.1986).]" "The Fourth Amendment does not deal with notice of any kind, but Rule 41 does.")). "'The prevailing view among federal courts is that the Fourth Amendment does not invalidate the delayed notice aspect of such warrants.' " (*Id.* (quoting *In the Matter of the Application of the U.S. for a Warrant Authorizing,* No. 14–MJ–8116 (TJJ), 2015 WL 667923, at *8 (D. Kan. Feb. 13, 2015)). And with respect to violations of Federal Rule of Criminal Procedure 41, "in the absence of a showing of intentional disregard of the requirement or of prejudice, [the Second Circuit] will not suppress evidence gained under a warrant that does not provide for the proper notice." *Pangburn*, 983 F.2d at 449–50; *see also United States v. Cardona,* No. 14–CR–314 (RA), 2015 WL 769577, at *7 (S.D.N.Y. Feb. 24, 2015).

The Oakes Motion points to the form search warrant order that authorizes delayed notification for up to thirty days, claiming that because the standard text on that form order refers

138

to the statutory citation in defining "adverse result," but does not specifically cite to § 3103a (even as it echoes the statutory language), it is deficient.  (Oakes Mot. at 25 (citing 2019 Oakes Barn SW at 1)).  To the contrary, a Court may make the requisite finding justifying delayed notice, without including the statutory citation itself.[61]  Oakes willfully misinterprets the purpose of the citation (which, appropriately, cites to Section 2705 to provide a definition of "adverse result," which follows the cross-reference in Section 3103a itself).  Oakes further ignores the separate application seeking delayed notice, which references and cross-references the same statutes Oakes cites, and the Court's subsequent order in reliance upon that application, finding delayed notice appropriate for a period of 30 days.  (2019 Oakes Barn SW at 34-37).

Oakes also challenges the orders extending the period of delayed notice, on the grounds that the orders did not make requisite findings (which they did, including with statutory citations), (*see* Oakes Mot. Ex. 4), and that the applications do not present sufficiently updated reasons warranting delayed notice. Oakes' arguments regarding the Court's findings in each of the extension orders misconstrues what is required by statute: a judge need not elaborate his or her reasoning for granting the delayed notice, so long as the order makes the requisite findings. Each order did just that.  With respect to the underlying applications, as with T-III wiretaps, the repetition of the reasons justifying delayed notice in each of the applications submitted by the Government to the Court are similarly no basis to suppress the fruits of the search, given that the

---

[61] The language on the face of the search warrant (in a form employed by the Department of Justice and courts across the country) states as follows: "I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized . . . for 30 days."  (2019 Oakes Barn SW at 1).  Consequently, the Court explicitly made the requisite finding, and the finding was supported by the application submitted to the issuing judge. Thus, the (dated, out-of-district) cases on which Oakes relies are inapposite.  (*See* Oakes Mot. at 27).

reasons warranting delayed notice had not changed—chief among them, the fact that Oakes was still under investigation, he and other Target Subjects had not yet been arrested, and notice would alert him and others to the Government's investigation and perhaps to confidential sources, thereby jeopardizing the Government's ongoing investigative efforts. *See, e.g.*, *United States v. Levy*, No. 11 Cr. 62 (PAC), 2012 WL 5830631, at *6 (S.D.N.Y. Nov. 16, 2012), *aff'd*, 626 F. App'x 319 (2d Cir. 2015) (discussing the permissibility of using repetitive language in a wiretap affidavit where the factual justification had not changed).

Finally, the length of time in which the Government sought delayed notice is, likewise, no basis for suppression, as the Second Circuit has set no time limitations on notice for covert searches, remarking only that it "must be given at *some* point after the covert entry," *id.*, so long as extensions of notice delay are authorized by the Court (which they were here). Given that the Government's investigation was ongoing, active, and not known to Oakes or the majority of the Target Subjects under investigation, delayed notice was warranted for the period of time in which it was withheld.[62]

Oakes' flimsy arguments make abundantly clear that there was no "intentional disregard" of the notice requirement given that initial and extension delayed-disclosure orders were sought by the Government and granted by various judges. Oakes does not dispute this. Nor is there any prejudice to Oakes, as the search and seizure would have "taken place in exactly the same way," irrespective of the grant or denial of the initial search, or the delayed notice applications

---

[62] Oakes' contention that the negative laboratory test results should have been included in the applications seeking a further delay of the notice requirement is an overreach. Delayed notice was premised on the Government's continued, covert investigation, which was not known to Oakes or to other Target Subjects. Under these circumstances, and irrespective of each fact uncovered in the course of the Government's investigation, delayed notice was warranted.

submitted by the Government. *Id.* at 453.

     v.          <u>No Basis to Suppress the Fruits of the 2020 Oakes Barn Premises Search</u>

