

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 15, 2021

**VIA ECF & E-MAIL**
The Honorable Mary Kay Vyskocil
United States District Court
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

    Re:    <u>United States v. Michael Kegley</u>, S7 20 Cr. 160 (MKV)

Dear Judge Vyskocil:

    Michael Kegley ("Kegley" or the "defendant"), for years served as the Director of Sales for a Kentucky-based company, Medivet Equine ("Medivet"), that marketed and sold an adulterated and misbranded performance-enhancing drug ("PED"), SGF-1000. Kegley was not a doctor, veterinarian, pharmacist, laboratory technician, or licensed professional. (*See* Probation Office Final Presentence Investigation Report ("PSR") at ¶¶ 38, 125, 126). Yet Kegley participated in the marketing, labeling, and sale of SGF-1000 to members of the public, including through in-person sales to non-veterinarians. SGF-1000 was misbranded and adulterated in a number of ways, including because: (1) it was not approved by the Food and Drug Administration ("FDA") for distribution; (2) it was not manufactured in a registered facility; (3) the labeling for the drug was deficient and misleading[1]; and (4) it was distributed without any valid prescription issued in the course of a veterinarian's professional practice. Notably, Kegley and his co-conspirators did not know the precise contents of SGF-1000 until at least in or about August 2019—years after Medivet had started marketing and selling the drug—but believed that no matter the component parts of the drug,[2] it would enhance a horse's performance (justifying the over $200/bottle price tag), and be untestable on standard drug tests.

---

[1] Among other deficiencies, the labeling for the drug lacked directions for use or ingredients, which are otherwise required by the FDA for approved drugs. Most significantly, and as discussed below, the labeling for SGF-1000 was deliberately altered to specifically evade regulatory attention after SGF-1000 became the subject of scrutiny by racing authorities in New York.

[2] In September 2019, individuals involved in Medivet (though, to the Government's knowledge, not the defendant), conveyed partial results of Medivet's own recent testing of SGF-1000 in an effort to convince the Racehorse Medication Testing Consortium ("RMTC") to "delist" SGF-1000 as a prohibited substance. The information Medivet representatives provided to the RMTC *excluded* portions of the original drug test results reflecting a cocktail of substances contained in SGF-1000. On August 8, 2019, a Medivet representative received a report from Industrial Laboratories reflecting a negative finding (at that time) for certain growth factors, and detection

Kegley's Stipulated Guidelines Range is 30 to 36 months' imprisonment. Probation recommends a sentence of 12 months' imprisonment. (PSR Sentencing Recommendation at 32-34). For the reasons explained herein, the Government respectfully asks that the Court sentence Kegley to a term of imprisonment within the low-end of the Stipulated Guidelines Range. The Government contends that such a sentence will appropriately balance the defendant's timely acceptance of responsibility and his relative culpability as compared to other defendants, as well as the nature and seriousness of his offense conduct, and the need to promote respect for the law, provide just punishment for the offense, and afford adequate general deterrence.

I.  **Offense Conduct**

Kegley, as Director of Sales for Medivet, assisted in marketing and selling SGF-1000 online and in-person, in conjunction with veterinarian and Medivet affiliate Dr. Kristian Rhein. They both extolled the performance-enhancing benefits of the drug to racehorse trainers, specifically. Up until the fall of 2019, marketing material for SGF-1000, which was at times provided to purchasers, and which was likewise available on Medivet's website, emphasized the potent effects of SGF-1000. (*See* Exhibits A-1 and A-2). SGF-1000 was touted as "an innovative formulation consisting of Regenerative Proteins, Cytokines, Peptides, *potent Growth Factors* and Signaling Molecules derived from Ovine Placental Extract." *Id.* (emphasis added). It was further described as similar to a "vasodilator" that would "increase [] stamina, performance, and overall health." *Id.* The materials even listed the growth factors that were purportedly found in SGF-1000, including fibroblast growth factor and hepatocyte growth factor. Of course, many jurisdictions prohibited the use of such growth factors on racehorses, particularly where the growth factors are component parts of drugs that are not approved by the FDA, and administered solely to improve a horse's recovery and race performance.[3]

---

of, among other things, low levels of acepromazine, levamisole, detomidine, pyrilamine, lidocaine, MEGX, xylazine, and caffeine; Medivet's reaction was to request that the negative and positive findings be split into two separate reports. On September 10, 2019, Medivet, through counsel, conveyed the *negative* findings to the RMTC, while withholding the positive findings. As of October 14, 2019, Medivet had learned that a subsequent test of SGF-1000 *did* result in findings reflecting the presence of a specific growth factor.