Oakes seeks to suppress the fruits of the March 9, 2020 search of his barn, yet fails to address the substance of the search warrant affidavit itself. (*See* Oakes Mot. Ex. 2 (February 28, 2020 Search Warrant Application for Search of Oakes' Barn (the "2020 Oakes Barn SW"))). Importantly, the 2020 Oakes Barn SW includes among the enumerated subject offenses violations of the FDCA, which places additional, and different, emphasis on the scope of conduct relevant to the probable cause determination. (2020 Oakes Barn SW at 13).[63] This casts the inclusion of certain facts in the 2020 Oakes Barn SW affidavit in a different light; for example, in one intercepted call wherein Oakes discusses re-distributing a Seth Fishman product to Navarro after "remov[ing]" the label, that act itself results in the product being misbranded in yet another manner, on top of the many ways in which the drug was already adulterated and misbranded by Seth Fishman. (2020 Oakes Barn SW at 16, 23-24. The 2020 Oakes Barn SW further discusses: (1) Oakes' ban from racing after one of his horses tested positive on a drug test, (*id.* at 16); (2) Oakes' so-called "untestable" drench, (*id.* at 16, 20-21); (3) a call between Navarro and Tannuzzo in which Navarro states that Oakes "loves" a particular generic blood builder that, unlike Epogen, will not show up positive on a drug test, (*id.* at 19 ("they can't find anything")); (4) Oakes and Navarro, in a series of calls in early February 2019, discussing various products, and Oakes agreeing to covertly provide Navarro with an unnamed product immediately before Navarro's horse, XY Jet, was scheduled to race, (*id.* at 21-22); (5) a

---

[63] For clarification, the pagination refers to the pagination of the entirety of Exhibit 2 to the Oakes Motion, and not the pagination that appears in the body of any individual document within that exhibit.

conversation between Navarro and Zulueta discussing Oakes' drench, which is described as "a milkshake that he makes that won't show up," and which Navarro described as "[t]he day of the race, the day of the race . . . Marcos I drenched two today and he says you can take their blood and nothing will come out," unlike other drenches where "they catch you," (*id.* at 23)).  There was undoubtedly sufficient probable cause on the basis of these calls.

The Oakes Motion makes the additional point that the 2020 Oakes Barn SW was apparently deficient for failing to mention that the blood draws of two horses collected from the 2019 search of Oakes' barn returned negative tests for prohibited substances.  (Oakes Mot. at 20).  Oakes has failed to meet the high bar of demonstrating, a deliberate or reckless omission, or that the statement is material to the probable cause finding.  *See Franks*, 438 U.S. at 155-56, 170-71.  As discussed at length above, *see supra*, Part II.A.ii, because Oakes—like Seth Fishman— was known to distribute and use drugs touted as undetectable on drug tests, it is unsurprising that horses administered these drugs would, naturally, not test positive on drug tests.  Had the affiant included this fact in the affidavit, it would not have impacted the probable cause finding, particularly as to a FDCA violation,[64] given the number of intercepted calls described in the affidavit wherein Oakes and others discussed Oakes' possession and/or use of drugs that would evade drug tests.

Oakes makes the final point that the intercepted calls enumerated in the affidavit were stale, and thus no search of Oakes' barn was required.  However, the affidavit did discuss recent

---

[64] Contrary to Oakes' argument, it was unnecessary to include in the affidavit a more precise statute by statute discussion of *how* his drugs were misbranded or adulterated, given the content of the prior intercepted conversations, and given the fact that including more description as to the FDCA provisions violated would not have changed the affiant's conclusion or the probable cause determination

points of contact between Seth Fishman and Oakes, establishing probable cause for the search. (2020 Oakes Barn SW at ¶ 19.c., d.). In any event, and for the same reasons discussed in response to the Garcia Motion, this argument, too, fails. *See supra*, Part II.D.iv.a; *see also Wagner*, 989 F.2d at 75 ("Facts of past criminal activity that by themselves are too stale can be sufficient if the affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." (citing *Fama,* 758 F.2d at 838; *Barlin,* 686 F.2d at 87–88)).[65]

## CONCLUSION

For the foregoing reasons, each of the defendants' motions to suppress should be denied.

Dated:  New York, New York
          September 2, 2021

                                      Respectfully submitted,

                                      AUDREY STRAUSS
                                      United States Attorney

                         By:    __/s/_____
                                      Andrew C. Adams
                                      Sarah Mortazavi
                                      Anden Chow
                                      Assistant United States Attorneys
                                      Southern District of New York
                                      (212) 637-2340/2520/2348

---

[65] Throughout the investigation, the Government sought and obtained numerous judicial orders authorizing searches and seizures, only certain of which are now challenged in the defendants' motions here. With respect to the challenged warrants, for the reasons set forth above, the findings by the prior District Judges and Magistrate Judges should not be disturbed. However, should the Court find that any of the warrants or intercept orders, including the 2019 and 2020 Oakes barn searches, were issued without probable cause, suppression remains inappropriate because the Government acted on a good faith basis having obtained the warrants. The defendants have failed to make the requisite showing that the process of obtaining the warrants was tainted by impropriety nor that the agents' reliance upon the warrants was unreasonable and therefore the resulting evidence should not be suppressed. *See Leon*, 468 U.S. at 922.

143