[3] *See* Association of Racing Commissioners International's Model Rule ARCI-011-015 Version 7.0 (approved December 9, 2016), *available at* https://www.gaming.ny.gov/pdf/legal/ARCI%20Prohibited%20Substances%20List%20Version%207.0%20(2016-12-09).pdf (prohibiting "[A]ny pharmacological substance that is not approved by any governmental regulatory health authority for human or veterinary use" as well as several of the growth factors listed as those contained in SGF-1000); Association of Racing Commissioners International's Model Rule ARCI-011-015 Version 9.1 (approved December 9, 2016), *available at* https://www.arci.com/wp-content/uploads/2019/09/Model_Rules_MASTER_V9.1AUGUST2019.pdf (same); *see also* 9 N.Y.C.R.R. §§ 4043.12(c)(5), 4043.16 (listing as prohibited certain substance that may not be used unless administered in a "time, place and manner specifically permitted in writing by the [New York Racing] commission" and must be "for a recognized therapeutic use." Further, any drug administered during training must be done pursuant to a valid veterinarian-client-patient

By bypassing the rigorous drug approval and registration process required under the Food Drug and Cosmetic Act ("FDCA"), Medivet reaped millions of dollars in revenue; unlike legitimate drug manufacturers, Medivet spent no funds on studies to demonstrate to the FDA the safety and efficacy of SGF-1000, compliance measures to ensure that SGF-1000 was manufactured consistent with good manufacturing practices, or engagement with the FDA to ensure that the labeling of SGF-1000 was factual and not misleading.

Despite the advertised effects of, and ingredients in, SGF-1000, the drug's appeal was rooted in the fact that it was undetectable in a horse's system through standard drug screens used in the racing industry, which Rhein repeatedly touted when discussing the drug. (*See* Exhibit B at 2, 3, 4 (intercepted call in which Rhein described SGF-1000: "They don't even have a test for it."; "There's no test for it in America."; "There's nothing that you did that would test."; "I got guys going through FEI testing . . . And they go right through the box for FEI and it's far stricter than anything we got"); *id.* at 4 (Rhein: "it's untestable"; "Put it this way, they have no test period . . . .")).[4] Thus, Kegley and his co-conspirators aimed to evade racing regulators while still generating millions of dollars in revenue for the illicit sale of SGF-1000, which cost hundreds of dollars for a single bottle.

Notably, beginning at least in June 2019, Rhein grew concerned regarding the potential for regulatory scrutiny of SGF-1000, and shared this concern with others at Medivet. On June 5, 2019, Jason Servis informed Rhein that Maximum Security had received a dose of SGF-1000 shortly before an unannounced drug test, and Rhein quickly reassured Servis that the drug would not test positive. The following day, Rhein and Servis resumed their discussions of SGF-1000, and Rhein noted his belief that "somebody squealed" regarding their use of that drug. (*See* Exhibit B at 4). A few weeks later, on July 9, 2019, Rhein and others affiliated with Medivet convened a conference call in which they discussed the potential for increased scrutiny of the drug. During that call, a participant mentioned that the federal government had prosecuted a racehorse trainer, Murray Rojas, for doping horses, citing it as an example of a case where drug use on racehorses had been pursued by governmental authorities beyond state racing commissions. (*See* Exhibit B at 8).

Following the drumbeat of events indicating heightened suspicion of SGF-1000, Rhein and Kegley strategized regarding the best way to divert people's attention away from SGF-1000. Rather than cease their sales of that drug, Kegley and Rhein instead discussed how they could

---

relationship after a veterinarian examines the horse, and "the veterinary judgments of the veterinarian" must be "independent and . . . not dictated by the trainer or owner of the horse."); *see also* 8:10 Kentucky Admin. Regs. § 21(2) ("Without the prior permission of the commission or its designee, a drug, medication, or substance that has never been approved by the [FDA] for use in humans or animals shall not be possessed or used at a location under the jurisdiction of the commission").

[4] The Government respectfully requests that Exhibits A-2, B, D and E be filed and maintained under seal, pursuant to the Court's Protective Order, as they contain non-public information that have been designated "Sensitive."

tweak the labeling of SGF-1000, so as to make it appear innocuous. (*See* Exhibit B at 11, 13 (Kegley: "You're right, it might help to re-brand it anyway"; "all we're gonna do is make up, make up a hundred boxes and a hundred labels for a trial and see what happens"; "we won't mention the word growth factor in any way shape or form"; "we can even put on the box, you know, dietary supplement for equine. That way it's not, no one even has to question if it's FDA approved or not it's strictly a supplement")).

In September 2019, Medivet's sales of SGF-1000 hit a significant hurdle: the New York Gaming Commission issued a notice in which it reiterated its longstanding prohibition against the use of growth factors and growth hormones on racehorses, but also specifically named SGF-1000 as a prohibited drug of the type that contained growth hormone or growth factors. (*See* Exhibit C). Kegley and Rhein continued to market and sell SGF-1000, however, consistent with their earlier conversation regarding rebranding the drug, Medivet altered the promotional material for SGF-1000 to divert attention and mislead anyone who was unfamiliar with the prior marketing materials description of SGF-1000. In Kegley's prior conversation with Rhein, he speculated that no one would notice the changes they planned to make to the description of SGF-1000 because "[i]t's not like we're putting it on a shelf at a pharmacy," (Exhibit B at 12), suggesting that Medivet could, with impunity, contort the drug's description and workshop different materials without any risk of getting caught. Rhein, Kegley, and their associates at Medivet did just that. Whereas the packaging and label for SGF-1000 in July 2019 described the drug as consisting of "regenerative placental proteins" that was "made in Australia," (*see* Exhibit D), by October 2019, the drug had been altered to remove any reference to Australia, and was instead described as a "homeopathic placental extract," (*see* Exhibit E). Likewise, by the time of Kegley and Rhein's arrests, the website for SGF-1000 had been scrubbed clean, removing any reference to growth factors, and much of the description regarding SGF-1000 itself. (*See* Exhibit F).

With full knowledge that SGF-1000 was banned in New York, that a racehorse trainer had been criminally charged for doping, *and* that law enforcement was beginning to scrutinize the use of SGF-1000 specifically, Medivet associates nonetheless continued to market and sell the drug, and Kegley and Rhein worked together and with others to deceptively label that drug, and to continue to sell the drug to those in the racehorse industry seeking a competitive advantage. In particular, Kegley directly sold this injectable drug to a non-veterinarian after he had reason to doubt the legality of distributing the drug as marketed.

In short, even after Kegley and others at Medivet had reason to pause and take stock of the illegality of SGF-1000, they nonetheless continued to sell the drug.

## II.   Procedural History

On February 26, 2020, a federal grand jury sitting in the Southern District of New York returned an Indictment charging 19 individuals, including the defendant, with engaging in various conspiracies to manufacture, distribute, and/or receive adulterated and misbranded PEDs intended for use on racehorses, and to secretly administer those PEDs to racehorses under the scheme participants' control, with the intent to mislead and defraud various people and entities, including federal and state drug and horse racing regulators. *United States v. Navarro et al.*, 20 Cr. 160 (MKV) (S.D.N.Y.). Kegley was charged in one count of participating in a conspiracy with Rhein,

veterinarian Dr. Alexander Chan, racehorse trainer Jason Servis, and assistant racehorse trainer Henry Argueta.

On July 23, 2021, Kegley pleaded guilty pursuant to a plea agreement with the Government to one count of substantive misbranding and adulteration of a drug, in violation of Title 21, United States Code, Sections 331 and 333. Kegley was the first defendant in *United States v. Navarro* to enter a change of plea in open court, and did so prior to filing any dispositive motions, and prior to learning of the Court's recent decision denying the defendants' various suppression motions.

### III.    The Presentence Report

The PSR calculates the defendant's offense level as 19, and his criminal history category as I, consistent with the parties' Stipulated Guidelines Range. (PSR ¶¶ 96, 99). The PSR, consistent with the plea agreement, finds that Kegley's sentencing Guidelines Range is 30 to 36 months' imprisonment given the statutorily authorized maximum sentence of 36 months' imprisonment. (*Id.* Page 32). The Probation Office recommends a sentence of 12 months' imprisonment, citing, among other things: (1) that Kegley "is amongst the first defendants to have pleaded guilty and accept responsibility for his actions" having entered a "timely guilty plea"; (2) that Kegley "appears to be remorseful and regretful"; (3) the lack of prior criminality; (4) serious cardiac and other medical issues that have required and will "require[] ongoing care"; (5) Kegley's relative culpability as compared to his co-conspirators and other convicted defendants charged in this matter; and (6) Kegley's compliance with pretrial supervision. (*See id.* Sentencing Recommendation at 32-34).

### IV.    Sentencing Factors

#### a. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### b. Discussion

As the Court is aware, the Government has carefully considered the relative culpability of the defendants who have pled guilty thus far and has endeavored to reach dispositions with Guidelines calculations that accurately and appropriately reflect the defendants' individual offense conduct and personal characteristics, their culpability relative to one another, as well as the timing of their acceptance of responsibility relative to the disposition of dispositive motions. The defendants who have pleaded guilty thus far in this matter and their stipulated Guidelines Ranges are listed below, accompanied by a brief summary of each defendant's offense conduct. This summary is provided for the Court's reference, but it of course does not purport to capture the totality of the relevant considerations for each defendant. In many cases, no PSR has yet been prepared or finalized for each defendant; thus, the summaries below are intentionally confined to enumerating general facts relevant to each defendant's offense conduct.

- Jordan Fishman (Guidelines Range of 12 to 18 months' imprisonment): Jordan Fishman, a drug manufacturer, assisted Seth Fishman in creating and manufacturing adulterated and misbranded performance-enhancing drugs ("PEDs") in his Massachusetts-based laboratory, for further distribution by Seth Fishman and Seth Fishman's sales representative, Lisa Giannelli. Jordan Fishman differs from Kegley in that Jordan Fishman personally produced adulterated and misbranded drugs for later distribution, created entirely new (illegal) drugs in conjunction with Seth Fishman (and at his direction), and was involved in the manufacture of a variety of different illegal drugs. Nonetheless, unlike Kegley, Jordan Fishman did not participate in the labeling or marketing of the drugs that were sold, did not solicit customers or otherwise engage with customers, and did not promote the drugs that he created and produced.

- Marcos Zulueta (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines Range is correspondingly adjusted to 30 to 36 months' imprisonment): Zulueta, a racehorse trainer, assisted Navarro in obtaining and administering performance-enhancing drugs for the purpose of doping horses, and exchanged tips with Navarro regarding new illicit drugs to administer to horses, and methods of administration. Zulueta not only procured illicit drugs, he personally administered them to the racehorses under his care and control. Although Zulueta, like other trainers, stood to personally profit from the improved performance of the racehorses he doped, Zulueta-trained racehorses (and, by extension, Zulueta) earned comparatively less

purse winnings than Navarro, and over the course of the conspiracy, Zulueta raced fewer racehorses than Navarro.

- Christopher Oakes (Guidelines Range of 46 to 57 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines Sentence is correspondingly adjusted to 36 months' imprisonment): Oakes, a racehorse trainer, procured adulterated and misbranded performance-enhancing drugs from Seth Fishman, re-distributed at least one of those drugs to Navarro, and produced his own drench that was purportedly untestable even when administered the day of a race, which Oakes administered to his own racehorses (those he owned and trained) and provided to Navarro. Oakes additionally assisted Navarro in surreptitiously administering drugs to one of Navarro's racehorses, "XY Jet," the day that horse was scheduled to race, by sneaking past racetrack security officials and concealing the true purpose of his entry into the racetrack and, specifically, into the barn area where "XY Jet" was housed. As with the other convicted racehorse trainers, Oakes was licensed—and was thus proficient in various racing rules prohibiting the use of PEDs—and personally administered drugs to the horses under his care and control.

- Kristian Rhein (Guidelines Range of 135 to 168 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines Sentence is correspondingly adjusted to 36 months' imprisonment): Rhein, a veterinarian and Medivet affiliate as described above, was a co-conspirator of Kegley's. Unlike Kegley, Rhein was a licensed veterinarian who predominantly treated racehorses; as such, Rhein was a more sophisticated actor than Kegley, and well-acquainted with the various legal regimes governing the sale and distribution of an adulterated and misbranded drug. Likewise, Rhein, unlike Kegley, personally administered SGF-1000 to racehorses, concealed bottles of that drug, instructed others to do the same, and falsely billed customers for SGF-1000 under a false billing code.[5]

- Jorge Navarro (Guidelines Range of 168 to 210 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines Sentence is correspondingly adjusted to 60 months' imprisonment): Navarro, a thoroughbred racehorse trainer, was a prolific doper of racehorses, utilizing multiple sources of supply for the PEDs he used, drawing from foreign and domestic sources, and soliciting drugs from both non-veterinarians and veterinarians alike. Navarro is notable for his aggressive pursuit of novel drugs to administer to the racehorses under his care and control. Moreover, as a trainer, Navarro personally profited from the improved performance of the racehorses he had surreptitiously and corruptly doped.

---

[5] Although Kegley claimed in a consensually recorded call to be aware that veterinarians engaged in the practice of false billing for SGF-1000, Kegley did not personally engage in this practice, nor was he in a position to facilitate this practice.

Turning to Kegley, the 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate general deterrence.

The Government believes that a sentence within the low-end of the Stipulated Guidelines Range is appropriate here, balancing Kegley's early and fulsome acceptance of responsibility, his medical issues, and his relative culpability as compared to other defendants, with Kegley's years-long participation in the conspiracy, the active role he played in both selling SGF-1000 and brainstorming the "re-branding" of the drug to evade law enforcement, and the damaging effects of widely supplying PEDs (including to laypeople). The Government acknowledges that Kegley, as Probation recognized, was among the first of the indicted defendants in this matter to admit his guilt. Moreover, Kegley has not sought to significantly diminish or distort the scope of the conspiracy, or his participation in it. Kegley's early admission of guilt and his contrition for having participated in these crimes are to be credited. The Government further notes that, based on the information available to the Government today, Kegley's poor health further distinguishes him from many, if not all, of the co-defendants in this matter, and further warrants some leniency.

Nevertheless, these mitigating factors are not dispositive of the Court's consideration of the appropriate sentence. A term of incarceration is needed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). Kegley participated in the conspiracy for years, contributing to Medivet's internal discussions regarding the online marketing of SGF-1000, and circulating promotional literature to purchasers, including to non-veterinarians. Kegley and his co-conspirators undertook these steps in the pursuit of millions of dollars of revenue from the sale of this drug, with little regard for the dangers inherent in marketing and selling an adulterated and misbranded drug. Although Kegley did not personally profit from the large volume of drugs sold through this venture, as Sales Director for the company, he was motivated to boost sales, and to avoid attracting law enforcement attention that could jeopardize the revenue generated by sales of SGF-1000.

Second, and as discussed above, when faced with increased scrutiny regarding the legality of SGF-1000, Kegley was not dissuaded. He instead partook in efforts to obscure the true purpose and nature of SGF-1000, while continuing to sell that drug to others. By design, Kegley and others at Medivet sought to make it even harder for law enforcement officers and regulators to investigate the purpose and use of SGF-1000. A significant sentence is warranted to provide just punishment for, both, the distribution of this unapproved, unregulated, and unknown drug, and for Kegley's efforts to thwart any scrutiny of this product, at a time when Kegley knew there was heightened attention regarding SGF-1000.

Third, in promoting and selling SGF-1000, Kegley ignored the risks involved in distributing drugs that were administered to animals without regard to the medical necessity of administering such drugs, (in many cases) without the oversight of a licensed veterinarian, and without seeking requisite FDA approvals to ensure that SGF-1000 was safe and effective. The distribution of unapproved, unregulated, and (in the case of SGF-1000 specifically) unknown drugs is pernicious. The only purpose for administering SGF-1000 was to artificially boost racehorse performance so that clients would win races, which would, in turn, motivate those clients

to continue buying the drug from Medivet. Circumventing the law to cater to the desires of racehorse trainers, who, in many cases, are acting not in the best interest of the animal, but rather to increase a racehorse's speed during races, with little regard for the dangers inherent in such actions, is wrong.

Finally, a substantial sentence is necessary to afford adequate general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Given the proliferation of websites that offer potent PEDs to those in the racehorse industry, similar to that operated by Medivet, a significant sentence is warranted to send a strong signal to others thinking of engaging in such criminality that there will be consequences for their crimes. Many actors in the racehorse industry have grown indifferent to, and dismissive of, the notion of obtaining illegal drugs to dope racehorses for profit, and assume that no serious ramifications will follow if they are ever caught. Suppliers of PEDs make their livelihood by stoking racehorse trainers' and racehorse veterinarians' desire to boost performance in order to gain a competitive edge without getting caught. A significant sentence will likewise counter any notion that selling and administering adulterated and misbranded drugs to racehorses is inconsequential, and that the criminal justice system is apathetic to such misconduct.

## Conclusion

The Government respectfully submits that a term of incarceration in the low-end of the Stipulated Guidelines Range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/_____.
    Sarah Mortazavi
    Andrew C. Adams
    Assistant United States Attorneys

cc: Scott Cox, Esq. (via ECF)